**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
lweaver@bfalaw.com
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Plaintiff Lucid Alternative Fund, LP*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LUCID ALTERNATIVE FUND, LP, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FIVE9, INC., MICHAEL BURKLAND, and BARRY ZWARENSTEIN,<br><br>Defendants. | Case No. 3:24-cv-08725<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

1        Plaintiff Lucid Alternative Fund, LP ("Plaintiff"), by and through its counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by Five9, Inc. ("Five9" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of Five9 conferences with investors and analysts; (iii) press releases and media reports issued and disseminated by the Company; (iv) analyst reports concerning Five9; and (v) other public information and data regarding the Company.

**NATURE OF THE ACTION AND OVERVIEW**

1.      This is a class action on behalf of all persons and entities that purchased or acquired Five9 securities, including call options, between June 4, 2024 through the close of trading on August 8, 2024, inclusive (the "Class Period"). Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) Five9, (ii) the Company's Chief Executive Officer ("CEO") Michael Burkland ("Burkland"), and (iii) the Company's Chief Financial Officer ("CFO") Barry Zwarenstein ("Zwarenstein").

2.      Five9 provides software for a cloud-based contact center. The Company's solutions are designed to enable Five9's clients to manage customer interactions through various channels, including voice, email, chat, and social media. The Company predominately generates revenue through subscriptions, primarily based on the number of named agents allowed to concurrently access Five9's solutions, usage, access to functionalities and applications, and professional services.

3.      This case concerns Defendants' misrepresentations regarding the purported strength of the Company's net new business bookings and visibility into its installed customer base. During the Class Period, Five9 stated its "net new business" experienced "very strong bookings momentum," was "knocking down some of the largest enterprise brands," and was "strong irrespective of the macro" environment. Five9 also touted its visibility into its installed

customers base, representing that the Company had "enough information in terms of our existing customers that are going live" such that Five9 would experience a positive inflection in its dollar-based retention rate ("DBRR") in the second half of the year.[1]

4.  In truth, when these statements were made, Five9 was in the throes of a "challenging bookings quarter" due to constrained and scrutinized customer budgets and sales execution issues, forcing the Company to cut its annual revenue guidance and take remedial action to address sales execution issues. Defendants also lacked sufficient visibility into their customer base such that Five9's statements with respect to the positive inflection in DBRR lacked a reasonable basis.

5.  The Class Period begins on June 4, 2024. On that day, before the market opened, the Individual Defendants participated in the Five9, Inc. at Robert W. Baird Global Consumer, Technology & Services Conference. During the conference, Defendant Zwarenstein discussed the Company's net new business and existing customer base, stating that the "macro really somewhat unusually just impacts what's in the [existing customer] base" and that the Company's net new business was "strong irrespective of the macro."

6.  During the conference, Defendant Burkland similarly touted the strength of Five9's business, stating that the Company was "knocking down some of the largest enterprise brands . . . the market's coming to us. And then again, in spite of that macro, the net new side of our business is very strong." Based on this, Burkland expressed his "confidence" that Five9 would achieve 16% revenue growth for the year. Defendant Zwarenstein similarly stated the Company had "enough information" from its existing customers' plans that the Company would see a positive inflection in DBRR in the second half of the year.

7.  On June 5, 2024, the next day, the Individual Defendants participated in the Five9, Inc. at William Blair Growth Stock Conference. During the conference, Defendant Zwarenstein touted the Company's "very strong bookings momentum on the net new side." And in response

---

[1] Five9's annual dollar-based retention rate measures the Company's ability to retain and grow revenue from existing clients by comparing recurring net revenue from the same client base over time.

to a William Blair & Company analyst asking whether there was a greater impetus for organizations to move from on-premise contact center solutions to the cloud, Defendant Burkland responded that it was "[a]bsolutely inflecting" and that the "best indicator I can talk about" was the "growth in our . . . net new logo bookings," touting that "quarter after quarter after quarter, we keep making records."

8. In contrast with these representations, on August 8, 2024, after market hours, Five9 released its second quarter 2024 financial results and held an earnings call that same day, whereby the Company cut its annual revenue guidance due to a "challenging bookings quarter" and "uncertain economic conditions." Defendants revealed customer budgets had been "constrained and scrutinized" and that "Q2 new logo bookings came in softer than expected[.]" Defendants also revealed sales execution "wasn't up to snuff" and announced remedial action to address sales execution and efficiency issues. As a result, the Company announced it was "no longer assuming" a DBRR inflection in the second half of the year.

9. On this news, the price of Five9 common stock fell over 26%, from $42.47 per share on August 8, 2024 to $31.22 per share on August 9, 2024, on unusually high trading volume.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Five9's headquarters is located within this District and Defendants conducted substantial economic activity in the District. As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14. Plaintiff is Lucid Alternative Fund, LP. Plaintiff purchased Five9 securities during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

15. Defendant Five9 is a Delaware corporation with its corporate headquarters and principal place of business in San Ramon, California. Five9's common stock trades on the NASDAQ stock exchange under the ticker symbol "FIVN."

16. Defendant Burkland is, and at all relevant times, was Five9's CEO and Chairman of the Company's Board of Directors.

17. Defendant Zwarenstein is, and at all relevant times was, Five9's CFO.

18. Defendants Burkland and Zwarenstein are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

19. The Individual Defendants, because of their positions and access to material non-public information available to them, knew the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

20. Five9 is a provider of cloud contact center software. The Company offers a comprehensive suite of applications delivered on its Virtual Contact Center, or VCC, cloud platform that is designed to enable Five9's clients to manage interactions through various channels, including voice, email, chat, and social media.

21. The Company provides its solutions through a software-as-a-service, or SaaS, business model with recurring revenue consisting of subscription revenue, based primarily on the number of agent seats (*i.e.*, the maximum number of named agents allowed to concurrently access the Company's solutions), and usage, based on minutes, as well as the specific functionalities and applications that Five9's clients deploy. Five9 also generates professional services revenue from assisting clients in implementing the Company's solutions and optimizing use.

**Materially False and Misleading Statements Issued During the Class Period**

22. The Class Period begins on June 4, 2024. On that day, the Individual Defendants participated in the Five9, Inc. at Robert W. Baird Global Consumer, Technology & Services Conference. During the conference, Robert W. Baird & Co. Inc. analyst William Power asked the Individual Defendants about the Company's "broader business" and "view of the macro environment," including "what you're kind of expecting through the balance of the year as you ta[lk] about sales cycles and [customers'] appetite to spend?"

23. Defendant Zwarenstein responded, stating that the Company's "net new business" was "strong irrespective of the macro" economic environment. In pertinent part, Defendant Zwarenstein stated:

> Before [I] actually respond to the macro, [I] want to make sure that everybody in the room understands that fundamentally under the hood, we have two businesses within Five9. ***We've got a net new business, new logos having to go from on-prem into the cloud and the second part is that existing base. And the macro really somewhat unusually just impacts what's in the base***.
>
> ***The net new, these are mission critical systems, there's no new vendors for the on-premise solutions and people have to get moving*** because, for example, just one of many, if you wanted to AI and automation, it's much, much easier to do it in the cloud than you can on the premise. ***So that part of the business is strong irrespective of the macro***.

24. Robert W. Baird & Co. Inc. analyst William Power also asked the Individual Defendants for an "update [] given the current climate and where we are here end of June [sic]. Just kind of what underpins confidence and you're getting to that 16% revenue growth for the year, given that requires an acceleration of growth in the back half of the year[.]"

25. Defendant Burkland stated that "*[t]he confidence comes from that net new logo win side of our business growth*, if you will, *we're knocking down some of the largest enterprise brands.*" Defendant Burkland went on to state:

> We talked about a Fortune 50 deal that we just closed in the quarter, $50 million ARR subscription revenue. That's just one of many deals. It's obviously the largest deal we've ever done, *but the market's coming to us. And then again, in spite of that macro, the net new side of our business is very strong*. We've got a strong backlog of bookings that haven't turned to revenue, and that's what gives us the confidence[.]

26. Defendant Zwarentstein continued, stating that the Company had "*enough information in terms of our existing customers that are going live to say . . . that we have a database retention rate that we expect to inflect upwards in the second half of the year*."

27. The next day, on June 5, 2024, the Individual Defendants participated in the Five9, Inc. at William Blair Growth Stock Conference. During the conference, William Blair & Company analyst Arjun Bhatia stated:

> I think the CCaaS [Contact Center as a Service] space is pretty unique because there is a big install base of on-prem contact center solutions. And now we have cloud that's been around for a while and we have generative AI that's taking off []. What are you seeing from that legacy installed base of customers that are at some of your competitors? Is there a greater impetus to move to cloud as a kind of steady state. What are you seeing from those customers?

28. Defendant Burkland responded, in pertinent part, stating: "It's a great question. *Absolutely inflecting. And the best indicators I can talk about are the growth in our bookings, our net new logo bookings*. We haven't quantified them exactly. *But we've told you quarter after quarter after quarter, we keep making records*."

29. Further, during the conference, William Blair & Company analyst Arjun Bhatia asked Defendant Zwarenstein regarding the Company's sales execution abilities and demand environment, stating in pertinent part: "can you talk about just what you're seeing now in terms of getting deals across the finish line? . . . are you still able to close deals on time, what's happening with sales cycles? Just gives some sense of what the demand environment looks like?"

30. Defendant Zwarenstein reiterated that the Company was "seeing very strong bookings momentum on the net new side," stating:

> Yes, when you look first at the net new business, we did see some elongation of sales cycles in part because of what Mike was talking about with the AI, what's happening to my data is going to see it is a private et cetera, **but that is returned to normal**. And for the reasons Mike also gave, **we are seeing very strong bookings momentum on the net new side**.
>
> These are mission critical systems they're not being enhanced beside maybe for security patches or bug fixes, what both of these or whatever, and you want to do AI and automation and where do you do AI and automation to do it in the cloud and on-prem [*sic*]. **And so we see very considerable momentum**.

31. Then, on June 12, 2024, the Individual Defendants participated in the Five9, Inc. at Rosenblatt Securities Technology Summit. During the summit, Rosenblatt Securities Inc. analyst Catharine Trebnick asked: "are you seeing any change in your sales on elongation or shortening of the sales cycle because there's more interest in AI from the buyers side and . . . how [do] you see that evolve in the next year?"

32. Defendant Burkland responded, in pertinent part, stating:

> There's offsetting factors here in terms of AI in sales cycles. And there again, the offsetting factors are -- these enterprise brands do need to look at the AI solutions from the various vendors, and it takes extra meetings to do that. And we love having those meetings. Obviously, we just talked about our leadership. So yes, we have more meetings. **But at the same time, there's an offsetting factor in that sales cycle**.
>
> **And that is the sense of urgency**, which has absolutely increased and it's increased for multiple reasons they want to get deployed with AI for one, but it's also there's a push. So there's a pull from AI in terms of urgency, but there's also a push from the legacy on-premise end-of-life announcements from some of our on-premise competitors that have, again, end of life, their on-premise solutions, **which is another great trend for us**.

33. The statements referenced in ¶¶23, 25-26, 28, 30, and 32 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) Five9's net new business was not "strong irrespective of the macro" and was, in fact, hampered by macroeconomic issues such as constrained and scrutinized customer budgets; (ii) Five9 was in the midst of a challenging bookings quarter due, in part, to sales execution and efficiency issues, and the Company was not "seeing very strong bookings momentum"; and (iii) Defendants did not have "enough information in terms of [their] existing customers that are going

live" such that the statements that Five9 would see a positive inflection in its dollar-based retention rate lacked a reasonable basis.

### The Truth Is Revealed

34. On August 8, 2024, after market hours, Five9 released its second quarter 2024 financial results. In pertinent part, the Company reduced its annual revenue guidance due to "recent bookings trends and the uncertain economic conditions." During the earnings call held that same day, Defendant Burkland revealed the Company "had a challenging bookings quarter" due to "constrained and scrutinized" customer budgets and sales execution issues, revealing that "sales execution, in my mind, wasn't up to snuff[.]" Defendant Burkland further announced remedial changes to address Five9's sales execution and efficiency issues.

35. During the earnings call, Defendant Zwarenstein revealed that "Q2 new logo bookings came in softer than expected" and that the Company was "no longer assuming" a dollar-based retention rate inflection in the second half of the year because of a "more muted seasonality in our service bookings[.]"

36. As a result of this news, Five9's common stock price dropped over 26%, from $42.47 per share on August 8, 2024 to $31.22 per share on August 9, 2024, on unusually high trading volume.

### LOSS CAUSATION

37. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Five9 securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on August 8, 2024, as alleged herein, the price of Five9 securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Five9 securities, including call options, during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**SCIENTER ALLEGATIONS**

38. As alleged herein, Defendants acted with scienter because Defendants knew that the public statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. As set forth elsewhere herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Five9, their control over allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Five9, participated in the fraudulent scheme alleged herein.

**CLASS ACTION ALLEGATIONS**

39. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Five9 securities, including call options, during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Five9 and their families and affiliates.

40. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of August 2, 2024, there were 74,736,098 shares of Five9 common stock outstanding, owned by at least thousands of investors.

41. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    A.    Whether Defendants violated the Exchange Act;

    B.    Whether Defendants omitted and/or misrepresented material facts;

    C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      D.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

      E.    Whether the price of Five9's securities was artificially inflated;

      F.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

      G.    The extent of damage sustained by Class members and the appropriate measure of damages.

42. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

43. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

44. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

45. Five9's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

46. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of Five9 who knew that the statement was false.

## PRESUMPTION OF RELIANCE

47. At all relevant times, the market for Five9's securities was an efficient market for the following reasons, among others:

      A.    The Company's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

      B.    As a regulated issuer, Five9 filed periodic public reports with the SEC;

  C. Five9 regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

  D. Five9 was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48. As a result of the foregoing, the market for Five9 securities promptly digested current information regarding Five9 from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of Five9 securities, including call options, during the Class Period suffered similar injury through their purchase of Five9 securities at artificially inflated prices and the presumption of reliance applies.

49. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

50. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Five9 securities at artificially inflated prices.

52. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Five9 securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Five9's business and revenue prospects, as specified herein.

54. During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business and revenue prospects, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

56. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Five9's securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

57. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

58. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against The Individual Defendants**

59. Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of Five9 within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Five9, the Individual Defendants had the power and ability to control the actions of Five9 and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

61. **WHEREFORE**, Plaintiff prays for judgment as follows:

    A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

62. Plaintiff demands a jury trial.

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

| | | |
|---|---|---|
| 1 | Dated: December 4, 2024 | Respectfully submitted, |
| 2 | | **BLEICHMAR FONTI & AULD LLP** |
| 3 | | By: */s/ Lesley E. Weaver* |
| 4 | | Lesley E. Weaver (Bar No. 191305) |
| 5 | | 1330 Broadway, Suite 630 |
| | | Oakland, CA 94612 |
| 6 | | Telephone: (415) 445-4003 |
| | | Facsimile: (415) 445-4020 |
| 7 | | lweaver@bfalaw.com |
| 8 | | -and- |
| 9 | | Javier Bleichmar (*pro hac vice* forthcoming) |
| 10 | | 300 Park Avenue, Suite 1301 |
| | | New York, New York 10022 |
| 11 | | Telephone: (212) 789-1340 |
| | | Facsimile: (212) 205-3960 |
| 12 | | jbleichmar@bfalaw.com |
| 13 | | -and- |
| 14 | | Ross Shikowitz (*pro hac vice* forthcoming) |
| 15 | | 75 Virginia Road |
| | | White Plains, New York 10603 |
| 16 | | Telephone: (914) 265-2991 |
| | | Facsimile: (212) 205-3960 |
| 17 | | rshikowitz@bfalaw.com |
| 18 | | *Counsel for Plaintiff Lucid Alternative Fund, LP* |
| 19 | | **THE LAW OFFICE OF JACOB SABO** |
| 20 | | Jacob Sabo |
| 21 | | 22a Mazzeh Street |
| | | Tel-Aviv, Israel |
| 22 | | Telephone (++972) 39070770 |
| 23 | | *Additional Counsel for Plaintiff Lucid Alternative Fund, LP* |

-14-

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS