**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
lweaver@bfalaw.com
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Lead Plaintiff Lucid Alternative Fund, LP*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| LUCID ALTERNATIVE FUND, LP, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FIVE9, INC., MICHAEL BURKLAND, and BARRY ZWARENSTEIN,<br><br>Defendants. | Case No. 5:24-cv-08725-PCP<br><br><u>CLASS ACTION</u><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.      NATURE OF THE ACTION ............................................................................... 1

II.     JURISDICTION AND VENUE ......................................................................... 6

III.    PARTIES ........................................................................................................... 6

        A.      Lead Plaintiff .......................................................................................... 6

        B.      Defendants .............................................................................................. 6

IV.     FACTUAL ALLEGATIONS ............................................................................ 7

        A.      Five9 Background .................................................................................. 7

        B.      November 2022:  Mike Burkland Returns as CEO and Exacerbates the
                Revenue Growth Slide............................................................................ 8

                1.      Before the Start of the Class Period, Mike Burkland Promotes
                        Unqualified Family Connections to Serve in Senior Positions .................. 9

                2.      Five9's AI Products Lagged Competitors ................................................ 10

        C.      Before and Throughout the Class Period, Defendants Are Told Revenue Has
                Fallen Significantly Behind Target ....................................................... 12

        D.      Defendants Resort to Desperate Tactics to Conceal Their Failures and
                Artificially Prop Up Revenue ............................................................... 15

                1.      Five9 Sneaks Additional Charges onto Customer Invoices in Breach of
                        Customer Contracts ................................................................................. 15

                2.      Five9 "Re-Interprets" Customer Contracts to Forbid Seat Reductions,
                        Leading to Loss of Customer Loyalty and Long-Term Revenue Loss ..... 17

                3.      Executives Instructed Salespeople to Secure Clients by Promising
                        Capabilities That Five9 Does Not Have .................................................. 18

        E.      Defendants Knowingly Misrepresent Sales Growth to Protect Burkland and
                His Friends and Family ......................................................................... 19

                1.      February 21, 2024: Defendants Knowingly Issue False Revenue
                        Guidance for 2024 .................................................................................. 19

                2.      June 2024: Defendants Further Misrepresent Five9's Business and
                        Revenue at Analyst Conferences ............................................................. 21

        F.      The Truth Is Revealed ........................................................................... 23

        G.      Post-Class Period.................................................................................. 25

V.      FORMER EMPLOYEE ALLEGATIONS ........................................................26

        A.      Former Employee 1: Senior Vice President of Customer Success ......................26

                1.      Mike Burkland Restructured Five9's Sales Department to Hire Matt Tuckness, and Promoted His Friends and Family to Senior Positions......27

                2.      At Weekly E-Staff Meetings, the Individual Defendants Were Told That Revenue Had Stagnated, the Company Had Significantly Fallen Behind Revenue Targets, and the Company Could Not Meet Its 2024 Revenue Target........................................................................................28

                3.      Many Five9 Bookings Were the Result of Artificial Sales .......................30

                4.      Five9 Resorts to Desperate Revenue-Boosting Tactics and "Re-Interprets" Customer Contracts to Forbid Seat Reductions ......................31

                5.      Five9's AI Products Were Not Competitive and Customers Rejected Five9's Ploy to Push These AI Products ....................................................32

        B.      Former Employee 2: Five9 Business Development Manager..............................33

                1.      Five9 Experienced Significantly Lower Sales in Q1 2024, Which Defendants Discussed at Regular Internal Meetings................................33

                2.      Macro Factors Were a Significant Reason for Declining New Business in 2024...................................................................................................35

                3.      Five9 Experienced Cancellations or De-Bookings Because It Sold Products and Capabilities That Five9 Did Not Possess ...........................35

                4.      Five9 Executives Promised to Hire More Engineers to Fix the Implementation Issues but Instead Terminated Engineers........................36

        C.      Former Employee 3: Five9 Account Manager ....................................................36

                1.      In 2024, Five9's Deficient AI Offerings Led to Poor Logo Retention .....37

        D.      Former Employee 4: Five9 Director of Solutions Consulting .............................37

                1.      Prior to June 2024, There Was a Significant Downturn in Bookings and Revenue and Five9 Admitted Internally It Would Not Hit Its Revenue Target........................................................................................38

                2.      Internally, It Was Known That Five9 Would Not Hit Its 2024 Revenue Target........................................................................................39

                3.      Implementation Delays and De-Bookings .............................................40

        E.      Former Employee 5: Five9 Director of Solutions Consulting .............................40

1. Weekly All Hands Meetings ...................................................... 40

2. Quarterly Town Hall ................................................................ 42

3. Salesforce ................................................................................ 42

4. Mike and Kathy Burkland's Nepotism Exacerbated Five9's Poor Performance ............................................................................. 44

5. Five9's AI Product Lagged Competitors and Disappointed Customers ... 45

F. Former Employee 6: Five9 Senior Financial Analyst ........................................... 45

1. Emergency Retroactive Budget Cuts ....................................... 46

2. 2024 Hiring Freeze ................................................................. 47

3. Bookings File Regularly Presented to the Individual Defendants ........... 47

4. Monthly LTM Report to CFO Zwarenstein ............................. 48

5. In-Office Contact with Mike Burkland and Barry Zwarenstein ............... 49

G. Former Employee 7: Five9 Director of Enterprise Sales ....................................... 49

1. Five9 Had Very Weak Net New Business Due to Macro Conditions and This Was Reported to Five9 Management in Salesforce .................. 49

H. Former Employee 8: Five9 Enterprise Account Manager ...................................... 50

1. In 2024, Sales Had Deteriorated and Five9 Resorted to Desperate Schemes to Generate Revenue ................................................. 51

I. Former Employee 9: Five9 AI Subject Matter Expert Consultant ......................... 54

1. Five9 Had an Inferior AI Product That Lacked Basic Capabilities .......... 54

VI. FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................... 56

A. False and Misleading Statements and Omissions Regarding Five9's Deteriorating Revenue Growth ............................................................................. 57

1. February 21, 2024 Q4 2023 Earnings Call .............................. 57

2. June 4, 2024 Robert W. Baird Global Consumer, Technology & Services Conference ................................................................. 59

3. June 5, 2024 William Blair Growth Stock Conference ............ 62

4. June 12, 2024 Rosenblatt Securities Technology Summit ........ 64

B. False and Misleading Statements and Omissions Regarding Five9's AI Products and Capabilities .................................................................. 65

    1. June 5, 2024 William Blair Growth Stock Conference ............................ 65

    2. June 12, 2024 Rosenblatt Securities Technology Summit ....................... 67

C. Five9's False and Misleading Risk Disclosures .................................................... 69

VII. ADDITIONAL ALLEGATIONS OF SCIENTER .......................................................... 73

A. Regular Internal Meetings During Which Five9's Revenue Shortfall, Macroeconomic Headwinds, AI Product Failures, and Desperate and Dishonest Sales Tactics Were Routinely Discussed Support a Strong Inference of Scienter ...................................................................................... 74

    1. E-Staff Meetings ...................................................................................... 74

    2. QBR Meetings ......................................................................................... 75

    3. Weekly All Hands Meetings ................................................................... 75

B. The Individual Defendants' Continuous Access to Salesforce Data and Receipt of Regular Reports That Reflected Five9's Revenue Shortfall, Macroeconomic Headwinds, Customer Loss, Underperforming Bookings, and AI Product Failures Further Supports a Strong Inference of Scienter ................. 76

    1. Salesforce ................................................................................................ 76

    2. Regular Internal Reports ......................................................................... 77

C. Defendants' Deceptive Sales Tactics to Generate Revenue Because They Knew They Would Not Meet Revenue Guidance Further Supports a Strong Inference of Scienter .................................................................................... 80

D. The Burklands' Motivation to Protect Nepotistic Hiring and Promotions Further Supports a Strong Inference of Scienter ................................................... 80

E. Defendants' Motivation to Artificially Inflate the Value of Defendants' Holdings For a Potential Acquisition Further Supports a Strong Inference of Scienter ............................................................................................................... 80

F. Emergency Retroactive Budget Cuts, Stealth Layoffs, a Hiring Freeze, and Aggressive Cost Cutting Further Supports a Strong Inference of Scienter .......... 82

G. Officer Terminations and Sales Restructuring Further Supports a Strong Inference of Scienter ............................................................................................. 83

H.     The Individual Defendants Repeatedly Spoke about Revenue, Bookings, and AI Capabilities, Which Wall Street Analysts Continuously Scrutinized, Further Supporting a Strong Inference of Scienter ................................................. 83

I.     The Cloud Software Was the Company's Core Operation and Only Product, Further Supporting a Strong Inference of Scienter ................................................. 84

J.     Corporate Scienter ........................................................................................... 85

VIII.   LOSS CAUSATION ........................................................................................... 88

IX.    CLASS ACTION ALLEGATIONS ..................................................................... 90

X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR OR SPEAKS CAUTION DOCTRINE ........................................................................................................ 91

XI.    PRESUMPTION OF RELIANCE ...................................................................... 91

XII.   CLAIMS FOR RELIEF ...................................................................................... 92

XIII.  PRAYER FOR RELIEF ...................................................................................... 94

XIV.   JURY DEMAND ................................................................................................ 94

Court-appointed Lead Plaintiff Lucid Alternative Fund, LP ("Lead Plaintiff"), by and through its counsel, bring this action asserting securities claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of themselves and all others similarly situated who purchased or otherwise acquired Five9, Inc. ("Five9" or the "Company") securities, including common stock and call options, between February 21, 2024 and August 8, 2024, inclusive (the "Class Period"), and were damaged thereby.

The allegations are based upon personal knowledge of Lead Plaintiff as to Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel. Lead Counsel's investigation included, among other things, a review and analysis of Five9's filings with the Securities and Exchange Commission ("SEC"), transcripts and audio recordings of Five9's public conference calls, press releases issued by Five9, news and media reports concerning the Company, research reports issued by financial analysts, other publicly available information, and interviews with Former Employees (FEs) of Five9 conducted in Lead Counsel's investigation. Lead Plaintiff believes that, after a reasonable opportunity for discovery, substantial additional evidentiary support will be available for trial that further supports the allegations in this Complaint.

## I.   NATURE OF THE ACTION

1. This case arises from Defendants' false and misleading statements and omissions in February and June 2024 that concealed Five9's declining revenue growth, which Defendants' inferior products and self-interested hiring decisions exacerbated. To mask their failures and artificially prop up revenue, Defendants also resorted to a campaign of undisclosed dishonest sales tactics.

2. Five9 is a SaaS ("Software as a Service") provider of cloud-based contact center software that markets itself as helping customers set up and efficiently run customer service call centers. From its 2014 Initial Public Offering ("IPO") through 2021, Five9 had been a fast-growing enterprise, and regularly posted revenue growth above 30%. In 2020-2021, the Company posted record growth due in large part to the COVID-fueled demand for software supporting remote and work-from-home operations. In 2021, Zoom Communications, Inc. ("Zoom") targeted

Five9 for an acquisition, which Defendant Mike Burkland and the Company's Board supported, as it would result in a massive personal payout.  But shareholders ultimately rejected the acquisition because they would be paid in rapidly depreciating Zoom shares.  As COVID demand cooled, Five9's revenue growth slowed, with year-over-year revenue growth shrinking every quarter from Q3 2021 through Q3 2022.

3.     In an effort to re-accelerate growth, in November 2022, Defendant Burkland returned to Five9 as Chief Executive Officer (CEO), receiving a compensation package valued at the grant date at more than $38.2 million in cash and stock units for his one month of service that year.  Instead of righting the ship, Burkland, along with his brother, Dan Burkland, who had become President and Chief Revenue Officer (CRO), and their longtime Chief Financial Officer (CFO) Defendant Barry Zwarenstein, made a series of short-sighted and self-interested business decisions that exacerbated the Company's deteriorating revenue growth and prospects for recovery.

4.     First, beginning prior to the Class Period, CEO Burkland hired and promoted family connections personally loyal to him, who would have directly profited along with him if the Company was ultimately acquired.  Among these hires was CEO Burkland's inexperienced godson, Matt Tuckness, who was to restructure the Company's sales department.  They also replaced experienced employees with Burkland family connections and hometown friends who had no established relationships with customers.  Sales suffered as a result.  At the same time, according to a former executive, Matt Tuckness, "screwed up" the sales organization "so bad" that the sales representatives were not hitting their numbers and, to prevent an exodus, Five9 had to pay them a guaranteed draw instead of relying on the customary sales-based commissions.

5.     Second, at a time when other companies in the SaaS space were heavily investing in and building advanced Artificial Intelligence (AI) capabilities, Defendants dissolved the Company's AI overlay team and neglected AI development.  Their decision left the Company with AI products that Five9's former executives confirm were outdated and "rudimentary."  And Five9's AI product could not even function outside the U.S.—which was fatal in the contact center business, as it is dominated by offshore operations.

6.     CEO Burkland, CFO Zwarenstein, and other senior Five9 executives were well aware of the disastrous impact that their self-interested and short-sighted decisions had on Five9's revenue growth both before and during the Class Period. In fact, prior to the start of the Class Period, Defendants Burkland and Zwarenstein commissioned extensive revenue analyses to understand Five9's true financial performance.

7.     As a result of these efforts, during weekly meetings in 2023 and early 2024, Burkland, Zwarenstein, and others were personally presented with data showing that (i) Five9's revenue growth rate had dropped off and had fallen significantly behind its revenue target; (ii) "macro" factors, like post-COVID demand and budget constraints, negatively impacted Five9's new business as much as they did existing customers; and (iii) the Company's 2024 revenue target was based on the false assumptions that Five9 was both increasing new business revenue and expanding revenue growth with existing customers. Further to this detailed information, the then-Senior Vice President (SVP) of Customer Success advised Defendants Burkland and Zwarenstein at weekly meetings prior to the start of the Class Period that Five9 would not generate sufficient revenue to match what Defendants "told the Street we were going to make." (FE-1.)

8.     Defendants also had access, before and during the Class Period, to real-time financial and sales data in Five9's Salesforce system and regular internal reports specifically prepared for them that showed the 2024 revenue shortfall, the negative impact of macroeconomic headwinds on Five9's business, the customer loss, the underperforming new business bookings, and Five9's failure to successfully market its AI. For example, before and during the Class Period, a so-called "Bookings File" was stored under "Barry's [Zwarenstein's] folder" on the Five9 share drive and was regularly presented and discussed with Defendants Burkland and Zwarenstein, among others. This file provided Defendants with up-to-date sales data and, according to former employees, showed them that in 2023 and 2024 sales to new and existing customers were poor and significantly underperforming the Company's forecasts.

9.     Defendants thought the situation was so bad that by January 2024, before the start of the Class Period, Defendants Burkland and Zwarenstein personally imposed extreme retroactive

budget cuts, stealth layoffs, a hiring freeze, and aggressive cost cutting designed to compensate for and conceal Five9's declining revenue growth.

10.     Rather than admit the truth that they knew at the beginning of the Class Period in February 2024, CEO Burkland and CFO Zwarenstein misled investors by announcing revenue growth guidance that was "the same as" the "last 7 out of 9 years," over which Five9 reported an average of 28% revenue growth.[1]

11.     But Defendants did not stop there.  Knowing that Five9 could not sustain its reported revenue growth or meet this guidance, Defendants resorted to deceptive tactics to conceal their failures from investors and artificially prop up bookings and revenue.  These practices included: (i) sneaking additional charges onto customer invoices, even though doing so was in violation of Five9's contracts with its customers; (ii) "re-interpreting" customer contracts to forbid them from taking usage reductions that had been promised to induce customers to sign up with Five9; and (iii) instructing salespeople to secure clients by promising capabilities that Five9 did not have.  None of this was disclosed to investors.  And none of this had any success.  Instead, Defendants eroded customer loyalty and further damaged the prospect of legitimately returning to the Company's prior history of impressive revenue growth.

12.     Defendants continued to conceal the truth from investors.  Hoping to shield Defendant Burkland and his family and friends from scrutiny and maintain Five9's appeal to potential acquirers (and thereby the value of their holdings, including Burkland's sizable equity awards), Defendants continued to mislead investors about the state of Five9's revenue growth.  Specifically, in June 2024, Defendants fraudulently claimed that (i) the Company was on track to reach its revenue guidance; (ii) Five9 had "very strong" and "record" new business; (iii) Five9's net new business was not negatively impacted by "macro" economic and political factors; (iv) sales to existing customers were also "inflect[ing] upwards" following quarters of decline; (v) there was no delay implementing bookings because "we can go as fast as [customers] can go"; (vi) Five9 was experiencing "very strong" customer retention; and (vii) Five9 had been "winning"

_____

[1] Conference call quotation alleged herein are based on Lead Plaintiff's review of transcripts and audio recordings of those calls.

large enterprise business due to demand for its industry-leading AI products. All of this was false and misleading, and concealed the truth.

13.    Ultimately, on August 8, 2024, after market hours, Defendants had no choice but to begin revealing the truth. Defendants released Five9's disappointing second quarter 2024 financial results and cut its annual revenue guidance. Despite Defendants' prior statements, the Company admitted to a "challenging bookings quarter," that "Q2 new logo [*i.e.*, new customer] bookings came in softer than expected," and that the Company had been negatively impacted by "uncertain economic conditions" and customer budgets having been "constrained and scrutinized." Defendants also admitted that Five9's sales team "wasn't up to snuff" and announced remedial action to address "sales execution and efficiency" issues. On this news, the price of Five9 common stock plummeted over 26%, from $42.47 per share on August 8, 2024 to $31.22 per share on August 9, 2024, on unusually high trading volume.

14.    Analysts and commentators were "surprised … based on how management had previously discussed guidance," and "broadly disappoint[ed]." As one analyst noted, "resetting the growth trajectory is a tough pill to swallow." Another commentator summarized that "full-year revenue guidance reduction translates into an uninspiring low-teens percentage (versus historical average in the high-twenties range)," which "leaves little justification for staying bullish." In October 2024, *Yahoo! Finance* named Five9 first on its list of the "10 Worst-Performing Growth Stocks in 2024."

15.    Since then, Dan Burkland has been removed as President and CRO, and relegated to a "consultant" role, and CFO Zwarenstein put into retirement. While Mike Burkland's godson, Matt Tuckness, remains at Five9, a "Chief of Staff" was quickly hired, and tasked with fulfilling key responsibilities that Tuckness had failed to meet, like "developing and executing strategic plans to achieve revenue targets and growth objectives," handling "weekly metrics reviews, board meetings, and quarterly kickoffs," and "manag[ing] conversations with the Board and C-Suite."

## II.    JURISDICTION AND VENUE

16.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Five9's headquarters is located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

20.    Lead Plaintiff is Lucid Alternative Fund, LP.  Lead Plaintiff purchased Five9 securities during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

### B.    Defendants

21.    Defendant Five9 is a Delaware corporation with its corporate headquarters and principal place of business in San Ramon, California.  Five9's common stock trades on the NASDAQ stock exchange under the ticker symbol "FIVN."

22.    Defendant Michael Burkland ("Mike Burkland" or "Burkland") is, and during the Class Period was, Five9's CEO and Chairman of the Company's Board of Directors.  Mike Burkland has been a member of Five9's Board of Directors since January 2008, and Chairman of the Board since February 2014.  Mike Burkland has been CEO of Five9 since November 28, 2022. Prior to that, Mike Burkland was also CEO of Five9 from January 2008 through December 2017.

In addition to false and misleading statements on conference calls with investors and analysts, as alleged herein, Defendant Burkland signed and certified Five9's false and misleading reports filed on Forms 10-K and 10-Q with the SEC in 2024.

23.    Defendant Barry Zwarenstein ("Zwarenstein") was the CFO at Five9 throughout the entirety of the Class Period.  Zwarenstein joined the Company in January 2012 as CFO and held the role until March 2025.  He was also Interim CEO from December 2017 to May 2018.  In addition to false and misleading statements on conference calls with investors and analysts, as alleged herein, Defendant Zwarenstein signed and certified Five9's false and misleading reports filed on Forms 10-K and 10-Q with the SEC in 2024.

24.    Defendants Burkland and Zwarenstein are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Defendants, because of their positions and access to material non-public information available to them, knew the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the representations and omissions which were being made were then materially false and/or misleading.

## IV.    FACTUAL ALLEGATIONS

### A.    Five9 Background

25.    Founded in 2001, Five9 is a provider of cloud contact center software.  The Company offers SaaS marketed as making it easier for companies to set up and efficiently run call centers, and as offering more tailored customer support and management of customer interactions through various channels, including voice, email, chat, and social media.

26.    Defendant Mike Burkland became Five9's CEO and Chairman of its Board in January 2008 and continued to serve in those roles through the Company's IPO in 2014.  In December 2017, Defendant Mike Burkland stepped down as CEO, while remaining Chairman of

AMENDED CLASS ACTION COMPLAINT

CASE NO. 5:24-cv-08725-PCP

the Board.  He was replaced by Rowan Trollope ("Trollope"), who served as CEO from 2018 through November 2022.

27.    Under Trollope's leadership, Five9 flourished.  Among other things, Trollope redesigned Five9's platform and invested in AI capabilities, including by acquiring the company Inference Solutions in November 2020, which was an Intelligent Virtual Agent ("IVA") platform designed to understand and respond to human queries and commands.  During every year of Trollope's tenure, Five9's revenue always grew by at least 27%, and sometimes up to 40%, resulting in an astounding revenue increase of more than 400% by the end of his time as CEO. Five9 shareholders were rewarded with billions of dollars in stock appreciation.

28.    In addition, Five9 benefited from the COVID-19 pandemic.  Beginning in the first quarter of 2020, the demand for cloud-based call center products exploded as Five9's customers and potential customers sought to continue their call center operations without requiring their agents to appear in person.  This heightened demand further increased revenue growth for Five9. Between the first quarter of 2020 and the second quarter of 2021, Five9's year-over-year revenue growth increased by over 57%, with Five9 recording 28% growth in Q1 2020, 29% growth in Q2 2020, 34% growth in Q3 2020, 39% growth in Q4 2020, 45% growth in Q1 2021, and 44% growth in Q2 2021.  During the same period, Five9's stock price increased by 195% from $66.76 per share at the start of Q1 2020 to $196.99 after announcing Q2 2021 earnings.

29.    Then, as Five9's COVID boom cooled, so did its steady growth.  Year-over-year revenue growth shrank every quarter from Q3 2021 through Q3 2022.

**B.    November 2022:  Mike Burkland Returns as CEO and Exacerbates the Revenue Growth Slide**

30.    Following Five9's revenue skid, Defendant Mike Burkland reinserted himself as CEO on November 28, 2022.  But instead of returning revenue growth to its pre-COVID or COVID levels, during Burkland's second tenure as CEO, Five9 never exceeded 20% annualized revenue growth, whereas Trollope's worst year was 27%.  This was largely a result of Burkland's self-interested and short-sighted business practices, later compounded by dishonest business tactics, which fueled Five9's slide into record low performance.  Specifically, under Burkland's direction,

Defendants (i) promoted unqualified family members over proven personnel to run Five9 sales functions; and (ii) failed to invest in AI, resulting in Five9 falling significantly behind its competitors.

**1.    Before the Start of the Class Period, Mike Burkland Promotes Unqualified Family Connections to Serve in Senior Positions**

31.    After reassuming the CEO role, Mike Burkland installed family connections in key sales positions at Five9 in place of experienced, successful salespeople.  With Mike's brother, Dan Burkland, already installed as President and CRO, he also hired his son, Tyler Burkland, for a lead sales position.  And though Mike's wife, Kathy Burkland, had no formal role at the Company, she was given access to Five9's internal financial information and authority over hiring and firing decisions at Five9, as confirmed by FE-1 and a Five9 Director of Solutions Consulting (FE-5). The Burkland family deeply entrenched itself at Five9 and prioritized hiring and promoting family members and personal connections loyal to Mike Burkland over more experienced and qualified candidates.  (FE-1, FE-5.)  This practice led to loss of institutional knowledge.  (FE-1.)

32.    In December 2023, Mike Burkland completely upended Five9's sales organization by tasking his unemployed and inexperienced godson, Matt Tuckness, to restructure the organization.  Tuckness was not qualified to assume such a significant position at such a pivotal time.  Prior to returning to Five9 in December 2023, Tuckness had served unremarkably in a relatively low-level commercial sales position at Five9 but got burnt out with even the modest junior-level responsibilities and quit, as confirmed by FE-1, FE-5, and a Five9 Director of Solutions Consulting (FE-4).  Since then, Tuckness remained unemployed until Defendant Burkland took him in, called him the "vision for the future," and put him in charge of sales to Five9 customers.  (FE-1, FE-5.)  Burkland also hired and promoted other Burkland and Tuckness connections, including making Matt's brother, Kevin Tuckness, Five9's Head of Sales and Sales Development.

33.    Mike Burkland's hire of Matt Tuckness seriously damaged Five9's sales function. Under Matt Tuckness, Five9's competent sales leadership was fired, sales personnel were forced to reapply for their jobs, and customer accounts were reassigned, as confirmed by FE-4 and a Five9

Director of Enterprise Sales (FE-8). In 2024, Matt Tuckness announced that he was going to reconcile and improve Five9's disparate sales processes across the different segments, but he was lost and accomplished nothing, explained FE-5. "It was a mess," FE-8 recounted, "[t]hey switched up everybody's job functions," account management personnel had to reapply for their jobs, and even by August 2024 the new structure had still not "solidified." (FE-8.) Due to the floundering sales department, Five9 was forced to turn to consultants to help remediate the mess, which included the firm "Winning by Design" to help Five9 to understand how to create sales processes, and a second consulting company to "look at general reorganization." (FE-5.) As FE-5 put it, "all" Matt Tuckness has "accomplished is throwing all the pieces in the air and breaking half of them when they hit the ground." (FE-5.) Even Five9's now-President Andy Dignan expressed concern about Matt Tuckness, acknowledging that such a senior position was being "given to a kid who has no idea what he is doing," but admitted that there was "only so much I can control" because the decision to bring in Matt Tuckness was Mike Burkland's. (FE-1.) In fact, within months of his hire, Matt Tuckness had "screwed up" the sales organization "so bad" that the sales representatives were not hitting their numbers and leaving Five9, and the Company had to compensate them via a guaranteed draw for the first two quarters of 2024 instead of via a customary commission. (FE-4.)

34.    In addition to the affirmative damage caused by Burkland's hires, the loss of Five9's experienced sales staff resulting from Burkland's nepotism also materially damaged Five9. Over many years, Five9 salespeople had built relationships with customers that allowed them to "go out and ask for orders." (FE-4.) But with those employees now fired or re-assigned, Five9 had no established relationships with customers, which significantly hurt sales. (FE-4.)

### 2.    Five9's AI Products Lagged Competitors

35.    When Mike Burkland became CEO in 2022, he also put a halt to Five9's development of competitive AI products, which left Five9 lagging behind its competitors and frustrated Five9's customers, as confirmed by FE-1, a Five9 Account Manager (FE-3), and a Five9 AI Subject Matter Expert Consultant (FE-9). By 2024, Five9 had only outdated AI capabilities that had previously been developed during CEO Trollope's tenure. (FE-1.) Five9 did not even

launch a large-language-model-based AI platform (*i.e.*, an AI system that can, among other things, utilize machine learning to recognize and generate human language by processing large amounts of data) for customer use until August 2024, well after other SaaS companies began offering similar products.

36.     For example, Five9's Version 7 of the Gen AI Studio—its generative AI product created to purportedly introduce generative AI to contact centers—was a generation behind and had serious technical limitations.  Most critically, it did not work outside the U.S. due to lack of regulatory approvals. (FE-9.)  Given that many call centers are abroad, this limitation significantly reduced Five9's sales.  (FE-9.)  Further, there was no migration path from Version 6 to Version 7, and Five9 was forcing customers to pay a new implementation fee if they wanted to upgrade to Version 7, which further alienated existing customers.  (FE-3.)

37.     Five9 was not winning business from large enterprises due to its lack of AI capabilities, and the large enterprise customers that did do business with Five9 did not even utilize Five9's AI products. (FE-1.)  As FE-1 explained, Five9 was eager for sales representatives to push AI offerings, but the Company's AI offerings were "rudimentary."  Five9's AI offerings were not ahead of competitors and had little interest from customers.  (FE-1.)  For instance, Five9 pushed sales staff to sell existing customers Five9's Intelligent Virtual Agent, or IVA.  (FE-1.)  But, to Five9's dismay, customers "tried it, did not like it, and did not buy it."  (FE-1.)  In fact, Five9 admitted in internal sales documentation that its AI products were inferior to competitors like Cresta and Level AI, especially for strategic and enterprise customers.  (FE-9.)  Five9's disappointing and inferior AI product also led customers to look at competitors like NICE or Genesys—who could offer both AI and contact center software with the goal to "take the whole contact center" and "utilize AI on the front end to reduce the number of seats that would be required"—which made Five9 especially vulnerable to losing customer accounts.  (FE-3.)

38.     When FE-1 brought these issues up in meetings with Defendants Burkland and Zwarenstein in 2023, Defendants decided to try giving customers free trials of Five9's IVA product. (FE-1.)  Five9 offered these free trials to new and existing customers in 2023 and through at least February 2024. (FE-1.)  But customers balked at free trials too and did not take it, even

though it was offered for free.  (FE-1.)  By the end of 2023, Defendants Burkland and Zwarenstein were specifically advised that customers had such little interest in Five9's AI product that they even rejected the free trials.  (FE-1.)

**C.      Before and Throughout the Class Period, Defendants Are Told Revenue Has Fallen Significantly Behind Target**

39.      During regular meetings before and during the Class Period, Defendants Burkland and Zwarenstein were informed that Five9 had experienced significant deterioration in the Company's sales and revenue growth as a result of customer loss, and that macroeconomic factors had negatively impacted the Company's ability to generate revenue from new business, according to FEs who attended these meetings.  Further, Defendants received real-time reports from the Company's Salesforce system contradicting their statements to investors.

40.      Since at least 2023, Defendants Burkland and Zwarenstein attended a weekly "E-Staff Meeting" by Zoom, generally held Mondays at 10:00 A.M., which included a dedicated presentation on the latest revenue data.  (FE-1.)  This dedicated revenue portion of the E-Staff Meeting was also attended by President and CRO Dan Burkland, Chief Operating Officer (COO) Andy Dignan, EVP of Finance Bryan Lee, SVP, Sales and Business Operations Ari Klionsky, and FE-1, among others.  (FE-1.)

41.      During E-Staff Meetings in 2023, Defendants Burkland and Zwarenstein were presented with data showing that Five9's revenue growth rate had dropped off and the Company was underperforming its forecasts.  (FE-1.)  Defendants Burkland and Zwarenstein directed FE-1 and other key personnel to create an additional Revenue Breakout Session, to examine revenue in greater detail and look into why Five9's revenue growth rate had dropped off.  (FE-1.)

42.      Beginning in the summer or fall of 2023, the weekly Revenue Breakout Sessions were led by Bryan Lee, and attendees included FE-1, President/CRO Dan Burkland, SVP Ari Klionsky, Andy Dignan, and VP Global Services Operations and Strategy Blake Nelson.  (FE-1.)  Utilizing key data, such as how many seats were "going live," implementation delays, and customer de-bookings, Bryan Lee presented an "enormous spreadsheet" of revenue figures and revenue forecasts to Defendants Burkland and Zwarenstein at E-Staff Meetings.  (FE-1.)  These

revenue presentations at the end of 2023 and early 2024 showed that Five9's revenue had stagnated, and the Company had fallen significantly behind its revenue targets. (FE-1.) Specifically, these presentations showed Defendants Burkland and Zwarenstein that the Company's 2024 revenue targets were based on the false premise that Five9 was both increasing new business revenue and expanding revenue growth with existing customers. (FE-1.)

43.    Additionally, at the end of 2023 and early 2024, FE-1 and other E-Staff Meeting attendees reviewed and discussed data with Defendants Burkland and Zwarenstein showing that macro factors had negatively impacted the Company's new business and prevented the Company from achieving its revenue targets. For example, FE-1 told the attendees at E-Staff Meetings at the end of 2023 and early 2024 that "COVID is over" and "our customers are shrinking," that macro factors and customer budget constraints negatively impacted the new business as much as they did existing customers, and relayed reports from customers who had informed FE-1's sales staff that they could not spend money because of the way the economy was going and uncertainty surrounding the clients' businesses. (FE-1.) Indeed, Five9's Business Development Manager, who led the sales team responsible for generating and developing new business, similarly confirmed that, by 2024, economic factors deterred customers from buying Five9's products and solutions. (FE-2.)

44.    These macroeconomic obstacles to Five9's revenue growth were published internally on systems and databases available to and routinely accessed by Defendants and other senior Five9 executives. A Five9 Director of Enterprise Sales (FE-7) reported that FE-7 and FE-7's colleagues failed to meet sales targets and were unable to close deals due to macroeconomic conditions. (FE-7.) Only 1% of FE-7's leads assigned by Five9 ever resulted in a sale, and out of the 99% of leads that did not result in a sale, the clear majority of them declined the sale due to macro reasons, such as economic uncertainty, general customer budget constraints, "market conditions," and "the economy at the time." (FE-7.) For each of these leads, FE-7 dutifully recorded in Five9's Salesforce system that the Company had failed in converting net new business leads and opportunities because of macro reasons. (FE-7.) This data was incorporated into the "Clari" tool, which Five9 relied on to track the Company's performance towards its targets, and

"Dan's Dashboard," which rolled up all bookings data to Dan Burkland as part of his oversight role, showing the entire sales pipeline and status of how all deals were progressing, how the Company was performing relative to its forecasts, and had functionality that allowed a user to "drill down into those top line numbers." Both Clari and Dan's Dashboard were presented to Dan Burkland at Weekly All Hands Meetings and accessible to Five9's senior leadership. (FE-5, FE-7.)

45. The attendees of the Weekly All Hands Meetings also discussed instances of "de-bookings" and that customers were backing out of sales because of the inability of Five9 engineers and implementation personnel to timely and effectively deliver what Five9 sales personnel purported to have sold to customers. (FE-1.)

46. Their revenue shortfall was further confirmed by Clari updates, presented by Ari Klionsky to Dan Burkland at Weekly All Hands Meetings, which showed Five9's expected bookings and sales for the current period based on the extensive sales data compiled by the Clari tool that was attached to Five9's Salesforce system. (FE-5.) At the Weekly All Hands Meetings on the Monday after the end of Q1 2024, Dan Burkland (in a message that according to FE-1 he repeated at a quarterly business review meeting at or around the same time) acknowledged that sales were weaker than expected and the Company was not on track to meet its projections. (FE-2.)

47. By mid-May 2024, the Company had a very clear picture of its revenue for 2024. (FE-5.) Because it took upwards of a year for a booking to actually turn into revenue, Five9's revenue for the year was a reflection of the bookings that had already been secured by that time. (FE-5.) And, specifically, by mid-May 2024, it was apparent from Klionsky's presentations of the Clari updates that Five9 was significantly behind its bookings needed and that Five9 was not going to hit its growth target for the year 2024. (FE-5.) Or, put differently, by mid-May 2024, the Clari trend had dropped so significantly that it demonstrated to any rational observer that it was not possible to meet the Company's revenue growth target. (FE-5.)

**D.     Defendants Resort to Desperate Tactics to Conceal Their Failures and Artificially Prop Up Revenue**

48.     Knowing that the Company's revenue growth was declining and under pressure from investors, Defendants resorted to desperate and dishonest tactics to conceal their failures from investors and artificially prop up bookings and revenue.

49.     These schemes, which began in 2023 and escalated in 2024, were carried out with full knowledge of Five9's senior executives.  When shown Five9 was underperforming compared to the Company's forecasts during Weekly All Hands Meetings, President Dan Burkland specifically instructed that "we need to do anything we can do" to "pull" revenue from future quarters into the current quarter. (FE-5.)  Defendants had no articulable plan to meet their revenue projections in 2024 and instead were relying on blind, wishful thinking that these tactics could conceal their revenue shortfall and deteriorating business.

50.     Specifically, these tactics included (i) sneaking additional charges onto customer invoices; (ii) "re-interpreting" customer contracts to forbid them taking previously-promised seat reductions; and (iii) instructing salespeople to secure clients by promising capabilities that Five9 does not have.  But in addition to artificially inflating the stock price, these tactics only resulted in undermining customer confidence and further deteriorating Five9's revenue growth.  These "Hail Mary" tactics failed. (FE-4.)

**1.     Five9 Sneaks Additional Charges onto Customer Invoices in Breach of Customer Contracts**

51.     Five9 management sought to generate revenue by charging customers more for the use of phone lines than customers had previously agreed, in violation of Five9's customer contracts.  At a Weekly All Hands Meeting in May 2024, executives revealed that they had added additional line fees to customer invoices. (FE-8.)  This meeting was led by SVP Ari Klionsky, and attended by President/CRO Dan Burkland and VP Matt Tuckness, as well as Five9's account management team that handled existing customers and the net new sales team. (FE-8.)  In the Weekly All Hands Meeting, Five9 executives stated that the purpose of these additional line charges was to drive revenue. (FE-8.)

52.    Critically, Five9 imposed these line fees, knowing that, for many customers, the additional charges caused Five9 to exceed the three to five percent cap on such increases specified in Five9's customer contracts.  (FE-8.)  Even before the invoices went out, Five9 knew that they were going to get "blowback."  (FE-8.)  During Weekly All Hands Meetings with Dan Burkland, Ari Klionsky, Matt Tuckness, and others, Ari Klionsky and his team gave instructions to the account managers about how to respond if and when customers found out about the scheme and complained about the additional fees.  (FE-8.)  Among other things, Ari Klionsky and his team instructed FE-8 and other account managers to misrepresent to Five9 customers that the additional line charges were necessary because infrastructure costs were going up, data storage costs were increasing, or rack space costs were escalating.  (FE-8.)  Further, Five9 account managers were instructed to acknowledge the problem and admit the customer was right only when customers pointed out that Five9 was in breach of their contract because it was charging them more than what was contractually allowed or threatened to sue.  (FE-8.)  Five9 set up a "workflow" in its Salesforce system to reverse the improper line charges solely for customers who detected the Company's breach or threatened to sue Five9.  (FE-8.)

53.    FE-8 observed that approximately half of Five9 customers paid the invoices automatically without noticing the fees or saying anything, thus increasing Five9's revenue.  (FE-8.)  For the other half, FE-8 and other account managers had to deal with the mess on the backend, after the additional line fees were invoiced and customers complained about the charges.  (FE-8.)  Dealing with the blowback from Five9 customers consumed a lot of energy and time.  (FE-8.)  For instance, FE-8 recalled receiving both emails and phone calls from his assigned customers regarding the additional line fees.  (FE-8.)  Customers also complained to FE-8 that Five9 was breaking the terms of the contract by charging the additional line fees.  (FE-8.)  FE-8 recalled that some customers threatened litigation as a result of the additional line fees and contract breaches.  (FE-8.)  From meetings with colleagues, FE-8 knew that the other account managers also experienced "blowback" from their assigned customers regarding the additional line fees.  (FE-8.)  FE-8 and other account managers then conveyed the client frustration to their direct managers, and that Five9 was losing customers.  (FE-8.)

AMENDED CLASS ACTION COMPLAINT

CASE NO. 5:24-CV-08725-PCP

54. The negative client feedback and the resulting frustrations of the account managers caused by the additional line charges were discussed with senior Five9 executives, including during the Tuesday account management Zoom calls led by Matt Tuckness, attended by FE-8 and other Five9 account managers. (FE-8.) President/CRO Dan Burkland and COO Andy Dignan attended some of these Tuesday account management calls as well. (FE-8.) Based on the feedback and discussions at these calls, Matt Tuckness understood the frustration and anger that the additional line charges were causing Five9 customers and understood the pain that the additional charges were causing the account managers like FE-8, who had to deal with the blowback from customers and try to deceive them about the basis for the charges. (FE-8.) Nonetheless, Five9 did not change its policy on imposing additional line charges. (FE-8.)

**2. Five9 "Re-Interprets" Customer Contracts to Forbid Seat Reductions, Leading to Loss of Customer Loyalty and Long-Term Revenue Loss**

55. Five9 sought to boost sales by re-interpreting material terms of customer contracts. For years, Five9 sales representatives sold Five9's contact center software as a "software as a service," that allowed customers to "flex" the number of seats up or down, depending on their needs. (FE-1.) In other words, Five9 customers were willing to purchase large numbers of seats, based on Five9's assurances that if demand was lower than expected, the customer could reduce the number of seats they wanted or needed any time, and not be charged for any unused seats. (FE-1.) The ability to flex the numbers of seats in this way was a meaningful selling point for many customers. (FE-1.) Until 2023, FE-1's team "consistently" received requests from new customers to reduce the number of seats below their original commitment, and Five9 honored those requests. (FE-1.) In fact, such reduction requests happened so often that Five9 established a policy that FE-1's team was not docked financially for these seat reductions. (FE-1.)

56. However, beginning in 2023, after the severity of Five9's revenue decline became evident, Defendants reneged on these representations to its customers. (FE-1.) That is, Defendants changed how Five9 interpreted the contracts and required FE-1 to refuse to allow customers to reduce the number of seats they bought below their original commitment. (FE-1.) FE-1 emphasized that this change was "really stressful" for FE-1's team. (FE-1.) Five9's customers

were operating with the understanding that they could reduce the number of seats, based on the representations made to them by Five9 account executives. (FE-1.) FE-1 recounted that the change alienated customers. (FE-1.) A typical contract was one year, and while Five9's bait-and-switch temporarily propped up deteriorating revenue growth in the short term by Five9 forcing customers to pay for additional seats that they did not want, in the end, these tactics damaged the relationship with clients. (FE-1.)

### 3. Executives Instructed Salespeople to Secure Clients by Promising Capabilities That Five9 Does Not Have

57. Sales personnel were trained that as long as it *seemed potentially possible* to them that Five9 *may be able to* deliver what the customer needed, they told the customer that Five9 *would* deliver the product and then booked the sale. (FE-2.) This sales training happened in meetings, including as part of the BiWeekly Sales Meetings that were held every other Friday. (FE-2.) For example, in a BiWeekly Sales Meeting about IVA, or Intelligent Virtual Agent, in approximately March 2024, President Dan Burkland personally instructed sales personnel to "say yes, say yes," when a customer asked about Five9's capabilities, even though certain requests could be novel, complex, or not feasible. (FE-2.) FE-1 explained that the sales team pitched a vision of what Five9 products could do, but in many cases the product sold did not exist because Five9 lacked the product capabilities sold. (FE-1.) Nevertheless, the Company told customers Five9 could do things with AI to try to win business. (FE-1, FE-4, FE-9.) The disconnect between the Company's instructions to sales personnel and the actual capabilities of the Company's software led to significantly longer implementation times for bookings, as well as de-bookings and seat reductions. (FE-1, FE-4.) As a result, Defendants' public statements about "new logo bookings" and "backlog" of orders or bookings was misleading because many were sales of products that did not exist and thus would ultimately bring in little or no revenue. (FE-1, FE-2.)

58. Five9's AI product did not function outside the U.S., and these shortcomings were acknowledged internally. (FE-9.) Nonetheless, Five9 continued to push its AI product and promote sales into global markets. (FE-9.) The lack of functionality outside the U.S. was a big problem and "absolutely" hurt sales, especially because many call centers are outside of the U.S.

(FE-9.)  Five9 lost customers as a result of the AI deficiencies, including the lack of international functionality.  (FE-9.)

59.    Even though these misrepresentations by Five9's sales team resulted in a "sale" and Five9 recorded a "booking," the prospect of actually earning revenue was dubious.  (FE-1.)  For these "bookings," implementation was delayed while Five9 engineers tried to figure out if they could create the product capabilities that did not exist at the time of the sale.  (FE-1, FE-2.)  This sales practice directly affected revenue as the Company could not bill for seats that were not live, even if the contract had been signed.  (FE-1.)  In many cases, the revenue ended up being zero, or significantly below the original sale amount, due to de-bookings and seat reductions as customers became frustrated by the delays or discovered that Five9 was not able to deliver the promised product.  (FE-1, FE-2.)

60.    Changes to bookings, including de-bookings like these, were immediately entered into the Salesforce system and known to Dan Burkland and Mike Burkland who kept close track of the status of signed deals.  Salesforce was relied on inside Five9 as "our single source of truth" for financial and sales data, as confirmed by FE-4, FE-5, FE-7, FE-8, and a Five9 Senior Financial Analyst (FE-6).

**E.    Defendants Knowingly Misrepresent Sales Growth to Protect Burkland and His Friends and Family**

61.    Rather than admit the existence of a revenue shortfall to shareholders and that their nepotistic and short-sighted policies had backfired, Defendants led shareholders to believe that business was booming and the Company's revenue was growing as it had under Trollope's tenure.

**1.    February 21, 2024: Defendants Knowingly Issue False Revenue Guidance for 2024**

62.    On February 21, 2024, at the Q4 2023 earnings call, Defendant Zwarenstein gave "prepared remarks" issuing Defendants' guidance for "our full year 2024."  He told investors that "for the last 7 out of 9 years, we've started with prudent revenue guidance of 16% year-over-year growth" and that "[f]or 2024, we are doing the same by guiding to a growth of 16% year-over-year at the midpoint or $1.055 billion in revenue."  To investors, this signaled revenue growth

consistent with Five9's revenue growth over the "last 7 out of 9 years."  During that time where "prudent revenue guidance of 16% year-over-year growth" was reported, it yielded an average of 28% revenue growth, as illustrated in the following table:

| Year | Five9 Revenue Guidance at Outset of Year | Actual Revenue Growth Reported at End of Year |
|------|------|------|
| 2015 | 16% | 25% |
| 2016 | 16% | 26% |
| 2017 | 16% | 24% |
| 2018 | 16% | 29% |
| 2019 | 16% | 27% |
| 2020 | 16% | 33% |
| 2021 | 20% | 40% |
| 2022 | 24% | 28% |
| 2023 | 16% | 17% |

63.     But, unbeknownst to investors, in 2024, Five9's revenue growth was not "the same" as those "last 7 out of 9 years," where the "prudent revenue guidance of 16% year-over-year growth" yielded an average of 28% revenue growth.  Instead, at the time of this Q4 2023 earnings call, Defendants knew that the Company could not achieve the 16% revenue growth stated to investors, let alone the 28% revenue growth that Defendants indicated with their comparison to prior years.

64.     It is for that reason that Defendants resorted to the desperate and "Hail Mary" tactics described above, which were designed to conceal these facts from investors and artificially pull future revenue into Q1 and Q2 2024.

65.     In fact, when confronted internally with reports of Five9's deteriorating financial performance and the Company's inability to meet its overly optimistic 2024 revenue number, Defendant Mike Burkland was unable to articulate any plan or possibility for how the Company could meet its unrealistic revenue projections. (FE-2.)  When asked how the Company would meet

AMENDED CLASS ACTION COMPLAINT

20

CASE NO. 5:24-CV-08725-PCP

the revenue projections, Mike Burkland stunned executives by simply responding with the phrase "Don't Stop Believin," quoting the title of the song by the band Journey.  (FE-2.)

66.    In Five9's Q1 2024 results reported on May 2, 2024, Defendants reiterated their optimism and continued to conceal their revenue shortfall.  During that earnings call, Defendant Zwarenstein touted year-over-year revenue growth for the quarter that "exceed[ed] the midpoint of our guidance by 3 percentage points" and reiterated Q2 and second half 2024 guidance.  To analysts, this signaled Q2 and second half 2024 revenue growth consistent with "the last 7 of 9 years."  An analyst on the call from Canaccord Genuity asked about "the full year outlook" on year-over-year revenue growth, to which Zwarenstein responded that the Company's "very strong backlog [] gives us great visibility…. So overall, we feel pretty good."  Analysts seized on this optimism.  In a May 3, 2024 report, analysts at BTIG wrote "[l]ooking ahead, the company maintained its full-year revenue guide, in typical prudent fashion, ***implying a major acceleration in 2H24***."  The same day, analysts at RBC expressed their confidence as well, going so far as to suggest that Five9's reiteration of 2024 guidance, as opposed to increasing guidance, "was purely conservatism."  In response to Five9's reiterated revenue guidance, analysts at William Blair opined, "[s]imilar to past years, we believe there is conservatism baked into these estimates."

**2.    June 2024: Defendants Further Misrepresent Five9's Business and Revenue at Analyst Conferences**

67.    On June 4, 5, and 12, Defendants Burkland and Zwarenstein attended the Robert W. Baird Global Consumer, Technology & Services Conference, William Blair Growth Stock Conference, and Rosenblatt Securities Technology Summit, respectively.

68.    On June 4, 2024, at the Robert W. Baird Global Consumer, Technology & Services Conference, also attended by President Dan Burkland, Defendants misrepresented that Five9's net new business "is strong irrespective of the macro" environment; touted the strength of Five9's revenue from existing clients (*i.e.*, "dollar-based retention rate") and new business alike, as well as its strong backlog of bookings; and reiterated their false confidence in 16% revenue growth for the year.

69.    Specifically, when Defendant Zwarenstein was asked about the "macro environment," he answered by distinguishing "two businesses within Five9. We've got a net new business, new logos [*i.e.*, new customers] having to go from on-prem into the cloud and the second part is that existing base." Defendant Zwarenstein represented to investors that "the macro really somewhat unusually just impacts what's in the base" and, by contrast, "*[t]he net new … part of the business is strong irrespective of the macro*."

70.    Defendant Burkland reiterated the Company's 16% revenue growth for 2024. Asked "what underpins confidence and you're getting to that 16% revenue growth for the year, given that requires an acceleration of growth in the back half of the year[,]" Defendant Burkland responded:

> *The confidence comes from that net new logo win side of our business growth, if you will, we're knocking down some of the largest enterprise brands*. We talked about a Fortune 50 deal that we just closed in the quarter, $50 million ARR [annual recurring revenue] subscription revenue. *That's just one of many deals*. It's obviously the largest deal we've ever done, but *the market's coming to us*. And then again, *in spite of that macro, the net new side of our business is very strong. We've got a strong backlog of bookings that haven't turned to revenue*, and that's what gives us the confidence[.]

71.    Defendant Zwarenstein seconded this assertion, adding:

> In terms of the pipe from the net new, as Mike was talking about, *we've been seeing strong business, major orders, really big ones that are sitting in our backlog*….
>
> [A]t the end of the day*, we have enough information in terms of our existing customers that are going live to say to the street that we have a dollar-based retention rate that we expect to inflect upwards in the second half of the year.*

72.    On June 5, 2024, at the William Blair Conference, Defendants Burkland and Zwarenstein touted: (i) Five9's "very strong" and booking "record" new business; (ii) that "Five9 is not just like a little bit ahead," but "well ahead" of contact center competitors in AI; (iii) that implementation of bookings "take time not because we can't move fast … we can go as fast as [customers] can go"; and (iv) Five9's "very strong" "logo"—*i.e.*, customer—"retention."

73.     On June 12, 2024, at the Rosenblatt Securities Technology Summit, Defendant Burkland again misrepresented Five9's AI products, the backlog of bookings, and confidence in Five9's 2024 revenue guidance.  Critically, Defendant Burkland said (i) as to large enterprise businesses, "[w]e're winning those in large part because of our leadership in AI and it's front and center. It's a big differentiator for us."; and (ii) "We're closing a lot more [mid-market opportunities] obviously, that is how we drive revenue growth.  And that is what's in that backlog that we're so confident about our second half guide at this stage."

74.     In each case, Defendants statements were false and misleading at the time because they concealed the truth, including that the Company had a significant undisclosed revenue shortfall, Defendants had no plan to achieve 16% revenue growth, the Company's Q1 and Q2 2024 revenue was propped up by short-sighted and unsustainable tactics to "pull" revenue from future quarters, the Company had poor logo retention, and "macro" factors were a significant reason for Five9's declining new business.

**F.     The Truth Is Revealed**

75.     On August 8, 2024, after market hours, Five9 released its second quarter 2024 financial results.  In pertinent part, the Company reduced its annual revenue guidance of 16% year-over-year growth by nearly 25% to 12.2%, due to "recent bookings trends and the uncertain economic conditions."

76.     During the earnings call held that same day, President Dan Burkland revealed that the Company "had a challenging bookings quarter" due to "constrained and scrutinized" customer budgets and sales execution issues, stating that "sales execution, in my mind, wasn't up to snuff." President Dan Burkland further announced remedial changes to address Five9's sales execution and efficiency issues, saying "we are taking action to further improve our sales execution and efficiency, including recently promoting an accomplished 10-year Five9 veteran to EVPS sales [sic], giving us a single 100% dedicated sales leader" and that "we're also realigning resources across market segments and partnering more aggressively with certain technology solutions and integrations."  Defendant Zwarenstein revealed that "Q2 new logo bookings came in softer than

expected" and that the Company was "no longer assuming" a dollar-based retention rate inflection in the second half of the year because of a "more muted seasonality in our service bookings[.]"

77. As a result of this news, the price of Five9's common stock dropped over 26%, from $42.47 per share on August 8, 2024 to $31.22 per share on August 9, 2024, on unusually high trading volume.

78. Analysts were surprised by the abrupt change. Canaccord Genuity remarked that "the Q2 bookings miss [] surprised us based on how management had previously discussed guidance." Similarly, Roth Capital Partners noted that "FIVN abruptly reversed from an expected sharp 2H24 growth acceleration (prior expected to reach 25%) to a flattish 2H24 growth rate in the 10% level." RBC Capital Markets commented "Stepping back, the quarter was broadly disappointing," and "*resetting the growth trajectory is a tough pill to swallow*." D.A. Davidson Institutional Equity Research emphasized the "materially lower [] revenue guidance for 2024."

79. Noting the previously undisclosed impact of macro factors, Morgan Stanley remarked "we were surprised by the macro impacting FIVN as much as it did on new deals," and that it "seems as if even AI projects are seeing challenges in getting approvals in this budget environment (particularly those that may take 12-15 months to show a benefit)."

80. Analysts also commented on Defendants' reorganization of the sales function. Morgan Stanley noted that "[g]iven the surprise weakness that materialized towards the end of Q2, management is now adding an EVP to the sales org tasked with more aggressively managing and forecasting the sales org." Similarly, Canaccord Genuity noted that, to address underlying issues behind the revenue miss, "Five9 intends to layer in a new EVP of Sales (going back to a structure that used to be in place, with a 100% dedicated sales leader), realign resources across segments to ensure appropriate coverage, and more tightly partner with certain tech vendors."

81. A *Seeking Alpha* commentator downgraded Five9 stock and explained the significant shift in the Company's revenue trajectory represented by Defendants' August 8, 2024 disclosures:

> FIVN's full-year *revenue guidance reduction translates into an uninspiring low-teens percentage (versus historical average in the high-twenties range) top-line growth outlook*.

As such, my previous Buy rating for the stock is no longer warranted.

…. ***FIVN's annual revenue growth will fall below +15% for the first time*** (Five9 was listed since 2014) in 2024. As a comparison, ***the company's historical FY 2014-2023 top line CAGR was +27.4%. There is little justification for staying bullish on FIVN***, considering the company's disappointing near-term growth outlook."

## G.     Post-Class Period

82.     Since August 2024, the disappointment over Mike Burkland's low-revenue growth regime has set in and Five9 stock has not recovered.  As of the close of trading on May 30, 2025, the price was below $27 per share, even lower then at the end of the Class Period.

83.     On August 20, Five9 announced layoffs to reduce its headcount by 7%.  Then in April 2025, Five9 laid off another 4% of its workforce.

84.     To compensate for Matt Tuckness's poor performance, in August 2024, the Company quickly hired a Chief of Staff for EVP of Sales who holds qualifications that Tuckness does not, for example, an MBA, and who, according to the Company, acts as "proxy to the EVP of in [sic] developing and executing strategic plans to achieve revenue targets and growth objectives," handles "weekly metrics reviews, board meetings, and quarterly kickoffs," and "manage[s] conversations with the Board and C-Suite," among other things.

85.     In October 2024, *Yahoo! Finance* named Five9 first on its list of the "10 Worst-Performing Growth Stocks in 2024," noting that "[w]hile the company was expected to outperform amid the digital revolution and the Internet of Things, that has not been the case."

86.     On November 7, 2024, the Company retroactively announced that it had decided to remove Dan Burkland as President and CRO, and would instead make him "Executive Vice President, Go-to-Market Strategy."  Then, just a few months later, on February 7, 2025, the Company announced that Dan Burkland was fired from this position too and made a "consultant."

87.     On February 20, 2025, Five9 announced the sudden "retirement" of Defendant Barry Zwarenstein, after more than 13 years as the Company, effective March 31, 2025.  The announcement was so sudden that the Company had not had time to undertake a search process or

locate a replacement. As a result, EVP Bryan Lee was appointed as "interim Chief Financial Officer," effective April 1, 2025, while "the Company conducts a formal search process for the CFO position."

88. Defendants' August 2024 revelations were so significant that, even nine months later, analysts still used them as a reference point. For example, on May 2, 2025, Roth Capital Partners led its earnings analysis by explaining "Despite a conservative guidance track record, in mid-2024, FIVN abruptly reversed from an expected sharp 2H24 growth acceleration (prior expected to reach 25%) to a roughly 10% growth outlook." Moreover, as noted in the same report, the prospect of Five9's "AI-related offerings [] be[ing] able to defend its growth, [] has not yet panned out."

## V.    FORMER EMPLOYEE ALLEGATIONS

89. As part of Lead Counsel's investigation, several former Five9 employees provided information on a confidential basis supporting that Defendants made material false and misleading statements that omitted and concealed the truth from the investing public and acted with a strong inference of scienter in making the alleged material false and misleading statements and omissions. The former employees' accounts corroborate one another and the additional facts alleged herein. These accounts include the following:

**A.    Former Employee 1: Senior Vice President of Customer Success**

90. FE-1 served as Senior Vice President of Customer Success from January 2021 until February 20, 2024. FE-1 had been with the Company since 2012, starting as an account manager. As Senior Vice President of Customer Success, FE-1 led the entire organization that oversaw existing customer accounts and was responsible for retaining customers and growing revenue within that base. When FE-1 left Five9, FE-1 had approximately 230 employees reporting to them. FE-1 reported to then-COO Andy Dignan, who reported directly to CEO Mike Burkland. FE-1 provided the information in this subsection.

**1.    Mike Burkland Restructured Five9's Sales Department to Hire Matt Tuckness, and Promoted His Friends and Family to Senior Positions**

91.    In December 2023, CEO Mike Burkland hired Matt Tuckness to lead a newly-formed group of account directors, who were tasked with sales to Five9's existing customer base. Matt Tuckness was close with the Burkland family. Despite having no known management experience, CEO Burkland deemed Tuckness the vision for the future who would be much better at selling and could manage the sales team.

92.    Matt Tuckness's lack of qualification was widely known at Five9. FE-1 was not aware of Matt Tuckness having any management experience. Prior to taking on the EVP role, Matt Tuckness had served unremarkably in a relatively low-level commercial sales positions at Five9, and then quit to spend 14 months traveling the world. FE-1 had a discussion with Five9's now-President Andy Dignan about Matt Tuckness, and Andy Dignan shared FE-1's concern that such a senior position was being "given to a kid who has no idea what he is doing." Dignan said there was "only so much I can control" and that the decision to bring in Matt Tuckness was Mike Burkland's decision.

93.    Mike Burkland also hired Matt Tuckness's friends and promoted them to senior vice president positions, even though they, like Tuckness, lacked relevant experience. For example, Matt Tuckness's high school friend Chase Lampley was made Mike Burkland's chief of staff after only having experience as an analyst on the deal desk.

94.    Mike Burkland's wife, Kathy Burkland, was also very involved in the Company. Kathy Burkland did not have a formal title at Five9 but had access to Five9's internal financial information and was involved in hiring and firing decisions at Five9. Employees with a personal connection or loyalty to Kathy Burkland were spared from Company layoffs. FE-1 had discussions with Mike Burkland in passing and in the halls of the office, where Mike attempted to justify his wife's involvement, stating "she is just a genius with money," and warned Five9 employees: "Kathy is really going to reel in all this spending."

**2.    At Weekly E-Staff Meetings, the Individual Defendants Were Told That Revenue Had Stagnated, the Company Had Significantly Fallen Behind Revenue Targets, and the Company Could Not Meet Its 2024 Revenue Target**

95.    The Company's 2024 revenue target was based on the false assumptions that Five9 was both increasing new business revenue and expanding revenue growth with existing customers.

96.    FE-1 attended weekly Executive Staff Meetings, called "E-Staff Meetings," which included CEO Mike Burkland, President/CRO Dan Burkland, CFO Barry Zwarenstein, COO Andy Dignan, and EVP of Finance Bryan Lee. The weekly E-Staff Meeting generally lasted two to three hours, and was usually conducted on Monday mornings at 10 A.M. Pacific Time, though it was moved to Tuesday if Monday had a conflict, such as a holiday.

97.    Since at least 2021, FE-1 attended the Revenue portion of the E-Staff Meetings, which, in addition to CEO Burkland, President/CRO Burkland, CFO Zwarenstein, COO Dignan, and EVP Lee, also included SVP, Sales and Business Operations Ari Klionsky, who was Dan Burkland's "right hand man" and tracked all bookings and sales data for Dan; and VP Global Services Operations and Strategy Blake Nelson, who was Andy Dignan's "right hand man." Occasionally, Dan Burkland had SVP Doug Dopita or SVP Nick Delis attend as well. Approximately one third of the time, FE-1 brought Dave Hill and Kurt Conard to attend the E-Staff Meeting, particularly where Dan Burkland relayed to FE-1 in advance of the E-Staff Meeting that Mike Burkland and Barry Zwarenstein wanted more granular information about revenue headwinds or specific customers, including "why a customer was churning, which meant we were losing revenue from them." Dave Hill and Kurt Conard reported to FE-1.

98.    The meetings were held by Zoom and Klionsky presented Five9 sales data on the Zoom screen for the attendees to view during the meetings. At some point during FE-1's tenure, the Zoom meetings started to be recorded. The recordings were available so that FE-1 and others could go back and get the transcriptions, and the recordings were also circulated by email with a link.

AMENDED CLASS ACTION COMPLAINT

CASE NO. 5:24-CV-08725-PCP

99.    The Revenue portion of the E-Staff Meetings included discussion of bookings, how to increase revenue, and how much revenue was coming in.  Blake Nelson discussed "projected seat turn-ups"—*i.e.*, customer seats that were going live and thus beginning to generate revenue for Five9.

100.    By the second half of 2023, CEO Mike Burkland and CFO Barry Zwarenstein were grappling with Five9's diminished revenue growth and placed pressure on how Five9 could generate more revenue from its existing customers to make up for the Company's underperformance.  Specifically, CEO Burkland and CFO Zwarenstein were concerned about the Company missing its revenue projections.

101.    Accordingly, CEO Burkland and CFO Zwarenstein directed FE-1 and other E-Staff Meeting attendees to conduct separate weekly Revenue Breakout Sessions.  The weekly Revenue Breakout Sessions began in the second half of 2023 and were generally held on Fridays.  Bryan Lee led the sessions, which were attended by FE-1, Dan Burkland, Ari Klionsky, Andy Dignan, and Blake Nelson, among others.  Bryan Lee circulated outlook calendar invitations to FE-1 and the other attendees for each Revenue Breakout Session.  Lee's calendar invitations typically included a spreadsheet tracking possible ways that the Company could immediately generate additional revenue, such as by imposing additional charges for existing clients, and also stated the revenue Five9 was hoping to derive from its schemes to increase revenue.

102.    During E-Staff Meetings, Bryan Lee reported to CEO Mike Burkland and CFO Zwarenstein what was discussed during the Revenue Breakout Sessions.  Specifically, Bryan Lee had an "enormous spreadsheet," in which he entered information, and presented at E-Staff Meetings.  Among other things, Lee's spreadsheet incorporated data that Blake Nelson was responsible for tracking and presenting, such as how many seats were "going live," implementation delays, and customer de-bookings.  Lee's spreadsheet also incorporated information from FE-1 about which customers were decreasing in a given month, why customers were decreasing, and the resulting negative impact on revenue.  Lee regularly opened and edited his spreadsheet during E-Staff Meetings and Revenue Breakout Sessions that FE-1 attended with him.  FE-1 emphasized, that at the E-Staff Meetings "[t]hey were constantly, constantly following revenue very tightly."

103.    By late 2023, customers informed FE-1's sales staff that they could not spend money because of the direction of the economy and uncertainty surrounding the clients' businesses.

104.    By the end of 2023 and early 2024, during the Revenue sessions of E-Staff Meetings, CEO Mike Burkland and CFO Zwarenstein were informed that the Company was behind where it needed to be if it were going to achieve the revenue guidance that the Company was reporting to investors.  CEO Burkland and CFO Zwarenstein instructed FE-1 to "find" revenue equal to the millions in shortfall "because we told the Street we were going to make this much." When instructed by Burkland and Zwarenstein to "find more revenue," FE-1 replied at the E-Staff Meetings that it was not possible to make up the shortfall and explained that "COVID is over" and "our customers are shrinking."  At the time, FE-1 warned the attendees that customers "did not have any money to grow the business" and that the "revenue is not going to increase" from Five9's base of existing customers.  By way of example, during the COVID pandemic, Five9 healthcare customers such as GoHealth, Blue Cross, and Select Quote typically added thousands of seats at the end of each year, which had been a "big boost of revenue at the end of the year." But that pattern of these customers adding thousands of seats at the end of each year ceased after COVID, and it was not possible for Five9 to replicate this "big boost" in revenue anymore.  The negative macro factors and budget constraints negatively impacted the new business as much as they did existing customers.  In addition, at E-Staff Meetings, Dan Burkland, Klionsky, SVP Doug Dopita, and SVP Nick Delis spoke on behalf of the net new business and detailed the negative impact of the economy and budget constraints conveyed by customers.  At the E-Staff Meetings, CEO Burkland and CFO Zwarenstein did not like these responses because it further confirmed that Five9 could not meet its revenue target.

### 3.    Many Five9 Bookings Were the Result of Artificial Sales

105.    By early 2024, Five9 was facing customer "de-bookings"—*i.e.*, customers that backed out of sales—because Five9 engineers and implementation personnel were unable to timely and effectively deliver what Five9 sales personnel told customers Five9 would be able to deliver. This was discussed at E-Staff Meetings as well as among the E-Staff attendees in the context of

informal office discussions. CEO Burkland, CFO Zwarenstein, and other E-Staff attendees sat next to each other at the Five9 headquarters building, and were often working in close proximity, exchanging hallway discussion, and talking in one other's office. Important topics like customer de-bookings were often discussed immediately and informally among E-Staff attendees prior to the more formal discussion at the next E-Staff Meeting.

106. In sum, the Five9 sales team pitched to customers promises of what Five9 products could do, but in some cases Five9's implementation team was not technically capable of making good on that promise. So even though the sales team made a sale and recorded a booking, the technology often was not able to deliver as promised. As a result, implementation was delayed while Five9 engineers tried to figure out a way to create the product capabilities promised to customers to entice the sale. This led to significant delays in implementation. Many customers de-booked the sale or reduced their seats as they became frustrated and learned the truth about Five9's products. This directly affected revenue as the Company could not bill for seats that were not live, even if the contract had been signed.

**4. Five9 Resorts to Desperate Revenue-Boosting Tactics and "Re-Interprets" Customer Contracts to Forbid Seat Reductions**

107. As part of enticing customers to initially contract for a certain number of seats, Five9 promised customers that they could reduce the seat number as conditions changed, thereby reducing the customer's costs. The customers' ability to flex the number of seats they had with Five9 was a meaningful selling point given the uncertain, fast-paced, or seasonal business environments in which many of them operate. Five9's customers "consistently" invoked these promises, which Five9 had always honored. In fact, seat reductions happened so often that Five9 had a policy in place to protect FE-1's team from compensation deductions due to customers reducing their number of seats.

108. In 2023, however, in order to offset the Company's declining revenues and seat reductions, Five9 "changed how they interpreted the contracts." FE-1, at Klionsky's direction, was required to refuse customer requests to reduce the number of seats they bought below their original commitment, even though the same request had been honored in previous years and even

though customers' contracts had no minimum seat requirement.  What's more, Klionsky insisted that the minimum seat requirements applied even to customers who had substantially increased their number of seats over time.  For example, where a customer who increased from 20 seats to 500 seats later gave notice that they would reduce to 400 seats, Klionsky insisted that the customer was subject to a 500-seat minimum requirement and therefore no reduction was allowed.  Many Five9 customers accepted these representations and withdrew their seat reduction requests.  On the other hand, some customers were familiar with their contracts and became "furious."  These customers pointed out there was no "minimum," and threatened to sue Five9 for breach.  Klionsky instructed that for customers that threatened to sue, Five9 should permit the requested seat reduction.

109.    This policy change alienated customers because they had previously understood that they could reduce the seat numbers up or down, based on the representations of Five9 account executives.  As a result, while Five9's revenue might have increased somewhat for the life of a customer's typical one-year contract, Five9 lost the more significant revenue from retaining and renewing customer contracts.

**5.    Five9's AI Products Were Not Competitive and Customers Rejected Five9's Ploy to Push These AI Products**

110.    Five9's AI offerings were not ahead of competitors; instead, its offerings were "rudimentary," and garnered little customer interest.  Defendants would instruct salespeople to tout the AI offerings to try to win business, but the products did not actually have the capabilities.  Not only was Five9 not winning business from large enterprises due to its deficient AI capabilities, large enterprise customers that did business with Five9 did not even utilize Five9 AI capabilities.

111.    In fact, Five9 could not even give the AI products away.  Although Five9 pushed sales staff to sell existing customers Five9's Intelligent Virtual Agent, often called "IVA," the customers "tried it, did not like it, and did not buy it."  When FE-1 brought these issues up in meetings with CEO Mike Burkland, CFO Zwarenstein, and President Dan Burkland in 2023, they decided that Five9 would give the customers free trials.  Five9 offered these free trials to new and existing customers in 2023 and through at least February 2024 when FE-1 left.  But customers

balked at free trials too and did not take Five9's AI product, even though it was offered for free. FE-1 shared this information with CEO Burkland and CFO Zwarenstein in connection with Five9's Customer Advisory Board meeting in 2023, and CEO Burkland and CFO Zwarenstein were "shocked" to learn in 2023 that customers had such little interest in Five9's AI product that they even rejected the free trials.

**B.    Former Employee 2: Five9 Business Development Manager**

112.    FE-2 worked as a Business Development Manager at Five9 from December 2022 until August 2024, and prior to that as a Business Development Representative and a Lead Development Representative starting in February 2021. As a Business Development Manager, FE-2 managed Five9 business development representatives, including for Five9's commercial, mid-market, enterprise, and international customers. Business development representatives who reported to FE-2 were tasked with sourcing net new business and setting up as many opportunities as possible for the account executives they supported. During FE-2's tenure at Five9, FE-2 worked closely with Five9 account executives, including through weekly meetings with account executives, and monthly meetings with Regional Vice Presidents (RVPs) who led teams of account executives, to provide updates, coordinate, and advance potential deals from the business development representatives to the account executives. FE-2 provided the information in this subsection.

**1.    Five9 Experienced Significantly Lower Sales in Q1 2024, Which Defendants Discussed at Regular Internal Meetings**

113.    In the first quarter of 2024, sales were significantly lower than they were in 2023, and the sales team fell behind on their quotas. Because sales were down in early 2024, the Company increased business development quotas and put pressure on the business development teams to generate more sales opportunities to make up for the disappointing underperformance in Q1 2024. FE-2 and the business development teams made more calls, sent more emails, and set more appointments than prior years, and even tried new strategies as well. Despite significantly greater efforts, Five9 sales remained significantly lower than in 2023, and the Company had significant problems closing deals throughout 2024.

114.    These issues were discussed at the quarterly business review ("QBR") meeting for Q1 2024, the Weekly All Hands Meetings, and BiWeekly Sales Meetings.

115.    President and CRO Dan Burkland attended four QBRs per year, each one held generally on Fridays immediately following the Company's quarterly report.  Senior Vice President Doug Dopita led the QBRs, which were attended by the sales team consisting of approximately 200 to 300 employees.  For the first QBR of 2024 held immediately following the first quarter 2024, the messaging from Five9 executives to the sales team was "somber."  The Company's sales were down, and sales were especially weak in the enterprise segment.  In fact, Dan Burkland specifically told the sales personnel that there was a gap between the Company's sales performance and its projections.

116.    Similar information was discussed with CEO Mike Burkland and others at Weekly All Hands Meetings, which were held on Mondays.  CEO Mike Burkland, President Dan Burkland, Five9's sales personnel, including FE-2, as well as representatives from marketing, IT, and the solutions consultants, among others, attended these meetings.  On the first Weekly All Hands Meeting after the Q1 2024 QBR, held at the beginning of April 2024, CEO Mike Burkland admitted that there was a significant underperformance in Q1 toward meeting the Company's projections.  At the same meeting, Dan Burkland repeated his message from the QBR confirming the Company's weaker than expected sales, and expressing concern about the growing gap between the Company's actual sales and revenue as compared to expectations presented outside the Company.

117.    When confronted with reports of Five9's deteriorating financial performance in 2024, and the Company's inability to meet its overly-optimistic revenue forecasts, Mike Burkland responded with the phrase "Don't Stop Believin," a reference to the song by the band Journey.  To FE-2 and the sales team, CEO Burkland's "Don't Stop Believin'" mantra represented his refusal to grapple with deteriorating sales, and inability to articulate how the Company could meet its unrealistic revenue projections.

AMENDED CLASS ACTION COMPLAINT

34

CASE NO. 5:24-cv-08725-PCP

### 2. Macro Factors Were a Significant Reason for Declining New Business in 2024

118. In 2024, new business customers told FE-2 and FE-2's team that they were reluctant to pay for Five9's products because they were "more price sensitive" and generally less willing to spend money on contact center software. The customers explained that this was largely due to economic factors, such as higher interest rates than in prior years, stock market fluctuations, and a volatile political environment, with an upcoming election. Another macro factor negatively impacting Five9's new business was that many companies had already invested in contact centers as they took on additional importance following the COVID pandemic. Customers had already invested when it was a necessity to have such software during the pandemic, and many new business customers took the position that now was not the time to make that investment and shell out a ton of money for contact center software.

### 3. Five9 Experienced Cancellations or De-Bookings Because It Sold Products and Capabilities That Five9 Did Not Possess

119. In the beginning of 2024, FE-2 began learning from Five9 account executives that, after deals were booked, customers cancelled, or "de-booked" as a result of Five9's inability to timely or reliably deliver product. The de-bookings occurred because Five9's sales personnel pitched new customers on products and platforms that the Company was not able to deliver. Specifically, the sales personnel were trained to promise customers product performance without any actual knowledge of the products' specifications and regardless of Five9's actual ability to deliver the product. So long as it seemed potentially possible that Five9 may be able to deliver what the customer needed, Five9 booked the sale.

120. This sales training happened in meetings, including as part of the BiWeekly Sales Meetings that FE-2 attended and were held every other Friday. For example, President Dan Burkland told salespeople in a BiWeekly Sales Meeting in approximately March 2024 that, with respect to Five9's IVA, or Intelligent Virtual Agent, to "say yes, say yes," when a customer asked about Five9's capabilities, even though certain requests could be novel, complex, or not feasible. Once the sale was booked, Five9 account executives passed the newly-signed deal to the

implementation personnel, who were tasked with creating the capabilities that did not exist at the time of the sale.

121.    This aggressive sales approach led to significant tension between the sales and implementation teams, and frustrated customers who, by the beginning of 2024, were cancelling or "de-booking" orders once they realized that Five9 lacked the products and capabilities they originally sold.  One pattern that commonly played out is as follows: a Five9 account executive informed a client that implementation personnel were working on the promised solution and it would be done by a particular upcoming date.  But representatives from Five9's implementation team did not learn of these commitments before they were confirmed with Five9 customers.  The implementation team told the customer: "We cannot do this and never said we could."

122.    Meanwhile, as the implementation team tried to determine if it could deliver to a given customer's specifications, Five9 clients either endured a long wait period or de-booked. Five9 customers were frustrated by the extended wait times, and told Five9 account executives that "clearly you do not have it together."  These de-bookings were eventually so frequent that Five9 developed a policy for how the de-bookings impacted sales commissions.

**4.    Five9 Executives Promised to Hire More Engineers to Fix the Implementation Issues but Instead Terminated Engineers**

123.    In February 2024, Five9 held its Sales Kickoff Meeting in Las Vegas, Nevada.  It was attended by CEO Mike Burkland, President Dan Burkland, Executive Vice President Panos Kozanian, FE-2, as well as sales staff, executives, solutions consultants, business development representatives, and marketing personnel.  At the February 2024 Sales Kickoff Meeting, Five9 executives made a big production of their commitment to hiring 80 new engineers, and in presentations communicated that they understood how expanding Five9's engineering team was necessary to meet Five9's sales and revenue goals.  But Five9 never hired additional engineers. To the contrary, as part of cost-cutting measures, Five9 actually terminated engineers.

**C.    Former Employee 3: Five9 Account Manager**

124.    FE-3 served as an Account Manager at Five9 from July 2019 until March 2024. FE-3 managed enterprise-level accounts, and in that role FE-3's responsibilities also included

customer retention and expansion, and upselling and cross-selling to existing Five9 customers. FE-3 provided the information in this subsection.

**1.    In 2024, Five9's Deficient AI Offerings Led to Poor Logo Retention**

125.    By late 2023, Five9 was losing existing customers to competitors as a result of its deficient AI offerings.  Customers reported to account managers that they were upset and disappointed with Five9's AI products.  Among other things, there was no migration path from Version 6 to Version 7 of Five9's AI product.  Further, Five9 was forcing customers to pay a new implementation fee if they wanted to upgrade to Version 7.  Five9's disappointing AI product led customers to look at competitors like NICE or Genesys, who could offer both AI and contact center software with the goal to "take the whole contact center" and "utilize AI on the front end to reduce the number of seats that would be required," which made Five9 especially vulnerable to losing customer accounts.  Multiple customer accounts even admitted to FE-3 directly that they had planned to switch to Five9 competitors Genesys and NICE after testing their AI products.

126.    The impact of these issues was material.  In early 2024, Five9 lost hundreds of contact center software seats from one of FE-3's enterprise customers, who had given up on Five9 and decided to take its business to a competitor.  This was not an isolated incident and other account managers were losing seats to Five9's competitors as well.  Five9's customers were switching to its competitors because they understood that Five9's products were outdated and lagging competitors.

**D.    Former Employee 4: Five9 Director of Solutions Consulting**

127.    FE-4 initially joined Five9 as a Solutions Consultant in October 2018 and became a Manager of Solutions Consulting from 2021 to 2023.  FE-4 was then promoted to a Director of Solutions Consulting and held that position from August 2023 until August 2024.  FE-4 reported to Regional Vice President, Net New Solutions Consulting Americas Brandon Ewing.  In turn, Ewing reported to VP, Global Solutions Consulting Phil Files.  As a Director of Solutions Consulting, FE-4 managed a team of sales personnel focusing on both net new and existing accounts.  FE-4 provided the information in this subsection.

**1.    Prior to June 2024, There Was a Significant Downturn in Bookings and Revenue and Five9 Admitted Internally It Would Not Hit Its Revenue Target**

128.    Although Five9's sales to its existing customer base had already been "sluggish and slow" in 2023, revenue growth was worse in 2024 as a result of bringing in Matt Tuckness and restructuring Five9's sales team.  Specifically, under Matt Tuckness, highly competent salespeople and customer success managers were fired or required to reapply for their jobs.  Their accounts were then reassigned to different salespeople who were less experienced and lacked the established relationships with customers that would have allowed Five9 salespeople to "go out and ask for orders."  Matt Tuckness "was brought in and he shook the snow globe really hard," and made the sales problems much worse.

129.    Five9's net new business bookings also stalled by early 2024 as a result of macroeconomic concerns.  Specifically, FE-4's discussion with front line salespeople in early 2024 revealed that the weak net new business bookings were caused by apprehension and reservation as a result of the upcoming election cycle, economic headwinds, and other macroeconomic concerns. The macro impediments to new business bookings were recorded in the Five9 Salesforce system available among executives and the sales team.  In early 2024, the Salesforce information system reflected that macroeconomic conditions were impeding new sales.  The quantity of deals had decreased due to these conditions.  The Salesforce system was the single source of truth at Five9 and was the repository of sales data at the Company from which executive-level personnel received reports on the status of sales.

130.    To combat the "exceptionally sluggish" bookings and struggle to get business from new net logos (*i.e.*, new customers) in Q1 2024, Ari Klionsky, Doug Dopita, Nick Delis, and other Five9 senior leadership implemented policies during that quarter acknowledging that Five9 would not meet its revenue forecast.  The downturn in the outlook for the rest of the year was obvious throughout Q1 and Q2 2024.  Five9 was stealing from the next quarter's forecast to make the number for the current period.  And, by doing that, they ended up in a situation where they did not have any more forecast to bring into the current period, including because of the negative impact of the macroeconomic headwinds on the quantity of opportunities.

131.    One such tactic began in March 2024, when Matt Tuckness, on a Zoom call with more than a dozen other CSMs (customer success managers) and other sales personnel, including FE-4, announced a change in compensation policy whereby Five9 gave a guaranteed "draw" to sales and customer management teams (*i.e.*, an advance against future commissions to ensure steady personal income).  Matt Tuckness, who was hired back to Five9 in December 2023 in a position several ranks higher than when he quit in 2022, within months of his return, "screwed up" the sales organization "so bad" that the sales representatives were not hitting their numbers and leaving Five9.  The Company implemented the guaranteed draw for the first two quarters of 2024 in an attempt to stem the departures and hope to prevent sales staff from losing effort or getting discouraged because they knew that they had no chance of hitting the sales numbers needed to earn their incentive compensation.  This draw policy was rolled out in March 2024 and guaranteed through the end of June, reflecting that Five9 was not hitting the sales numbers for those quarters.  These "Hail Mary" tactics did not succeed.

**2.    Internally, It Was Known That Five9 Would Not Hit Its 2024 Revenue Target**

132.    By at least May 2024, Five9 leadership discussed that Five9 would miss its 2024 targets.  Specifically, on Weekly All Hands Meetings every Monday, SVP Sales and Business Operations Ari Klionsky shared the latest revenue and financial metrics and how they compared with Five9's forecast.  President Dan Burkland attended these financial presentations and made introductory statements at the meetings.  In May 2024, at the end of month two of the second quarter, Klionsky reported that Five9 was significantly behind forecast and "only at 32 percent" of the revenue needed in Q2 to make the 2024 forecast.  This was also materially below where Five9 stood in prior years at this point in the quarter.

133.    Ari Klionsky reported to Dan Burkland and other attendees at the Weekly All Hands Meetings, prior to June 2024, that bookings were down, and we "are not going to hit our number" for 2024 revenue.  The data that Klionsky presented came from Five9's Salesforce system, and the projection was based on the Clari tool that Five9 relied on to track the Company's performance towards its targets.

### 3.     Implementation Delays and De-Bookings

134.     There was a disconnect between sales and implementation at Five9.  Five9 sales personnel made commitments to customers on which Five9 could not deliver.  Five9 sales representatives were trained to say "yes" to customer requests, like with respect to the Intelligent Virtual Agent (IVA).  This led to customer frustration, implementation delays, customer de-bookings.

135.     These implementation delays also consumed resources that could not be dedicated to deploying systems for other customers because Five9 engineers and other staff were spending significant additional time trying to create, rollout, deploy, or fix issues with a customer system.  Because Five9 customers did not have to pay anything until after implementation was complete, Five9 was not earning revenue from the customer during these implementation delays.

136.     At times, Five9's implementation and professional services personnel got on the line with customers after the sale and told the customer directly that they could not deliver what was purportedly sold.

### E.     Former Employee 5: Five9 Director of Solutions Consulting

137.     FE-5 worked for Five9 from August 2016 until October 2024.  FE-5 initially served as a Senior Solutions Consultant beginning in August 2016.  Thereafter, FE-5 was promoted to a manager position in Solutions Consulting.  In approximately 2021, FE-5 became a Director of Solutions Consulting and held that position until October 2024.  As a Director of Solutions Consulting, FE-5 managed about 20 sales engineers.  FE-5's team delivered demos, helped identify which products clients needed, helped solve problems related to deliverables to customers as part of the sales process, and guided the sales cycle for new and existing customers.  FE-5 was designated a top performing member of the sales team and attended President's Club trips reserved for sales staff given that honor.  FE-5 was also nominated as Top Sales Engineer as well.  FE-5 provided the information in this subsection.

### 1.     Weekly All Hands Meetings

138.     FE-5 attended Weekly All Hands Meetings led by SVP Sales and Business Operations Ari Klionsky and held by Zoom.  In the Weekly All Hands Meetings, various teams,

including sales, marketing, the partner team, the product team, sales engineering, human resources, and professional services attended and made presentations to provide updates about Five9's business. Senior executives, including Matt Tuckness, Doug Dopita, SVP Chris Silver and Nick Delis, regularly attended as well and presented on their respective business areas. President Dan Burkland often attended and spoke about the Company's performance and sales. The Weekly All Hands Meetings were a CRO-focused meeting with the central purpose of presenting information to Dan Burkland.

139. During Q1 of 2024, the tone of Weekly All Hands Meetings became one of concern about the poor booking numbers. And during Q2 2024 and, certainly by mid-May 2024, the discussion in Weekly All Hands Meetings had completely changed from the prior year and became centered on the serious shortfalls in the Company's bookings. Given Five9's growing implementation times, it took upwards of a year for a booking to actually turn into revenue. Thus by mid-May 2024, the Company had a very clear picture of its revenue for 2024 because that year's revenue was a reflection of the bookings that had already been secured by that time.

140. The deteriorating bookings by mid-May 2024 were presented as a serious concern at Weekly All Hands Meetings at that time because they meant a significant revenue shortfall for 2024.

141. Throughout this period, Klionsky presented to the attendees the latest data showing the Company's sales, revenue, bookings, and other financial metrics, and demonstrated to attendees how these figures showed that Five9 was underperforming compared to the Company's forecasts and performance the prior year. The presentations were numbers-driven, and attendees could see where things were at. President Dan Burkland was present for these discussions. During this March to May 2024 period, President Dan Burkland made comments along the lines of: "We have to get serious" and urged that "we need to do anything we can do" to "pull" bookings from future quarters into the current quarter. By the May 2024 Weekly All Hands Meetings, the data presented clearly showed that Five9's customer retention, dollar-based retention rate, as well as sales to new customers were poor and significantly underperforming the Company's forecasts.

**2.      Quarterly Town Hall**

142.     Five9 held internal Quarterly Town Hall meetings several days after its quarterly earnings calls.  Chief Executive Officer Mike Burkland led these meetings, which Chief Financial Officer Barry Zwarenstein attended, along with nearly all executives and staff.  Barry Zwarenstein presented the "financial portions" of the business during the meetings.

143.     In early May 2024, FE-5 attended Five9's Quarterly Town Hall following its Q1 2024 earnings call.  At that May 2024 Quarterly Town Hall, Mike Burkland was asked direct questions from Ashish Umrani about the Company's financial performance.  In response, Mike Burkland admitted that Five9's business was struggling and, in particular, that macroeconomic headwinds had negatively affected both new business and existing business sales.  Mike Burkland added that the sales cycles had grown longer and potential Five9 new customers were hesitant to make large purchases because of the macro environment.

**3.      Salesforce**

144.     Five9 heavily relied on Salesforce for its financial and sales data.  "Salesforce was our single source of truth" for such information and Salesforce data was used to generate various reports and metrics relied upon by Five9 senior executives.

**a.      Clari and "Snap the Chalk" Updates**

145.     At the start of the quarter (typically seventh business day of quarter) Ari Klionsky prepared a "Snap the Chalk" analysis that distilled the latest Salesforce data to project Five9's sales for the quarter.

146.     Beginning by 2022, throughout each quarter, Five9 also relied heavily on a sales operations tool called Clari, which is an "add on" to Salesforce and was based on Salesforce data. The Clari tool showed Five9's expected sales for the current period based on the extensive sales data in the Salesforce system and updated dynamically throughout the quarter based on how the sales team progressed. The Clari tool established the latest projection of Five9 sales for the quarter.

147.     Klionsky presented the latest Clari updates to President Dan Burkland and other attendees at the Weekly All Hands Meetings.  During April and May 2024, the Clari tool showed that Five9's sales were materially below where they were projected to be and getting worse.  By

mid-May 2024, it was apparent from the Clari updates presented at the Weekly All Hands Meetings that Five9 was behind its sales forecast and not going to hit its growth target for the year 2024. Further, during All Hands Meetings, Klionsky compared the latest Clari updates to his original Snap the Chalk projection at the start of the quarter. By mid-May 2024, the Clari trend had dropped so significantly that it demonstrated to any rational observer that it was not possible to meet the Snap the Chalk sales projection for Q2 2024 or the Company's revenue growth target.

### b.    Dan's Dashboard

148.    Another report with bookings and sales data provided to Dan Burkland that reported the Company's shortfall and failure to meet revenue expectations in 2024 was referred to as "Dan's Dashboard." This was a real-time Salesforce dashboard that depicted how the Company was progressing for all deals, including closed deals and pipeline deals for the current quarter and the upcoming quarter. Dan's Dashboard reported this information by customer segment—strategic, enterprise, mid-market, commercial, and international. Dan's Dashboard contained both net new and existing business, and it showed the entire sales pipeline. The report was referred to as "Dan's Dashboard" internally at Five9 because all bookings rolled up to Dan Burkland. Dan Burkland cared about the data for all the customer segments as part of his oversight and responsibility for all sales. FE-5 and anyone within the sales organization could access "Dan's Dashboard" within Salesforce and use it to view the Company's performance compared to its quarterly target, drill down into top line numbers, and drill down on the specifics of each customer deal.

149.    In the March through May 2024 time period, Dan's Dashboard corroborated the Clari updates showing that Five9 was behind its forecast and had no realistic chance of hitting its revenue growth forecast for the year 2024.

### c.    Year-over-year Retention Reports

150.    At the outset of Matt Tuckness's return to Five9, Mike Burkland sent an email to FE-5 and other sales personnel stating that he had empowered Matt Tuckness to run the sales organization as to existing customers, and Matt Tuckness was empowered to make decisions and restructure sales as he saw fit. By early 2024, during Q1 2024, FE-5 had Zoom calls with Matt Tuckness where Matt Tuckness presented "Year-over-year Retention Reports" created from

Five9's Salesforce data that showed the Company's dollar-based retention rate was concerningly behind historical performance as well as the Company's targets for the year.

151. During these Zoom calls, which included larger meetings with sales engineers in addition to as "special one offs" and "ad hoc meetings," Matt Tuckness showed the Company's poor dollar-based retention rate (*i.e.*, DBRR) and negative year-over-year retention of customers. DBRR measures a company's ability to retain and grow revenue from existing clients.

**4.      Mike and Kathy Burkland's Nepotism Exacerbated Five9's Poor Performance**

152. One of the reasons for Five9's poor performance in this period was Mike and Kathy Burkland's hiring of family and friends.  Matt Tuckness's tenure, in particular, was a "disaster." Not only did Tuckness push out experienced, qualified, and successful executives, like Doug Dopita and others, he also launched ill-advised business initiatives.  In 2024, Matt Tuckness announced that he was going to reconcile and improve Five9's disparate sales processes across the different segments, but he was lost and accomplished nothing.  Due to Matt's failures, Five9 was forced to turn to consultants to help remediate the mess, which included consultants from Winning by Design to help Five9 to understand how to create sales processes, and a second consulting company to look at general reorganization. None of Tuckness's initiatives bore fruit.  Instead, they accelerated the negative trends driving down Five9's revenue and base.  As FE-5 put it, "all" Matt Tuckness has "accomplished is throwing all the pieces in the air and breaking half of them when they hit the ground," Tuckness's incompetence has driven down Five9's revenue, customer base, and internal morale.

153. Kathy Burkland was a decision maker at Five9, despite not having a formal title at the Company.  Kathy Burkland had direct input on which people could stay and go, based on her understanding of the business.  For example, senior executives, like Senior Vice President Nick Delis, personally appealed to Kathy Burkland to ask to be spared during Company layoffs.  Mike and Kathy Burkland nepotistic and self-serving agenda led to loss of institutional knowledge and the Company's poor performance.

154.     Family and personal friends of the Burkland family and Tuckness family were known at Five9 as the "Danville Mafia," referencing their connection to the Danville, California area. Mike Burkland's son, Tyler Burkland, was hired in 2024. Members of the "Danville Mafia," survived the 2024 layoffs, and many were promoted into senior positions. They were protected and/or moved up. These individuals included: Matt Tuckness, who was hired in December 2023 and promoted multiple times in 2024; Matt Tuckness's brother, Kevin Tuckness, who was promoted to Head of Sales and Sales Development in 2024; and Matt Tuckness's friends with whom he had a personal relationship, from college or elsewhere, including VP of Mid-Market and Commercial Sales Kyle Shandera; Director, Enterprise Solution Consulting Max Saravia; and SVP of Sales Josh Biers. Underpinning this point, Josh Bier's wife, Cori Biers, also worked for Five9, and Cori Biers reported to her own husband. It was widely understood within Five9 that Matt Tuckness was Mike Burkland's godson, and that Mike Burkland had a close personal relationship with Matt Tuckness dating back to Matt Tuckness's childhood.

### 5. Five9's AI Product Lagged Competitors and Disappointed Customers

155.     As far as AI, Five9 was falling further and further behind competitors, which was another reason why sales were declining. Five9 customers expressed disappointment in the Company's AI product and capabilities to FE-5 and questioned: "Is that all you got?" Five9 was not winning enterprise deals due to the Company's AI leadership or the actual AI capabilities that the Company claimed to have, and enterprise customers were hardly using Five9's AI, if at all. Five9 had a vision for AI, but did not have the capabilities, and was convincing customers of its vision, not selling customers on a deliverable product.

### F. Former Employee 6: Five9 Senior Financial Analyst

156.     FE-6 served as a Senior Financial Analyst at Five9 from April 2023 until mid-February 2024. In this role, FE-6 worked on the Financial Planning & Analysis ("FP&A") team at Five9. FE-6 reported to Manager, Financial Planning and Analysis Mike Mullins. Mullins reported to Director of FP&A Sarah Fong, who reported to Executive Vice President Bryan Lee who, in turn, reported to CFO Barry Zwarenstein. FE-6's responsibilities included managing and tracking budgets for various departments including sales, legal, and HR; reviewing spending

requests from department heads; participating in monthly forecast cycles; and assisting with annual budget planning.  FE-6 provided the information in this subsection.

### 1.    Emergency Retroactive Budget Cuts

157.    In late 2023, FE-6 and the FP&A team completed Five9's yearly budget for FY 2024 and had been directed by department heads and C-level executives to "keep things under wraps" and keep spending "tight."  CFO Zwarenstein specifically stated that the reason for budget cuts was that macroeconomic headwinds were negatively impacting Five9's revenue and growth. Following these directives, the FP&A team then consolidated the budget for 2024, and presented it to Zwarenstein and Mike Burkland in a meeting in December 2023 for approval by Zwarenstein and Mike Burkland.

158.    Then, in January 2024, after the 2024 budget was already finalized and in place, CEO Mike Burkland suddenly ordered retroactive cuts.  Specifically, CEO Mike Burkland ordered new miscellaneous negative amounts added for the different departments' budgets.  CEO Burkland's additional budget cuts for 2024 were entered in a "miscellaneous line" in the budgets, which stood out to FE-6 because large entries in the miscellaneous column were often a red flag for someone working in finance.  The amount of these additional budget cuts was significant from a financial perspective.  Normally, the heads of each department (budget owners) like Legal or HR had freedom to manage their budgets.  However, this changed in January and early February 2024. Bryan Lee instructed FE-6 and others to make sure department heads know that they did not have discretion as to how to implement the new retroactive cuts.  Instead, Lee informed FE-6 that Mike Burkland had a very particular way he wanted to meet this cut.  FE-6 understood from Lee, as well as Manager, Financial Planning and Analysis Mike Mullins and Director of FP&A Sarah Fong, that these miscellaneous retroactive budget cuts reserved for CEO Mike Burkland were for stealth layoffs designed to avoid public detection, which was ultimately confirmed by layoffs beginning Q1 2024, which included FE-6.  Additionally, Zwarenstein or Mike Burkland had to approve any new expenditure requests, and department heads were instructed to avoid any expense not strictly necessary; they were not permitted to have "nice-to-haves" and were told that most departments would be lucky to get approval even for spending that was "needed urgently" for the business.

## 2.     2024 Hiring Freeze

159.     Five9 also implemented a hiring freeze in late 2023 or early 2024. The department heads could not add headcount to their respective teams. Absent an employee departure, there were no new hires, even on the sales team. Moreover, SVP Ari Klionsky had to secure approval from CEO Mike Burkland or CFO Barry Zwarenstein before any hiring at all, unless it was for backfills to replace a departed employee.

## 3.     Bookings File Regularly Presented to the Individual Defendants

160.     Mike Burkland, Dan Burkland, and Barry Zwarenstein all used and/or reviewed a "Bookings File" maintained by Bryan Lee that showed sales that had not yet gone live and/or started to generate revenue, including for new logos (*i.e.*, new customers) as well as existing customers. The Bookings File was Excel based and used to "make the finance forecast," to assess what was projected to come in, and as a means to plan for funding operations. The Bookings File contained Five9's quarterly and yearly forecast, and the "actual" revenue, broken down in detail. In addition to Lee, the Bookings File was updated and maintained by Senior Analyst, Strategic Finance Khrishan Gopal and Senior Analyst, Strategic Finance Eric Chien.

161.     The Bookings File was stored under "Barry's [Zwarenstein's] folder" on the share drive, which FE-6 knew based on FE-6's own access to the folder, and because FE-6 would personally use that pathway to access the Bookings File, which he used it to fulfill FE-6's job responsibilities.

162.     The Bookings File was updated daily. It reflected updates from the sales team, including when de-bookings or customer losses occurred. Lee's bookings file was also updated any time there was a change in the forecast from sales.

163.     Both Dan Burkland and Mike Burkland utilized Lee's Bookings File. In fact, the Burklands discussed the Bookings File during Company meetings and even brought up how often Bryan Lee used it. The Bookings File was also presented to CFO Zwarenstein in quarter-end and year-end meetings, attended by FE-6 and all employees who reported up to CFO Zwarenstein, which included the finance and accounting organizations. During these meetings, Zwarenstein

provided updates to his team, including regarding budgeting, forecasting, and departmental issues, as well as topics bearing on the Company's finances.

### 4.    Monthly LTM Report to CFO Zwarenstein

164.    CFO Zwarenstein also received a Monthly LTM Report that tracked annual recurring revenue for the last twelve months for Five9 customers, the changes in customer business, and the reasons for the changes, and also broken down by customer segment. "LTM" stood for "last twelve months." This Monthly LTM Report had been kept by Mike Mullins, but later transitioned to FE-6 having responsibility for it. FE-6 created the Monthly LTM Report using Excel. The Excel file was approximately five to ten sheets in length. It explained the deltas (*i.e.*, changes) between customers, month-over-month and-quarter-over-quarter, and was designed so that top finance executives could see month-over-month and quarter-over-quarter changes in detail, and the reasons for these changes. If there was a customer loss or reduction in seats, the data were captured and tracked in the Monthly LTM Report.

165.    To prepare the report, FE-6 downloaded data from Salesforce, including the data entered by sales personnel specifically showing "why is this customer down this amount." There was a notes column in the Excel-based report, which provided the "reason why a particular customer" or account "was down." If FE-6 had questions about the data, FE-6 reached out to a representative in the sales organization. However, it was rare that FE-6 had to reach out to the sales representatives, as the Salesforce system had very detailed information.

166.    FE-6 circulated the file via a Slack channel on a monthly basis created for top finance executives, which included CFO Zwarenstein, Bryan Lee, and Sarah Fong. There were roughly ten to fifteen recipients in total. FE-6 personally sent the Monthly LTM Report to this Slack channel, which included CFO Zwarenstein, in both January 2024 and February 2024, and for these months the Monthly LTM Reports showed a year-over-year revenue stagnation below Company expectations. FE-6 submitted each monthly report by the third day of the next month. For example, FE-6 submitted the January 2024 Monthly LTM Report to the Slack channel by February 3, 2024.

**5.      In-Office Contact with Mike Burkland and Barry Zwarenstein**

167.    Five9 headquarters employees occupied the second and third floors of the corporate office. There was a open area—sometimes called the "minion area"—where FE-6 and other members of the finance team sat on the third floor.  FE-6 and other members of the finance team worked at the office on Monday, Wednesday, and Thursday, and at home on Tuesday and Friday. There was a conference room and a hallway that separated the offices of Bryan Lee and CFO Barry Zwarenstein in the corporate headquarters.  FE-6 essentially sat "right next to Bryan [Lee] and [Chief Financial Officer] Barry [Zwarenstein]."  Zwarenstein and Mike Burkland's offices were "right next to each other."  Klionsky's office was next to Lee's office. The executives were "constantly back and forth, going to and from each other's" offices.  FE-6 said that Lee was "popping into" Mike Burkland and Zwarenstein's offices daily.

**G.      Former Employee 7: Five9 Director of Enterprise Sales**

168.    FE-7 served as a Director of Enterprise Sales at Five9 from December 2022 until May 2024.  In that role, FE-7 focused on new business sales and reported to former Regional Vice President (RVP) of Sales Tim Walsh, who reported to Area Vice President Julie Dang, who, in turn, reported to Senior Vice President Doug Dopita.  FE-7 provided the information in this subsection.

**1.      Five9 Had Very Weak Net New Business Due to Macro Conditions and This Was Reported to Five9 Management in Salesforce**

169.    In 2024, sales were particularly slow.  Five9 had plenty of leads and that was not the problem.  Instead, the difficulty was that enterprise businesses were not interested in buying Five9 products due to macro concerns and uncertainty.

170.    These issues existed for Five9 across all geographic regions.  FE-7 and four to five colleagues focused on enterprise sales for the Northeast region, which included New York.  All of FE-7's colleagues, as well as FE-7's boss, Tim Walsh, experienced the same extreme difficulty in making enterprise sales.  FE-7 was in frequent contact with the sales personnel for the other regions and had the same experience with extremely poor sales and lack of interest in Five9 from enterprise business leads.  FE-7 was given approximately 200 leads by Five9.  Despite significant efforts,

only about fifteen of them ever converted to a genuine sales opportunity, and only two of those ever resulted in any type of sale, with none of the sales closing prior to the end of Q2 2024. The sales environment at Five9 was very pressure-filled in 2024. Tim Walsh was under the gun because his entire team was not performing to target.

171. Doug Dopita and other senior leadership was aware of the fact that net new business enterprise sales were being negatively impacted by the economy because it was reported in Salesforce. FE-7 regularly and recurringly updated the Salesforce system with notes that explained why FE-7 was not closing deals. This included updating the Clari system within Salesforce with the latest details of FE-7's inability to secure new business. Pursuant to instruction from the Five9 executives to whom Tim Walsh reported, FE-7 and FE-7's colleagues diligently and immediately recorded all updates on sales leads and opportunities in Five9's Salesforce system. Of the approximately 198 sales leads that did not result in a sale, the clear majority of them declined due to macro reasons, such as economic uncertainty, general customer budget constraints, market conditions, and the economy at the time. For each of these leads, FE-7 dutifully recorded in Five9's Salesforce system that the Company had failed in converting net new business leads and opportunities for macro reasons. During the weekly meetings FE-7 attended, FE-7's peers in net new business enterprise sales described that they were similarly unable to close deals due to macroeconomic factors.

172. This Salesforce system is what CEO Mike Burkland and other top executives use for the Company's financial reporting and projections. Walsh also relied on those notes to provide answers to his more senior leaders. There was very strong pressure to immediately record in Salesforce any positive or negative update, and the feedback or explanations from sales leads and opportunities, and it was always done at least within the week.

**H.    Former Employee 8: Five9 Enterprise Account Manager**

173. FE-8 served as an Enterprise Account Manager at Five9 from March 2016 until August 2024. In that role, FE-8 supported between 40 and 50 enterprise customers, which each purchased 150 or more seats from Five9, and represented an average annual recurring revenue (ARR) for Five9 of $750,000. FE-8's responsibilities included daily customer communications,

quarterly business reviews and executive reviews with assigned accounts, contract negotiations, and onsite visits with customers. FE-8 provided the information in this subsection.

174. The reporting hierarchy and organizational structure changed in late 2023 or early 2024. As a result, during 2024, FE-8 reported to then-Director, Customer Engagement Tom McBath, who reported to Matt Tuckness. Prior to that, FE-8 reported to then-Vice President of Customer Success David Hill. In addition, the account management team previously rolled up through sales to Chief Revenue Officer Dan Burkland. But after the restructuring in late 2023 or early 2024, the existing customer base team was split up between customer success managers and account directors. The account management team members had to reapply for their jobs in this timeframe. FE-8 emphasized, "It was a mess. They switched up everybody's job functions." Throughout 2024, there was a lot of confusion and the new structure had still not solidified even by the time FE-8 left the Company in August 2024.

### 1. In 2024, Sales Had Deteriorated and Five9 Resorted to Desperate Schemes to Generate Revenue

175. By 2024, Five9's sales had significantly deteriorated. Throughout 2024, until FE-8 left in August 2024, most account managers were unable to make their sales quotas, which were measured in annual contract value. As a result, Five9 management was desperate to generate revenue in 2024. This was evident in Weekly All Hands Meetings, led by Senior Vice President Ari Klionsky in 2024, and attended by President/CRO Dan Burkland and VP Matt Tuckness, as well as Five9's account management team that handled existing customers and the net new sales team.

176. To address this revenue shortfall, executive leadership implemented revenue-generating schemes in the Weekly All Hands Meetings, and tasked FE-8 and other sales personnel with carrying out these schemes. Specifically, FE-8 and other sales personnel were directed to carry out executive leadership's scheme to generate revenue by sneaking additional charges onto customer invoices without telling the customers about it, and in violation of Five9's contracts with customers. At a Weekly All Hands Meeting in May 2024, executives explained that Five9 customers would immediately be receiving invoices that would include additional line fees, above

and beyond what they had been previously billed for their phone lines. The additional fees imposed by Five9 on these lines in Q2 2024 were substantial because there were at least three phone lines for every license Five9 sold and some customers had thousands of lines. The additional fees were also in many cases a breach of Five9's customer contracts, which dictated that Five9 could not increase the contract value by more than three percent or, in the case of some contracts, five percent per year during the course of the agreement. In essence, Five9 breached its contracts with customers by charging them in excess of agreed-upon caps on cost increases specified in the contracts. At these Weekly All Hands Meetings FE-8 attended in Q2 2024 with Dan Burkland, Ari Klionsky, Matt Tuckness, and others, Five9 executives stated that the purpose of these additional line charges was to drive revenue. It was apparent at the time the scheme was initiated that Five9 was breaching its contracts with customers.

177. Some Five9 customers did not have a clue what was in their contracts or did not sufficiently scrutinize their invoices to notice the fees, and therefore paid them without question, despite the fact that Five9 breached the contractual terms. Other customers knew the agreements well and immediately responded to the breaches. Based on conversations with the customers FE-8 managed and conversations with the other account managers, FE-8 estimated that approximately one half of Five9 customers paid the invoices automatically without noticing the fees, or saying anything, thus increasing Five9's revenue.

178. There was significant blowback from customers who noticed the additional fees. The customers who complained about the additional fees typically expressed their aggravation directly to their assigned account managers, who spent a lot of time and energy dealing with the complaints. For instance, FE-8 recalled receiving both emails and phone calls from FE-8's assigned customers complaining that Five9 was breaking the terms of the contract by charging the additional line fees. In some cases, these customers threatened litigation.

179. Five9's senior executives knew that this scheme would draw customer complaints and instructed salespeople to further mislead customers. During Weekly All Hands Meetings with Dan Burkland, Ari Klionsky, Matt Tuckness, and others, Ari Klionsky and his team gave instructions to the account managers about how to respond if and when customers found out about

the scheme and complained about the additional fees.  In response to customer complaints, the account managers "tried to do the dance," including, per the instructions of Ari Klionsky and his team, leading customers to believe that there was a legitimate reason for the additional fees, other than the fact that the existing customer revenue had stagnated and Five9 was trying to fill the void. Per the recommendations at Weekly All Hands Meetings, account managers lied to disgruntled customers by telling them that the additional line charges were necessary because infrastructure costs were going up, data storage costs were increasing, or rack space costs were escalating.  FE-8 recounted that the account managers resented Five9 instructing them to mislead customers with whom the account managers had longstanding relationships.

180.    The account executives were allowed to relent only when the customers called out Five9's false explanation for the additional fees or threatened litigation.  Specifically, at Weekly All Hands Meetings that FE-8 attended with Dan Burkland, Matt Tuckness, and others, Ari Klionsky and his team instructed that Five9 account managers should only acknowledge the problem when customers identified that Five9's additional fees breached their customer contract or threatened to sue.  In this situation, FE-8 and other account managers advised these disgruntled customers that the Company would "back out" the charges.  Specifically, FE-8 and other account managers informed their immediate directors that the customer had alleged a contract beach and opened a "sales ops case" in the Salesforce system to start the process of having the additional line fees reversed.  SVP Ari Klionsky and his team managed the sales ops cases and there was an existing workflow set up in the Salesforce system to facilitate the fee reversals.

181.    FE-8 and other enterprise account managers experienced "blowback" from their assigned customers regarding the additional line fees and loss of Five9 customers.  FE-8 and other account managers then conveyed the "significant pushback" to their immediate managers regarding the customers' negative reactions to the additional line charges.

182.    The negative client feedback and the resulting frustrations caused by the additional line charges were also discussed during Tuesday account management calls held on Zoom, led by Matt Tuckness, and attended by FE-8, President/CRO Dan Burkland, COO Andy Dignan, and other Five9 account managers, among others.  During these calls, Dan Burkland and Matt

Tuckness were informed of the frustration and anger that the additional line charges were causing Five9 customers and also understood the pain that the additional charges caused the account managers who had to deal with the blowback from customers and try to deceive them about the basis for the charges. Nonetheless, Five9 did not change its policy on imposing additional line charges.

**I.    Former Employee 9: Five9 AI Subject Matter Expert Consultant**

183.    FE-9 was employed by Five9 from July 2022 to October 2024. FE-9 was first a Senior Solutions Consultant until July 2023, and then an AI Subject Matter Expert ("SME") Consultant for the remainder of the employment, from July 2023 to October 2024. In the latter role, FE-9 worked on business deals with new and existing customers. This included consulting in the pre-booking phases of deals and in complex deal assessment meetings convened with respect to AI products for the largest customer deals, which were part of Five9's enterprise or strategic business segments. FE-9 provided the information in this subsection.

**1.    Five9 Had an Inferior AI Product That Lacked Basic Capabilities**

184.    As AI SME Consultant, FE-9 also worked closely with Minh Bui (Five9 Senior Director of Product Management – AI & Automation) who was the engineering head of the AI product, and attended weekly meetings led by Chief Technology Officer Jonathan Rosenberg to discuss AI product development.

185.    During this time, FE-9 observed that Five9 was over-promising what Five9's AI products could actually do. Five9 sales personnel sold the possibility of what AI could do without consideration for what Five9's AI capabilities actually were. This caused lengthy delays in implementation times, and "absolutely" hurt deals and led to de-bookings. Bui had no more than three to five developers available to him to work on AI product development, including writing and building code for AI products, which was not nearly enough to make meaningful progress or keep up with Five9's competitors. Five9's competitors invested much more heavily in AI than Five9, released more frequent updates, and had better AI products—including as to agent assist, automation, and analytics capabilities.

186.    Throughout FE-9's tenure, Five9 failed to invest in resources in developing AI products or otherwise supporting the AI-related agenda that the Company promoted to investors and potential clients.  Though Five9 executives recognized the engineering deficiencies and announced plans to hire more engineers at the February 2024 Sales Kickoff, no new engineers were hired by the time of FE-9's departure in October 2024.

187.    Five9's AI products were poorly received by customers.  In fact, Five9's AI products were so unsuccessful that Five9 memorialized in internal sales guidelines that they were inferior.  FE-9 had assisted in preparing these guidelines which were also sometimes called the "Swim Lanes" Document, or Guidelines for Enablement.  These guidelines acknowledged that Five9's AI products were inferior to others on the market, including admitting that the Cresta and Level AI solutions were better than Five9's AI products for strategic and enterprise customers.  For example, the guidelines identified Cresta's AI product as best for agent assist.  Regional Vice President Michael Howell presented the guidelines to Five9 executive leadership in April or May 2024, who approved it, and released it to the Five9 sales staff.

188.    Further, Five9's AI product did not work outside the United States, and these shortcomings were acknowledged internally.  Specifically, Five9's AI product had a subprocessor issue and lacked the necessary regulatory approvals to work internationally, among other issues. Nonetheless, Five9 continued to push its AI product and promote sales into global markets.  The lack of functionality outside the U.S. was a big problem and "absolutely" hurt sales, especially because many call centers are outside of the U.S.  Five9 lost customers as a result of the AI deficiencies, including the lack of international functionality.  Only in the last months of FE-9's tenure did Five9 begin to gain functionality for its AI product in a handful of foreign countries, but even by the time FE-9 left in October 2024, Five9's AI product was still broadly unavailable in Asia, South America, as well as the EMEA region (Europe, Middle East, and Africa).

189.    Accordingly, even when Five9 made large enterprise deals for its contact center software, the large customers still rarely used Five9's AI product.  For example, Five9 proclaimed FedEx as a big sale, but FedEx selected Cresta's AI product, not Five9's, because FedEx did not like the limited capabilities of Five9's product.

## VI.   FALSE AND MISLEADING STATEMENTS AND OMISSIONS

190.   During the Class Period, Defendants made false and misleading statements that concealed the truth regarding Five9's sales, revenue, and business.  Specifically, Defendants' false and misleading statements alleged in this section omitted the truth and concealed that:

a) Five9's Deteriorating Revenue Growth: In February 2024, Defendants issued false and misleading statements concerning Five9's revenue growth that omitted the known truth that the Company was experiencing a revenue shortfall and could not achieve the growth it was disclosing.  In June 2024, Defendants further falsely stated and omitted the truth that Five9's sales to new customers were not impacted by macro issues, that sales were "very strong" and setting "records," and that they had a backlog of new customers that would generate additional revenue.

b) Five9's AI Products and Capabilities: Defendants falsely told investors in June 2024 that Five9's AI products were "leading … the market" and that Five9 was winning business because its AI was "well ahead" of Five9's competitors.

c) Five9's False and Misleading Risk Disclosures: Defendants issued false and misleading risk disclosures in Five9's SEC filings and at conferences that identified the risks of adverse economic conditions and inability to attract new customers or retain existing customers as purely hypothetical risks, when in fact they knew Five9's revenue growth was already suffering as a result of those very same risks.

191.   For all the reasons stated herein, these statements were false and misleading and omitted the truth and concealed that:

a) beginning in 2023, Five9's revenue growth had slowed significantly and Defendants' self-serving business practices and macroeconomic headwinds prevented the Company from achieving 16% annual revenue growth in 2024;

b) Defendants had not adequately invested in the development of Five9's AI products, and as a result Five9's AI offerings were obsolete and rudimentary, and were so unappealing to customers that Five9 could not even give away free trials, let alone secure new customer bookings;

    c)  de-bookings and seat reductions as a result of long implementation times had eroded the revenues from Five9's bookings and sales figures, and

    d)  to overcome its depressed revenue growth and conceal their business failures and revenue shortfall, Defendants implemented desperate and dishonest schemes to secure additional revenue, which ultimately alienated customers and further deteriorated future sales.

Additional bases for falsity are set forth specifically below for each alleged false and misleading statement and omission. For the avoidance of doubt, all the affirmative statements alleged to be actionably false and misleading when made are set out in this Section.

**A.    False and Misleading Statements and Omissions Regarding Five9's Deteriorating Revenue Growth**

**1.    February 21, 2024 Q4 2023 Earnings Call**

192.    On February 21, 2024, during the Q4 2023 earnings call, Defendant Zwarenstein gave "prepared remarks" issuing Defendants' guidance for "our full year 2024." He told investors that "*for the last 7 out of 9 years, we've started with prudent revenue guidance of 16% year-over-year growth*" and that "*[f]or 2024, we are doing the same* by guiding to a growth of 16% year-over-year at the midpoint or $1.055 billion in revenue."

193.    These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. In addition, Five9's revenue growth was not "the same" as over the "last 7 out of 9 years," where "prudent revenue guidance of 16% year-over-year growth" yielded an average of 28% revenue growth because, unbeknownst to investors, by late 2023 and in 2024, Defendants had been informed that Five9's revenue growth was not "the same" as those "last 7 out of 9 years." Further, at the time of this statement, Defendants had been informed that Five9 would not meet the 16% revenue guidance because of the poor performance of Five9's improper sales practices by unqualified sales executives, its rudimentary and unappealing AI offerings, and macroeconomic impediments to generating business from new customers. Defendants further concealed that because the Company could not achieve the 16% revenue growth stated to investors, let alone the

28% revenue growth indicated, Defendants implemented desperate and dishonest schemes to conceal their revenue shortfall, and artificially inflate the Company's year-over-year revenue growth and, in turn, the Company's stock price.

194.    During the earnings call, an analyst from Barclays asked: "How should we think about the cadence of revenue growth throughout the year? Given the 1Q guide and the full year guide, it seems like there is solid growth embedded in the second half of 2024. Anything to call out there besides seasonality?" Both CEO Mike Burkland and CFO Zwarenstein responded.  First, CFO Zwarenstein said:

> Yes. The basic reason over there is *the fact that we've got good visibility on the new logo side*. *We've got this considerable backlog*, *and we still have three or four months or so of new enterprise orders that Dan [Burkland] and the team will bring in* of what we call [go get] that *will count towards revenue in 2024*. So we feel pretty comfortable that we're taking the right stance and balancing the prudence on the installed base side with the visibility that we have on the net new.

CEO Mike Burkland added:

> And Ryan, I'll pile on just a little bit here. *Our confidence in the rest of the year is really driven by what's in the backlog*. We had a record Q4 bookings for enterprise, and *we've had very good quarters from a booking standpoint for the last several quarters, and it's – that's what gives us a lot of confidence in the back half of the year.*

CFO Zwarenstein then added:

> And since Mike is piling on, I'm going to pile on as well. And that is that if you look at the guidance we gave, and *we gave pretty explicit guidance -- well, explicit, obviously in Q1, but also for Q2 in the revenue. And it doesn't take a rocket scientist to figure out that there is an acceleration coming in the second half of the year that is embedded into our guidance* with our initial 16% starting point.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition: (i) while Five9 had "good visibility on the new logo side," that visibility revealed that Five9 was severely struggling in new business bookings especially in late 2023 and early Q1 2024, and

although Five9 tried to make up gaps through dishonest sales tactics and by offering incentives to customers that only deepened the hole for months going forward; (ii) there was also no "acceleration coming in the second half of the year that is embedded into our guidance with our initial 16%" because the Company's 2024 revenue targets were based on the false premise that Five9 was both increasing new business revenue and expanding revenue growth with existing customers, as described by FE-1; (iii) Five9's purported "backlog" of bookings was, in reality, built up by Defendants winning deals by misrepresenting product capabilities they did not have, resulting in significantly longer implementation times and ultimately bringing in little or no revenue; (iv) Five9's new business revenue had been negatively impacted by "macro" conditions, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty; (v) Five9's sales were so poor that the Company had implemented a hiring freeze, stealth layoffs, cost-cutting, emergency retroactive budget cuts, and a complete restructuring of its sales team; and (vi) Defendants implemented desperate and dishonest schemes to conceal their revenue shortfall and artificially inflate the Company's year-over-year revenue growth.

**2.     June 4, 2024 Robert W. Baird Global Consumer, Technology & Services Conference**

195.    During the June 4, 2024 Conference, a Robert W. Baird & Co. analyst asked about Five9's "broader business" and "your view of the macro environment," given that "there's been a lot of mixed pictures, mixed signals from other software companies over the last several weeks as to what's transpiring in the market," adding "[j]ust love kind of your perspective on what you're seeing, what you're kind of expecting through the balance of the year as you talk about sales cycles and appetite to spend?"  Defendant Zwarenstein answered:

> [B]efore [I] actually respond to the macro, want to make sure that everybody in the room understands that fundamentally under the hood, we have two businesses within Five9. We've got a net new business, new logos having to go from on-prem into the cloud and the second part is that existing base. ***And the macro really somewhat unusually just impacts what's in the base.***

> The net new, these are mission critical systems, there's no new vendors for the on-premise solutions and people have to get moving because, for example, just one of many, if you wanted to do AI and automation, it's much, much easier to do it in the cloud than you can on the premise. ***So that part of the business is strong irrespective of the macro.***

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition, the reality was that Five9's "net new business" was not "strong irrespective of the macro," and had been negatively impacted by "macro" conditions, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty.  Indeed, FE-1 and FE-2 described that macro factors negatively impacting Five9's new business in 2024 because many companies had already invested in contact centers during the COVID pandemic and no longer had the budget to undertake such expenditures.  At E-Staff Meetings, FE-1, Dan Burkland, Klionsky, Dopita, and Delis detailed the negative impact of the economy and budget constraints on the Company's new business to Defendants Burkland and Zwarenstein.  Further, FE-4 and FE-7 similarly reported extremely weak new business bookings in early 2024 as a result of macroeconomic concerns, which were contemporaneously reported on Five9's Salesforce system.

196.    The Robert W. Baird & Co. analyst also asked Defendants for an "update [] given the current climate and where we are here end of June [sic]. Just kind of what underpins confidence and you're getting to that 16% revenue growth for the year, given that requires an acceleration of growth in the back half of the year."  Defendant Burkland responded:

> ***The confidence comes from that net new logo win side of our business growth, if you will, we're knocking down some of the largest enterprise brands***. We talked about a Fortune 50 deal that we just closed in the quarter, $50 million ARR subscription revenue. ***That's just one of many deals***. It's obviously the largest deal we've ever done, but ***the market's coming to us***. And then again, ***in spite of that macro, the net new side of our business is very strong. We've got a strong backlog of bookings that haven't turned to revenue***, and that's what gives us the confidence[.]

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition: (i) rather than "very strong" bookings from "the net new side of our business" and "a strong backlog of bookings," the truth was that Five9 was severely struggling in new business bookings, sales to new customers were significantly underperforming the Company's forecasts, and these bookings also included deals won by Defendants misrepresenting product capabilities that Five9 did not have, and thus would ultimately bring in little or no revenue; (ii) rather than strong net new business bookings "in spite of the macro," the truth was that Five9's new business efforts had been negatively impacted by "macro" conditions, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty; and (iii) rather than "confidence" that Five9 is "getting to that 16% revenue growth for the year" based on new business "bookings" and demand from "the market," Defendant Burkland had been advised in E-Staff Meetings that new business was struggling and Five9 had fallen significantly behind 16% revenue growth and, moreover, by April and May 2024, the Company's internal metrics, including the Clari updates, confirmed that Five9 would not hit 16% revenue growth for the year 2024.

197.    Defendant Zwarenstein continued, stating that:

> In terms of the pipe[line] from the net new [business], as Mike was talking about, *we've been seeing strong business, major orders, really big ones that are sitting in our backlog*. Now there's a small complement there that Dan and his team needs—we call them "go gets"—so that's to get in the next little while to recognize revenue in the course of 2024 but we feel pretty serene about that.
>
> …. But at the end of the day*, we have enough information in terms of our existing customers that are going live to say to the street that we have a dollar-based retention rate that we expect to inflect upwards in the second half of the year*.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition: (i) rather than "strong business, major orders, really big ones that are sitting in our backlog" from Five9's "net new" customers, the truth was that Five9 was severely struggling in new business

bookings, sales to new customers were significantly underperforming the Company's forecasts, and these bookings also included deals won by Defendants misrepresenting product capabilities that Five9 did not have, and thus would ultimately bring in little or no revenue; (ii) rather than a "dollar-based retention rate that we expect to inflect upwards in the second half of the year," revenue from the Company's existing customer base was underperforming due to de-bookings and cancellations resulting from long implementation times and deceptive sales tactics that alienated customers and Five9 had no legitimate means for increasing it to meet the Company's revenue target, as detailed by FE-1 at E-Staff Meetings; and (iii) Five9 had fallen significantly behind 16% revenue growth and, by April and May 2024, the Company's internal metrics, including the Clari updates, showed that Five9 would not hit 16% revenue growth for the year 2024.

**3.    June 5, 2024 William Blair Growth Stock Conference**

198.    The next day, on June 5, 2024, Defendants participated in the Five9, Inc. at William Blair Growth Stock Conference.  At the conference, a William Blair & Company analyst asked, "What are you seeing from that legacy installed base of customers that are at some of your competitors? Is there a greater impetus to move to cloud as a kind of steady state. What are you seeing from those customers?"  Defendant Burkland responded:

> It's a great question. Absolutely inflecting. ***And the best indicators I can talk about are the growth in our bookings, our net new logo bookings***. We haven't quantified them exactly. ***But we've told you quarter after quarter after quarter, we keep making records.***

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition, rather than "growth in our bookings" and "quarter after quarter after quarter, we keep making records," the truth was that Five9 was severely struggling in "net new logo" (*i.e.*, new business) bookings and sales to new customers were poor and significantly underperforming the Company's forecasts, and these bookings also included deals won by Defendants misrepresenting product capabilities that Five9 did not have, and thus would ultimately bring in little or no revenue.

199.    Asked "are those deployments now getting more complex and how is that impacting your implementation times" for Five9 customers, Defendant Burkland responded:

> [T]hese large deployments are complex. ***They take time not because we can't move fast***.
>
> We turned up the large parcel delivery service. We turned up 10,000 seats in literally weeks, so ***we can go as fast as they can go***. It's typically these are multiple business units across global multinational corporations, and it's a separate project for every business unit. So that's really why these take time.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition, rather than Five9's implementations "go[ing] as fast as [customers] can go," the truth was that Five9 had lengthy implementation times not because of the customers, but because Five9 had secured sales by misrepresenting Five9's product capabilities, and the engineering team had to try to invent those promised capabilities after the fact—which was slow, difficult, and in some respects impossible.  Moreover, this sales practice directly affected revenue as the Company could not bill for seats that were not live, even if the contract had been signed.  In many cases, the revenue ended up being zero, or significantly below the original sale amount, due to de-bookings and seat reductions as customers became frustrated by the delay or learned the truth about Five9's unsuitable products.

200.    Next, the William Blair & Company analyst asked: "[C]an you talk about just what you're seeing now in terms of getting deals across the finish line? Is it getting harder? Is it are you still able to close deals on time, what's happening with sales cycles? Just give us some sense of what the demand environment looks like?"  Defendant Zwarenstein responded:

> Yes, when you look first at the net new business, we did see some elongation of sales cycles … but ***that is returned to normal***. And for the reasons Mike also gave, ***we are seeing very strong bookings momentum on the net new side***.
>
> …. ***[O]ur logo retention has been very strong***. You don't switch out the systems, as Mike called it, these are heart transplants. ***Our logo retention on our enterprise business***, which is 88% of the total, is the mid '90s. ***And when those tick up and you will see it, it will be both ratios*** from the revenue

point of view, but also from a margin point of view because of the leveraging against fixed and semi-fixed costs.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. In addition: (i) rather than a "return[] to normal" timing in sales cycles and to get deals across the finish line, the truth was that Five9's implementation time was significantly delayed, including because Five9 had secured sales by misrepresenting Five9's product capabilities, and the engineering team had to try to invent those promised capabilities after the fact—which was slow, difficult, and sometimes not possible; (ii) rather than "very strong bookings momentum on the net new side," the truth was that Five9 was severely struggling in new business bookings; sales to new customers were poor and significantly underperforming the Company's forecasts; (iii) customers had little to no interest in Five9's outdated and rudimentary AI offerings, and "AI and automation" was not the source of "very considerable momentum" for Five9, whether "on the net new side," or otherwise; and (iv) Five9's "logo retention" had not "been very strong," whether as to its "enterprise business," or otherwise.

### 4.      June 12, 2024 Rosenblatt Securities Technology Summit

201.    On June 12, 2024, Defendants participated in the Five9, Inc. at Rosenblatt Securities Technology Summit. At the conference, asked by an analyst, "what about the mid-market? I mean, are you moving away from the mid-market and just focusing up-market, can you give us some reassurance that's still a piece of your strategy, and what's your approach?" Defendant Mike Burkland responded:

> There's a lot more opportunities right in the middle of that bell curve, the $1 million to $5 million enterprise that are again, there are many more of those opportunities. ***We're closing a lot more of those obviously, that is how we drive revenue growth***.
>
> And ***that is what's in that backlog that we're so confident about our second half guide at this stage***. And by the way there's the other end of that tail, which is truly small businesses, and ***we still do very well in SMB and commercial***.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. In addition: (i) contrary to Defendant Burkland's representations, Five9 was not "closing a lot more [mid-market opportunities], nor "still do[ing] very well in SMB and commercial," especially not in any capacity that would "drive revenue growth" in 2024 along the lines Defendants had indicated to investors; (ii) rather than a "backlog" of mid-market bookings sufficient to be "so confident" in achieving 16% revenue growth, the truth was that Five9 was severely struggling and was not raising revenue from both new business bookings and sales to existing customers and sales were poor and significantly underperforming the Company's forecasts, and these bookings also included deals won by Defendants misrepresenting product capabilities that Five9 did not have, and thus would ultimately bring in little or no revenue; (iii) rather than being "so confident" that Five9 would achieve 16% revenue growth for 2024, Defendant Burkland had been advised in E-Staff Meetings that new business was struggling and Five9 had fallen significantly behind 16% revenue growth; (iv) by April and May 2024, the Company's internal metrics, including the Clari updates, confirmed that Five9 would not hit 16% revenue growth for the year 2024; and (v) because the Company could not achieve the 16% revenue growth stated to investors, Defendants implemented desperate and dishonest schemes to conceal their failures and revenue shortfall, and artificially inflate the Company's year-over-year revenue growth and, in turn, the Company's stock price.

**B.**    **False and Misleading Statements and Omissions Regarding Five9's AI Products and Capabilities**

**1.    June 5, 2024 William Blair Growth Stock Conference**

202.    At the William Blair Growth Stock Conference, the William Blair & Company analyst asked: "[C]ertainly I think the AI use case is pretty compelling in the CCaaS [Contact Center as a Service] market, but you have competitors in the market that have similar AI capabilities. When you think about maybe you'll debate that but the -- what is the differentiation and what is the competitive advantage the Five9 has over others in the CCaaS market, especially related to AI?"  Defendant Mike Burkland responded:

Yeah, our AI leadership is well known…. They talk about who's got the best AI *Five9 is not just like a little bit ahead. We're viewed as well ahead*. There's a reason *we're winning these large enterprise deals because our AI is ahead*, which partially because we made an acquisition over four years ago of a company called Inference, which has *the leading IVA in the market* we've built eight new products on top of that and integrated it into the Five9 platform itself.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition, rather than AI products "well ahead" of the competition, "winning [] large enterprise deals because our AI is ahead," and having "the leading IVA in the market," the truth was that (i) Five9 had fallen significantly behind in AI technology and could offer only outdated AI capabilities that were rudimentary; (ii) Five9's AI had serious technical limitations, including no migration path from Version 6 to Version 7 and inability to function outside the U.S. due to lack of regulatory approvals, which greatly limited sales especially because many call centers are outside of the U.S.; (iii) not only was Five9 not "winning" business from "large enterprise[s]" due to its AI capabilities, the Company did not utilize AI with the large enterprise customers that did business with Five9, as confirmed by FE-1; (iv) Defendants had directed Five9 sales personnel to sell AI products to customers by misrepresenting Five9's AI capabilities to try to win business; (v) rather than "the leading IVA in the market," Five9's whole push to get customers to buy the Intelligent Virtual Agent, or IVA, had failed because customers tried it, did not like it, and did not buy it; and (vi) Defendants Burkland and Zwarenstein had resorted to giving away Five9's IVA product for free, but customers balked at free trials too and did not take it, even though it was offered for free because they disliked Five9's IVA product and Defendants had already squandered customer trust and loyalty by their deceitful and money-grabbing treatment of Five9 customers.  Indeed, multiple high-ranking Former Employees confirm that when CEO Mike Burkland assured investors in June 2024 that "Five9 is not just like a little bit ahead," but "well ahead" of contact center competitors in AI and that the "reason we're winning these large enterprise deals because our AI is ahead," these statements were false.  (FE-1, FE-3.)

**2.    June 12, 2024 Rosenblatt Securities Technology Summit**

203.    On June 12, 2024, at the Rosenblatt Securities Technology Summit, a Rosenblatt Securities analyst asked, "So there are more competitors, obviously, in that space? And then how are you addressing some of the competitors?"  Defendant Mike Burkland responded:

> Yeah. So Catharine, it's interesting from a competitive standpoint, look, for large enterprises, like the Fortune 50 bank large financial institution, we just announced a $50 million ARR [annual recurring revenue] win with.  And that's ARR, not TCV [total contract value], not total contract value, which is much larger, obviously.  *We're winning those in large part because of our leadership in AI and it's front and center.  It's a big differentiator for us*.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition, contrary to Defendant Burkland's representations, Defendants were not "winning" business—from "larger enterprises" or otherwise—due to Five9's "leadership in AI," nor was AI "front and center" or "a big differentiator for us" in earning "ARR" from such businesses because (i) Five9 had fallen significantly behind in AI technology and could offer only outdated AI capabilities that were rudimentary; (ii) Five9's AI had serious technical limitations, including no migration path from Version 6 to Version 7 and inability to function outside the U.S. due to lack of regulatory approvals, which greatly limited sales especially because many call centers are outside of the U.S.; (iii) not only was Five9 not "winning" business from "large enterprise[s]" due to its AI capabilities, the Company did not utilize AI with the large enterprise customers that did business with Five9, as confirmed by FE-1; (iv) Defendants had directed Five9 sales personnel to sell AI products to customers by misrepresenting Five9's AI capabilities to try to win business; (v) Five9's whole push to get customers to buy the Intelligent Virtual Agent, or IVA, had failed because customers tried it, did not like it, and did not buy it; and (vi) Defendants Burkland and Zwarenstein had resorted to giving away Five9's IVA product for free, but customers balked at free trials too and did not take it, even though it was offered for free because they disliked Five9's IVA product and

Defendants had already squandered customer trust and loyalty by their deceitful and money-grabbing treatment of Five9 customers.

204.    The Rosenblatt Securities analyst followed up on the "the Fortune 50 bank large financial institution … win," asking, "And then on now that you brought up the large bank, could you differentiate for us why you were selected over a host of competitors.  I believe there were four or five other legacy vendors in there.  And I know that they had a strong relationship over the years with Google.  So there's probably another competitor by the name of [indecipherable] that might have been in there.  So elaborate on why they selected you over the cast of characters that were also responding?"  Defendant Mike Burkland responded:

> Sure. Happy to Catharine.  I would say three main reasons. And again, we're being redundant here.  But AI leadership was a big part of why we won that deal, I would say scalability and reliability, right.  I mean, it takes years to deliver a platform like we have, and we're on top in terms of scalability, being able to handle tens of thousands of human agents, as well as virtual agents, as well as digital interactions that scalability of our platforms and reliability of the platform is showing through in these large enterprise wins.  And I would say the other factor, well there is two others, actually, I'm going to go for four total.
>
> It's AI, scalability, reliability is two, the third is referenceability of these large enterprises.  We've talked about the parcel delivery service company.  We've talked about the health care conglomerate and the insurance conglomerate.  I mean, these are massive customers that are highly referenceable and that matters.  And then I would say fourth is our people.  As Jonathan said, you need the experts to do the implementation for these large brands.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein.  In addition, contrary to Defendant Burkland's representations, Five9 was not "selected over a host of competitors" due to "AI leadership," nor were Five9's outdated and rudimentary AI capabilities "a big part of why" Five9 won deals at this time because (i)  Five9 had fallen significantly behind in AI technology and could offer only outdated AI capabilities that were rudimentary; (ii) Five9's AI had serious technical limitations, including no migration path from Version 6 to Version 7 and

inability to function outside the U.S. due to lack of regulatory approvals, which greatly limited sales especially because many call centers are outside of the U.S.; (iii) not only did Five9 not have "large enterprise wins" due to its AI capabilities, the Company did not utilize AI with the large enterprise customers that did business with Five9, as confirmed by FE-1; (iv) Defendants had directed Five9 sales personnel to sell AI products to customers by misrepresenting Five9's AI capabilities to try to win business; (v) Five9's whole push to get customers to buy the Intelligent Virtual Agent, or IVA, had failed because customers tried it, did not like it, and did not buy it; and (vi) Defendants Burkland and Zwarenstein had resorted to giving away Five9's IVA product for free, but customers balked at free trials too and did not take it, even though it was offered for free because they disliked Five9's IVA product and Defendants had already squandered customer trust and loyalty by their deceitful and money-grabbing treatment of Five9 customers.

**C.     Five9's False and Misleading Risk Disclosures**

205.    On February 21, 2024, Five9 filed a Form 10-K with the SEC that was signed by both Individual Defendants.  On May 2, 2024, Five9 filed a Form 10-Q with the SEC that was also signed by Defendants Burkland and Zwarenstein.  In both filings, Defendants disclosed purported risk factors that "could cause our actual results to differ materially from those indicated in these statements."  These disclosures were false and misleading because while Defendants portrayed the purported risks as merely hypothetical, Defendants failed to disclose that at the time of the risk disclosures they knew that the risks had already materialized.

206.    Specifically, in both the February 21, 2024 Form 10-K and May 2, 2024 Form 10-Q, Five9 stated that:

> [A]dverse economic conditions, including the impact of macroeconomic deterioration, including continued inflation, increased interest rates, supply chain disruptions, decreased economic output and fluctuations in currency rates, the impact of the Russia-Ukraine conflict, the impact of the conflict in Israel, and other factors, *may* continue to harm our business.

207.    This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. In addition, by the time of the February 21, 2024 Form 10-K and May 2, 2024 Form 10-Q,

Defendants had been informed that new business efforts had already been negatively impacted by the "adverse economic conditions" that Defendants portrayed as merely hypothetical, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty. More specifically, by the end of 2023 and early 2024, FE-1 had informed Defendants Burkland and Zwarenstein that because of decreased post-COVID demand and other macro factors, customers did not have any money to grow the business and that revenue is not going to increase from Five9's base of existing customers. FE-2 likewise reported that customers were more price sensitive and generally less willing to spend money on Five9's contact center software because of economic factors, such as higher interest rates than in prior years, stock market fluctuations, and a volatile political environment.

208.    In addition, in both the February 21, 2024 Form 10-K and May 2, 2024 Form 10-Q, Five9 stated that:

> If we are unable to attract new clients or sell additional services and functionality to our existing clients, our revenue and revenue growth *will be* harmed.
>
> If our existing clients terminate their subscriptions or reduce their subscriptions and related usage, or fail to grow subscriptions at the rate they have in the past or that we might expect, our revenues and gross margins *will be* harmed, and we *will be* required to spend more money to grow our client base.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. In addition, by the time of the February 21, 2024 Form 10-K and May 2, 2024 Form 10-Q, Defendants had been informed that in late 2023 and throughout 2024, Five9 had been "unable to attract new clients or sell additional services and functionality to our existing clients" because of, among other things, Five9's inferior AI products and broader macroeconomic issues. In addition, Defendants had been informed that Five9's "existing clients [were] terminat[ing] their subscriptions or reduc[ing] their subscriptions and related usage" because Five9 had engaged in deceptive marketing tactics,

including promising products and services that it knew it could not deliver and imposing additional fees in breach of customer contracts.

209. Defendants also made similar false and misleading statements and omissions at the outset of earnings calls and conferences. On the February 21, 2024, Q4 2023 earnings call (during which, as alleged above, Defendants made false and misleading statements regarding Five9's deteriorating revenue growth), Five9 made the following statements generally, without reference to any specific statements made during the court of the call:

> Certain statements made during the course of this conference call that are not historical facts, including those regarding the future financial performance of the company, expected ARR [annual recurring revenue] from certain customers, customer growth, anticipated customer benefits, company growth, enhancements to and development of our solution, market size and trends, our expectations regarding macroeconomic conditions, company market position, initiatives and expectations, technology and product initiatives, including investment in R&D and other future events are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1955. Such statements are simply predictions, should not be duly relied upon by investors. Actual events or results may differ materially, and the company undertakes no obligation to update the information in such statements.
>
> These statements are subject to substantial risks and uncertainties that could adversely affect Five9's future results and cause these forward-looking statements to be inaccurate, including the impact of adverse economic conditions, including macroeconomic deterioration and uncertainty, including increased inflation, increased interest rates, supply chain disruptions, decreased economic output and fluctuations in currency exchange rates, lower growth rates within our installed base of customers and the other risks discussed under the caption Risk Factors and elsewhere in Five9's annual and quarterly reports filed with the Securities and Exchange Commission.

210. These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. In addition, by the time of the February 21, 2024 earnings call, Defendants had been informed that new business efforts had already been negatively impacted by the "adverse economic conditions"

AMENDED CLASS ACTION COMPLAINT

CASE NO. 5:24-cv-08725-PCP

that Defendants portrayed as merely hypothetical, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty.  More specifically, by the end of 2023 and early 2024, FE-1 had informed Defendants Burkland and Zwarenstein that because of decreased post-COVID demand and other macro factors, customers did not have any money to grow the business and that revenue is not going to increase from Five9's base of existing customers.  FE-2 likewise reported that customers were more price sensitive and generally less willing to spend money on Five9's contact center software because of economic factors, such as higher interest rates than in prior years, stock market fluctuations, and a volatile political environment.

211.    At the June 4, 2024, Robert W. Baird Global Consumer, Technology & Services Conference (during which, as alleged above, Defendants made false and misleading statements regarding Five9's deteriorating revenue growth), Defendant Zwarenstein stated:

> Before we start, I'd like to remind you that ... we will be making forward-looking statements during today's discussions, including regarding future events, turns, expectations, projections, beliefs that may affect the industry for our products or the Company's product development, AI information and potential growth drivers.
>
> These are predictions and should not be unduly relied upon by investors as actual events may be materially different, and we take no obligation to update. Please refer to our most recent Forms 10-K and 10-Q for more information on this.

212.    At the June 5, 2024, William Blair Growth Stock Conference (during which, as alleged above, Defendants made false and misleading statements regarding Five9's deteriorating revenue growth and Five9's AI products and capabilities), Defendant Zwarenstein similar stated:

> So I want to remind you that the forward-looking statements made during today's discussion regarding future events, trends, expectations, predictions, believes that may affect our industry, our company's products development, AI and automation, and potential growth drivers. Statements are predictions and should not be unduly relied upon by investors. Actual events or results may differ materially, and Five9 undertakes no obligation to update information of such statements.
>
> And lastly, for you to our Forms 10-K, 10-Q to understand why those things may be different.

AMENDED CLASS ACTION COMPLAINT

72

CASE NO. 5:24-cv-08725-PCP

213.    At the June 12, 2024, Rosenblatt Securities Technology Summit (during which, as alleged above, Defendants made false and misleading statements regarding Five9's deteriorating revenue growth and Five9's AI products and capabilities), Defendant Zwarenstein similar stated:

> So today, we're going to make comments and thoughts, events and trends in the industry affecting that company AI and the like obviously real results may actual results may differ from what we say. I refer you to our filings with the SEC 10-K, 10-Q for factors that could cause such a difference.

214.    These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically set forth above in this Section and alleged herein. At the time of the June 4, 5, and 12 conferences, Defendants had been informed more than that the "actual events or results *may* differ materially" and "the actual results *may* differ from what we say," but that the results did in fact differ.  Specifically, Defendants by the time of these conferences, Defendants had been informed that in late 2023 and throughout 2024, Five9 had been "unable to attract new clients or sell additional services and functionality to our existing clients" because of, among other things, Five9's inferior AI products and broader macroeconomic issues. Defendants had also been informed that Five9 had already been negatively impacted by the "adverse economic conditions" that Defendants portrayed as merely hypothetical, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

215.    As alleged herein, Defendants acted with scienter because Defendants knew, or at least recklessly disregarded, that the public statements issued or disseminated in the name of the Company were materially false and/or misleading; that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.  As set forth elsewhere herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Five9, their control over allegedly materially misleading misstatements and/or their associations with the Company which made them privy to

confidential proprietary information concerning Five9, participated in the fraudulent scheme alleged herein. What follows are additional particularized allegations of Defendants' scienter, which when taken together with all the allegations set forth herein support a strong inference of scienter.

**A.      Regular Internal Meetings During Which Five9's Revenue Shortfall, Macroeconomic Headwinds, AI Product Failures, and Desperate and Dishonest Sales Tactics Were Routinely Discussed Support a Strong Inference of Scienter**

216.    Five9's 2024 revenue shortfall, macroeconomic headwinds, AI product failures, and desperate and dishonest sales tactics to generate sales bookings were well documented in regular internal meetings. Defendants consistently had direct knowledge of Five9's revenue and sales deficiencies though regular internal meetings—many of which took place on weekly, biweekly, or quarterly bases—with Individual Defendants Burkland and Zwarenstein, their direct reports, and other C-Suite executives and senior officers (including President/CRO Dan Burkland, COO Andy Dignan, EVP of Finance Bryan Lee, SVP of Sales and Business Operations Ari Klionsky, SVP of Customer Success FE-1, and VP Global Services Operations and Strategy Blake Nelson).

**1.      E-Staff Meetings**

217.    As alleged in detail herein, throughout weekly E-Staff Meetings in 2023 and early 2024 prior to the start of the Class Period on February 21, 2024, Defendants Burkland and Zwarenstein were personally presented with data showing that (i) Five9's revenue growth rate had dropped off and had fallen significantly behind its revenue target; (ii) "macro" factors, like post-COVID demand and budget constraints, negatively impacted Five9's new business as much as they did existing customers; and (iii) the Company's 2024 revenue target was based on the false assumptions that Five9 was both increasing new business revenue and expanding revenue growth with existing customers. Further, FE-1 specifically advised Defendants Burkland and Zwarenstein at E-Staff Meetings prior to the start of the Class Period, following extensive analysis in dedicated Revenue Breakout Sessions, that Five9 would not be able to fulfill the request from Defendants

Burkland and Zwarenstein to "find" additional revenue from Five9 customers sufficient to make up the millions in shortfall compared to what Defendant "told the Street we were going to make."

### 2.    QBR Meetings

218.    As alleged in detail herein, in the Q1 QBR Meeting, held in April 2024, President and CRO Dan Burkland, along with 200 to 300 sales employees were informed that sales were down, and that sales were especially weak in the enterprise segment.  (FE-2.)  In fact, Dan Burkland himself made remarks specifically acknowledging that the Company was underperforming sales projections.

### 3.    Weekly All Hands Meetings

219.    As alleged in detail herein, at Weekly All Hands Meetings, President and CRO Dan Burkland was informed that, among other things:

a)  In April 2024, CEO Mike Burkland reiterated that there had been a significant underperformance in Q1 toward meeting the Company's projections.  (FE-2.)

b)  By mid-May 2024, the Company had a very clear picture of its revenue for 2024 and presentations of the Clari updates to President Dan Burkland showed that Five9 was behind its sales forecast and not going to hit its growth target for the year 2024.  (FE-5.)

c)  By May 2024, Five9 was underperforming compared to the Company's forecasts, yet Dan Burkland specifically instructed that "we need to do anything we can do" to "pull" revenue from future quarters into the current quarter. (FE-5.)

d)  By May 2024, Five9's customer retention, dollar-based retention rate, as well as sales to new customers were poor and significantly underperforming the Company's forecasts.  (FE-5.)

e)  In May 2024, SVP of Sales and Business Operations Ari Klionsky reported that Five9 was significantly behind forecast and was "only at 32 percent" of the revenue needed in Q2 to make the 2024 forecast.  (FE-4.)

AMENDED CLASS ACTION COMPLAINT                                CASE NO. 5:24-cv-08725-PCP

f) Based on the Salesforce data presented at the Weekly All Hands Meetings, prior to June 2024, SVP Klionsky reported bookings were down, and we "are not going to hit our number" for 2024 revenue. (FE-4.)

**B.    The Individual Defendants' Continuous Access to Salesforce Data and Receipt of Regular Reports That Reflected Five9's Revenue Shortfall, Macroeconomic Headwinds, Customer Loss, Underperforming Bookings, and AI Product Failures Further Supports a Strong Inference of Scienter**

220.    Before and during the Class Period, Defendants consistently had direct knowledge of Five9's 2024 revenue shortfall, the negative impact of macroeconomic headwinds on new business and existing business alike, customer loss, and severely poor and underperforming new business bookings, and failures to generate AI business through (a) the comprehensive contemporaneous financial and sales data available in Five9's Salesforce system well as (b) regular internal reports to Individual Defendants.

**1.    Salesforce**

221.    Salesforce was relied on inside Five9 as "our single source of truth" for financial and salas data. (FE-4, FE-5.)    Sales Directors, like FE-7 ensured that all data was contemporaneously recorded in Salesforce through the entire sales pipeline, even when there was no sale.    For example, 99% of the sales leads assigned to FE-7 by Five9 never resulted in a sale, and for each of them FE-7 dutifully recorded in Five9's Salesforce system the reasons each sales lead provided for declining the sale, which for the clear majority of them was "macro" reasons, such as economic uncertainty, general customer budget constraints, "market conditions," and "the economy at the time." (FE-7.)    This information was contemporaneously available to all executives and senior employees at Five9. (FE-1.)

222.    Indeed, Defendant Burkland readily admitted that Five9's C-Suite executives and Board of Directors "have great visibility" into the Company's sales data, including as to the "backlog" and "bookings," and "track them very closely."    Specifically, during the Class Period, Defendant Burkland told investors that "we manage that backlog of product, seats, subscriptions and other AI products included. … like a pipeline. It's -- once we book that business, our PS team,

our implementation team is very, very metrics-driven, and our turn-ups, we track them very closely. In fact, we just presented at our board meeting recently. So we're very -- it has -- we have great visibility on it."

### 2. Regular Internal Reports

223. Before and during the Class Period, utilizing Salesforce, Five9 executives generated regular reports for the Individual Defendants, their direct reports, and other C-Suite executives and senior officers that consistently gave Defendants direct knowledge of Five9's 2024 revenue shortfall, the negative impact of macroeconomic headwinds on new business and existing business alike, customer loss, and severely poor and underperforming new business bookings, and failures to generate AI business.  These include:

#### a. Bookings File

224. Individual Defendants accessed and used a "Bookings File" that contained up-to-date sales data and used it to generate updated quarterly and yearly forecast, and the "actual" revenue, broken down in detail.  (FE-6.)  It also showed when de-bookings or customer losses occurred as well as sales that had not yet gone live and/or started to generate revenue among both new and existing customers.  (FE-6.)  The Bookings File was stored under "Barry's [Zwarenstein's] folder" on the share drive and was regularly presented and discussed with CEO Burkland, President Burkland, and Defendant Zwarenstein.  (FE-6.)

225. As such, the Bookings File consistently gave the Individual Defendants direct knowledge that (i) sales to new customers and existing customers were poor and significantly underperforming the Company's forecasts; (ii) Five9's "logo retention," or customer retention was deteriorating; (iii) by late 2023 and throughout 2024, Five9 had fallen significantly behind achieving 16% revenue growth; (iv) Five9 had lengthy implementation times due to delay by Five9, not the customer, which directly affected revenue as the Company couldn't bill for seats that weren't live; and (v) Five9 was not "winning" business from "large enterprise[s]" due to its AI capabilities, and in fact the Company was not even deploying AI with large enterprise customers.

### b.    Monthly LTM Report

226.    Before and during the Class Period, Five9 kept a Monthly LTM Report to track annual recurring revenue for Five9 customers and "the change in customers and change in business, and explained why" the changes occurred. (FE-6.) Created using data from Salesforce, the Monthly LTM Report explained the deltas (*i.e.*, changes) between customers, month-over-month and-quarter-over-quarter, and was designed so that top finance executives could see month-over-month and quarter-over-quarter changes in detail, and the reasons for these changes. (FE-6.) FE-6 confirmed that if there was a customer loss or reduction in seats, the data were captured and tracked in the Monthly LTM Report. (FE-6.) FE-6 circulated the file via a Slack channel on a monthly basis created for top finance executives, which included CFO Zwarenstein, Bryan Lee, and Sarah Fong. FE-6 estimated that there were roughly ten recipients in total. FE-6 confirmed that FE-6 personally sent the Monthly LTM Report to this Slack channel, which included CFO Zwarenstein, in both January 2024 and February 2024, and for these months the Monthly LTM Reports showed a year-over-year revenue stagnation below Company expectations. (FE-6.)

227.    As such, the Bookings File consistently gave Defendant Zwarenstein direct knowledge that (i) sales to new customers and existing customers were poor and significantly underperforming the Company's forecasts; (ii) Five9's "logo retention," or customer retention was deteriorating; (iii) new business efforts had been negatively impacted by "macro" conditions, including constrained customer budgets and resources, decreased post-COVID demand, customer price sensitivity, and broader economic and political uncertainty; (iv) by late 2023 and throughout 2024, Five9 had had fallen significantly behind achieving 16% revenue growth for 2024; (v) Five9 had lengthy implementation times due to delay by Five9, not the customer, which directly affected revenue as the Company couldn't bill for seats that weren't live; and (vi) Five9 was not "winning" business from "large enterprise[s]" due to its AI capabilities, and in fact the Company was not even deploying AI with large enterprise customers.

### c.    Clari and Snap the Chalk Updates

228.    Before and during the Class Period, the "Clari" tool that was attached to Five9's Salesforce system used the Company's extensive sales data to generate important metrics relied

on by management. (FE-5, FE-7.) Specifically, Clari updated dynamically based on how the sales team performed to show Five9's anticipated sales for the quarter. (FE-5.) The Clari updates were also presented by Ari Klionsky to Dan Burkland at Weekly All Hands Meetings. (FE-5.) Klionsky also compared the latest Clari update with his original "Snap the Chalk" projection from the start of the quarter. (FE-5.)

229. During April and May 2024, the Clari updates showed that Five9's sales were materially below where they were projected to be and getting worse. (FE-5.) By mid-May 2024, it was apparent from these Clari updates on the Weekly All Hands Meetings that Five9 was behind its sales forecast and not going to hit its growth forecast for the year 2024. (FE-5.) Further, during All Hands Meetings, Klionsky compared the latest Clari update to his original Snap the Chalk projection at the start of the quarter. (FE-5.) By mid-May 2024, the Clari trend had dropped so significantly below Klionsky's April 2024 Snap the Chalk projection updates that it demonstrated to any rational observer that it was not possible to meet the Snap the Chalk sales projection for Q2 2024 or the Company's revenue growth target. (FE-5.)

### d.    Dan's Dashboard

230. Before and during the Class Period, "Dan's Dashboard" was a dashboard on the Company's Salesforce system that depicted detailed reporting on the Company's entire sales pipeline for all customer segments and both new and existing business. (FE-5.) The report was referred to within Five9 as "Dan's Dashboard" because "all bookings rolled up to Dan Burkland," and Dan Burkland used it as part of his oversight over all the bookings. (FE-5.) Everyone within Five9's sales organization had access to "Dan's Dashboard," and it was also presented to Dan Burkland at Weekly All Hands Meetings. (FE-5.) Dan's Dashboard demonstrated to Defendants that the Company was behind its forecast and not going to hit its revenue growth forecast for the year 2024.

**C.    Defendants' Deceptive Sales Tactics to Generate Revenue Because They Knew They Would Not Meet Revenue Guidance Further Supports a Strong Inference of Scienter**

231.    Beginning before the Class Period, knowing that the Company's revenue growth was declining and under pressure from investors, Defendants resorted to deceptive sales tactics to conceal their failures from investors and artificially prop up bookings and revenue.  As alleged in detail herein, these tactics included (i) sneaking additional charges onto customer invoices; (ii) "re-interpreting" customer contracts to forbid them taking previously-promised seat reductions; and (iii) instructing salespeople to secure clients by promising capabilities that Five9 does not have.  Defendants' deliberate and deceptive tactics with the express goal of artificially propping up revenue in order to meet the Company's stated targets, further supports a strong inference of scienter that Defendants knew their statements and omissions were false and misleading at the time they were made.

**D.    The Burklands' Motivation to Protect Nepotistic Hiring and Promotions Further Supports a Strong Inference of Scienter**

232.    Leading up to, and during the Class Period, Defendant Mike Burkland hired and promoted his family to high-paying senior positions at the Company, particularly in sales.  These family members were unqualified.  Defendant Mike Burkland had stacked the sales department with his own family, including his son Tyler Burkland, Godson Matt Tuckness, and Godson's brother Kevin Tuckness.  Defendant Mike Burkland was motivated to brush aside the significantly weaker sales numbers and tell investors that Five9 was on track for meeting its revenue guidance to protect his family.  He kept up the façade as long as he could, but sales performance kept getting worse, and by August 2024 that was no longer possible.

**E.    Defendants' Motivation to Artificially Inflate the Value of Defendants' Holdings For a Potential Acquisition Further Supports a Strong Inference of Scienter**

233.    From its 2014 IPO through 2021, Five9 had been a fast-growing enterprise, and regularly posted revenue growth above 30%.  In 2020-2021, the Company posted record growth due in large part to the COVID-fueled demand for software supporting remote and work-from-

home operations. But after the COVID boom cooled, Five9's revenue growth slowed considerably, with year-over-year revenue growth shrinking every quarter from Q3 2021 through Q3 2022. This was well-known to Board Chair Mike Burkland and other top executives who, in 2021, voted to sell the Company to Zoom. This would have been a massive payday for Defendants, with Mike Burkland alone walking away with approximately $100 million. But Five9 shareholders rejected the Zoom acquisition because they would be paid in rapidly depreciating Zoom shares.

234. At that time, in November 2022, knowing their ability to cash out was dwindling, Defendant Mike Burkland returned to Five9 as CEO. At the same time, the Burklands used Mike Burkland's return as CEO to position themselves and their family to profit even more significantly from a sale of the Company. Indeed, when Mike Burkland returned as CEO at the end of 2022, he received a compensation package valued at more than $38.2 million in cash and stock units as at grant date for his one month of service that year. Critically, this compensation package was mostly stock units pursuant to which Mike Burkland would profit in the event of an acquisition.

235. By December 2023, coinciding with Defendants' scheme to manipulate the share price, Five9 was working with advisers to help the Company pursue another acquisition, as reported by Bloomberg. Zoom again offered to buy the Company, which analysts reported "suggests that the discussions are likely to attract other strategic suitors as well." It was also reported that Microsoft, Google, Oracle, SAP, and others may be looking to acquire Five9.

236. By early 2024, Mike Burkland, his family trust, and Dan Burkland—Mike's brother and Five9's President and CRO—had amassed 676,065 shares of Company stock. This does not include the additional shares owned by Tyler Burkland, Matt Tuckness, Kevin Tuckness, and the other family connections installed throughout the Company. For years, the Burklands had been attempting to offload their stake in the Company.

237. Further, in the midst of the scheme to inflate the stock in order to increase their personal gain in the event of an acquisition, Mike Burkland and Barry Zwarenstein voted to increase the amount they would receive in compensation if a buyout were to occur. Indeed, in March 2024, the Compensation Committee of Five9's Board approved an extension of the

executive severance plan for an additional one-year period (*i.e.*, through April 4, 2025). In the event of an acquisition, Mike Burkland would receive $17 million and Zwarenstein would receive $4.3 million ***in addition to*** the proceeds of their stock sales.

238.    Major Five9 shareholders were pushing for a Five9 acquisition as well. For example, during the Class Period, on July 11, 2024, it was reported that investment firm Anson Funds Management, which had amassed a stake in Five9, "is urging" Five9 the "to consider a sale."

239.    Defendants were motivated to conceal the 2024 revenue shortfall after installing Burkland family in top positions. If Five9 were acquired before the truth came out, they could have profited considerably, and avoided ever reporting the disappointing revenue figures at all, because Five9 would be repurposed to suit the business of its acquirer and folded into that much larger company's financials.

**F.    Emergency Retroactive Budget Cuts, Stealth Layoffs, a Hiring Freeze, and Aggressive Cost Cutting Further Supports a Strong Inference of Scienter**

240.    In January 2024, before the Class Period, Defendants Burkland and Zwarenstein personally imposed extreme retroactive budget cuts, stealth layoffs, a hiring freeze, and aggressive cost cutting that further support an inference that they knew that the Company was significantly underperforming and sought to make cuts to address it without detection.

241.    Specifically, despite approving Five9's 2024 Budget in December 2023, in January 2024 Defendant Burkland reopened the budget to make unusual and retroactive additional cuts. (FE-6.) Specifically, there were new "miscellaneous negative amounts" added for the different departments' budgets. (FE-6.) Moreover, contrary to the established practice, the heads of each department (budget owners) were informed that they did not have discretion as to how to implement the new retroactive cuts. (FE-6.) Instead, as Lee informed FE-6, "Mike [Burkland] has a very particular way he wants to meet this cut." (FE-6.) FE-6 understood from Lee, as well as Manager, Financial Planning and Analysis Mike Mullins, and Director of FP&A Sarah Fong, that these miscellaneous retroactive budget cuts reserved for CEO Mike Burkland were for stealth layoffs designed to avoid public detection, which was ultimately confirmed by layoffs beginning

Q1 2024, which included FE-6.  (FE-6.)  Additionally, Zwarenstein or Mike Burkland had to approve any new expenditure requests, and departments heads were instructed to avoid any expense not strictly necessary; they were not permitted to have "nice-to-haves" and were told that most departments would be lucky to get approval even for spending that was "needed urgently" for the business.  (FE-6.)

**G.     Officer Terminations and Sales Restructuring Further Supports a Strong Inference of Scienter**

242.    On November 7, 2024, approximately six months after Five9 reported its poor Q2 2024 results, the Company retroactively announced that it had decided to remove Dan Burkland as President and CRO, and would instead make him "Executive Vice President, Go-to-Market Strategy."  Then, just a few months later, on February 7, 2025, the Company announced that Dan Burkland was fired from this position too, and made a "consultant."

243.    On February 20, 2025, Five9 announced the sudden "retirement" of Defendant Barry Zwarenstein, after more than 13 years as the Company, effective March 31, 2025.  The announcement was so sudden that the Company had not had time to undertake a search process or locate a replacement.  As a result, EVP Bryan Lee was appointed as "interim Chief Financial Officer," effective April 1, 2025, while "the Company conducts a formal search process for the CFO position."

**H.     The Individual Defendants Repeatedly Spoke about Revenue, Bookings, and AI Capabilities, Which Wall Street Analysts Continuously Scrutinized, Further Supporting a Strong Inference of Scienter**

244.    Defendants spoke repeatedly throughout the Class Period about the details of Five9's revenue, bookings, and AI capabilities in analyst and industry conferences, media appearances, Company publications, and SEC filings, including in the Management Discussion and Analysis sections of its SEC filings.  For example, in addition to the allegations herein:

   a)    Five9 specifically lists "Revenue" as the first "Key Components of Our Results of Operations" in the Management Discussion and Analysis sections of its SEC

filings. In that section, Five9 went on to speak at length about the components and sources of revenue and revenue recognition.

b) In its February 21, 2024 10-K filed at the start of the Class Period, Five9 specifically identified "advancements in artificial intelligence, or AI" as one of "three key industry trends driving growth in the cloud contact center market." Five9 goes on to describe its purported use of "Generative AI," "native AI and automation capabilities" in Five9's products, including in its "Interactive Virtual Agent, or IVA."

c) Five9 specifically spoke about the impact of "Macroeconomic" factors on its business, including "adverse economic conditions," "the global economic slowdown," "inflation," and "increased interest rates" in the Management Discussion and Analysis sections of its SEC filings. In that section, Five9 also stated that "[w]e continuously monitor the direct and indirect impacts of these circumstances on our business and financial results."

d) Five9 specifically listed "Annual Dollar-Based Retention Rate" as a "Key Operating and Non-GAAP Financial Performance Metrics" in the Management Discussion and Analysis sections of its SEC filings. In that section, Five9 goes on to state that "we monitor … to help us evaluate growth trends, establish budgets, measure the effectiveness of our sales and marketing efforts and assess operational efficiencies," and that "[w]e believe that our Annual Dollar-Based Retention Rate provides insight into our ability to retain and grow revenue from our clients, and is a measure of the long-term value of our client relationships."

I. **The Cloud Software Was the Company's Core Operation and Only Product, Further Supporting a Strong Inference of Scienter**

245. Five9's cloud software constituted core operations of the Company. As Defendants expressly stated in Five9's SEC filings, "[s]ince founding our business in 2001, we have focused exclusively on delivering cloud contact center software." Given the admitted importance of cloud

software to Five9's business, it constitutes core operations and further supports a strong inference of scienter.

**J.     Corporate Scienter**

246.    Five9 possessed scienter for two independent reasons.  First, the Individual Defendants were senior executives and/or directors of Five9 with binding authority over the Company and acted within the scope of their apparent authority.  The scienter of the Individual Defendants is imputed to the Company.

247.    Second, and independently, certain allegations herein establish Five9's corporate scienter based on (i) the state of mind of senior executives (other than the Individual Defendants) whose intent can be imputed to the Company, and/or on (ii) the knowledge of senior executives who approved the statements alleged herein despite knowing the statements' false and misleading nature.  Given the significance of Five9's revenue, bookings, AI products and capabilities, customer retention, sales practices and implementation to Five9's business, and the necessary involvement of numerous Five9 departments and personnel—including sales, operations, finance, accounting, legal, and engineering personnel—additional executives, some of whom are unknown at this time, sufficiently senior to impute their scienter to Five9 also knew of the fraudulent scheme alleged herein.  Accordingly, it can be strongly inferred that senior executives at Five9 possessed scienter such that their intent can be imputed to the Company.

248.    Such executives include direct reports to CEO Burkland and CFO Zwarenstein, as well as C-Suite executives and senior officers directly involved in the regular reports and regular internal meetings regarding Five9's revenue, bookings, AI products and capabilities, customer retention, sales practices and implementation, including, but not limited to, the following individuals:

        a)   Dan Burkland is the brother of CEO Mike Burkland and served as President from December 2017 to June 2022 and President and Chief Revenue Officer from June 2022 to November 2024.  Prior to that, Dan Burkland was the Senior Vice President of Enterprise Sales and Business Development from December 2009 to February 2014, Executive Vice President of Global Sales and Business

Development from March 2014 to October 2016, and Executive Vice President of Global Sales and Services from October 2016 to December 2017. Dan Burkland attended E-Staff Meetings and Revenue Breakout Sessions addressing the Company's revenue shortfall, attended Weekly All Hands Meetings where the Clari updates and "Dan's Dashboard" were presented to him, and attended Tuesday account management calls and BiWeekly Sales Meetings and otherwise led the Company's desperate and deceptive sales tactics designed to conceal Defendants' failures and the Company's revenue shortfall, among other things. Dan Burkland also attended and participated in the February 21, 2024 earnings call and June 4, 2024 Robert W. Baird & Co. Global Consumer, Technology & Services Conference.

b) Andy Dignan is the current President of Five9. From November 2023 through March 2025, Dignan was Chief Operating Officer (COO) where he reported directly to CEO Mike Burkland, attended E-Staff Meetings and Revenue Breakout Sessions addressing the Company's revenue shortfall, and attended Tuesday account management calls concerning Five9's deceptive sales practice of secretly adding improper line charges to customer invoices.

c) Bryan Lee has worked at Five9 for over a decade and is currently the Interim CFO. During the Class Period, Bryan Lee was Executive Vice President, Finance; attended E-Staff Meetings where he led presentations relating to revenue and financial performance; led Revenue Breakout Sessions and kept and circulated a spreadsheet tracking possible ways that the Company could immediately generate additional revenue; maintained the "Bookings File" stored under "Barry's [Zwarenstein's] folder" on the share drive that showed sales, contained Five9's quarterly and yearly forecast, and the "actual" revenue, broken down in detail; and had a lead role in Five9 budgeting; among other things.

d) Ari Klionsky worked at Five9 for more than thirteen years, including as Senior Vice President, Sales and Business Operations from November 2016 through January 2025. Klionsky attended E-Staff Meetings with Defendants Burkland and Zwarenstein, led presentations of Five9 sales data to C-Suite executives on his Zoom screen for review and discussion, led presentations to C-Suite executives on Five9's net new business customers, led deceptive sales practices falsely representing to customers that a seat "minimum" forbid requested reductions, led Weekly All Hands Meetings in which he presented the latest revenue and financial metrics (including Clari updates) and how they compared with Five9's forecast, and attended Revenue Breakout Sessions, among other things.

e) Matt Tuckness is (on information and belief) Mike Burkland's previously unemployed godson who Mike Burkland hired and empowered to restructure and run Five9's sales organization as to existing customers and make decisions as he saw fit. (FE-5.) Tuckness had significant authority of Five9 and its sales practices both formally and informally, furthered by his nepotistic relationship with Defendant Burkland. Among other things, Matt Tuckness led Five9's Tuesday account management calls and was personally involved in the dishonest sales practices designed to artificially prop of Five9's deteriorating revenue growth.

f) Blake Nelson was Senior Vice President, Services Operations & Strategy from February 2024 through February 2025. Nelson attended E-Staff Meetings with Defendants Burkland and Zwarenstein and led presentations to C-Suite executives on "projected seat turn-ups" for Five9 customers, among other things.

g) Doug Dopita worked for Five9 for more than thirteen years, including as Senior Vice President, Enterprise Sales from January 2022 through October 2024. Dopita worked directly for President and CRO Dan Burkland during the Class

Period, attended E-Staff Meetings with Defendants Burkland and Zwarenstein, and led presentations to C-Suite executives on Five9's net new business customers, among other things.

h) Nick Delis worked at Five9 for over a decade and, from July 2022 to April 2025, was Senior Vice President, International and Strategic Sales. Delis worked directly for President and CRO Dan Burkland during the Class Period, attended E-Staff Meetings with Defendants Burkland and Zwarenstein, and led presentations to C-Suite executives on Five9's net new business customers as well as LATAM and EMEA sales, among other things.

249. As alleged in detail above, the foregoing executives had regular contact, or indirect contact, with Defendants Burkland and Zwarenstein through regular reports and meetings where they worked very closely with Five9's management to keep them informed of Five9's revenue, bookings, AI products and capabilities, customer retention, sales practices and implementation deficiencies later publicly revealed on August 8, 2024.

## VIII.   LOSS CAUSATION

250. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions. This artificially inflated the price of Five9 securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on August 8, 2024, as alleged herein, the price of Five9 securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Five9 securities, including call options, during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

251. As detailed above, Defendants' false and misleading statements and omissions misrepresented Five9's business and revenue growth, including with respect to both existing customers and new customers, the success of Five9's AI offerings in generating revenue growth, and the hypothetical nature of the risks facing Five9's business.

AMENDED CLASS ACTION COMPLAINT

CASE NO. 5:24-cv-08725-PCP

252. Defendants began to reveal the falsity of these statements on August 8, 2024. In announcing the Company's second quarter 2024 financial results, the Company reduced its annual revenue guidance of 16% year-over-year growth by 25% to 12.2%, admitting that Five9 suffered unfavorable "recent bookings trends and the uncertain economic conditions." During the earnings call held the same day, President Dan Burkland further admitted that the Company "had a challenging bookings quarter" due to "constrained and scrutinized" customer budgets and sales execution issues, stating that "sales execution, in my mind, wasn't up to snuff." President Dan Burkland further announced changes to Five9's sales organization designed to remedy the undisclosed failures of Five9's inexperienced sales staff. Defendant Zwarenstein further revealed that "Q2 new logo bookings came in softer than expected" and that the Company was "no longer assuming" a dollar-based retention rate inflection in the second half of the year because of a "more muted seasonality in our service bookings[.]"

253. On this news, the price of Five9's common stock dropped over 26%, from $42.47 per share on August 8, 2024 to $31.22 per share on August 9, 2024. This steep drop was precipitated by unusually high trading volume of 13,572,500 shares on August 9, 2024 (as compared to 2,348,600 on August 8, 2024, 1,061,200 on August 7, 2024, and 923,100 on August 6, 2024). Five9's call options experienced corresponding declines in value.

254. Investment analysts reacted negatively to the news and expressed surprise based on what the Company had been saying during the Class Period. For instance, Canaccord Genuity remarked that "the Q2 bookings miss [] surprised us based on how management had previously discussed guidance." Similarly, Roth Capital Partners noted that "FIVN abruptly reversed from an expected sharp 2H24 growth acceleration (prior expected to reach 25%) to a flattish 2H24 growth rate in the 10% level." RBC Capital Markets likewise commented "Stepping back, the quarter was broadly disappointing," and "*resetting the growth trajectory is a tough pill to swallow*." D.A. Davidson Institutional Equity Research emphasized the "materially lower [] revenue guidance for 2024." Morgan Stanley remarked on the previously undisclosed impact of macro factors, stating "we were surprised by the macro impacting FIVN as much as it did on new deals," and that it "seems as if even AI projects are seeing challenges in getting approvals in this

budget environment (particularly those that may take 12-15 months to show a benefit)." A *Seeking Alpha* commentator downgraded Five9 stock observing that "***[t]here is little justification for staying bullish on FIVN***, considering the company's disappointing near-term growth outlook."

## IX.   CLASS ACTION ALLEGATIONS

255.   Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Five9 securities, including common stock and call options, during the Class Period from February 21, 2024 through August 8, 2024 (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Five9 and their families and affiliates.

256.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of August 2, 2024, there were 74,736,098 shares of Five9 common stock outstanding, owned by at least thousands of investors.

257.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a)   Whether Defendants violated the Exchange Act;

b)   Whether Defendants omitted and/or misrepresented material facts;

c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d)   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e)   Whether the price of Five9 securities was artificially inflated;

f)   Whether Defendants' conduct caused the members of the Class to sustain damages; and

g)   The extent of damage sustained by Class members and the appropriate measure of damages.

258.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

259.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

260.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR OR SPEAKS CAUTION DOCTRINE**

261.    Five9's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

262.    To the extent any of the false and misleading statements and omissions alleged herein can be construed as a forward-looking statement, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

263.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of Five9 who knew that the statement was false.

**XI.    PRESUMPTION OF RELIANCE**

264.    At all relevant times, the market for Five9 securities was an efficient market for the following reasons, among others:

a)  The Company's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)  As a regulated issuer, Five9 filed periodic public reports with the SEC;

    c) Five9 regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d) Five9 was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

265. As a result of the foregoing, the market for Five9 securities promptly digested current information regarding Five9 from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of Five9 securities, including call options, during the Class Period suffered similar injury through their purchase of Five9 securities at artificially inflated prices and the presumption of reliance applies.

266. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## XII.  CLAIMS FOR RELIEF

### <u>COUNT I</u>
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

267. Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation contained above as if fully set forth herein.

268. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Five9 securities at artificially inflated prices.

269. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Company securities in an effort to maintain artificially high market prices for Five9 securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

270. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Five9's business and revenue prospects, as specified herein.

271. During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

272. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business and revenue prospects, as specified herein, from the investing public and to support the artificially inflated prices of Company securities.

273. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Five9 securities. Lead Plaintiff and the Class would not have purchased Company securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

274. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Company securities during the Class Period.

275. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

276.     Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

277.     The Individual Defendants acted as controlling persons of Five9 within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Five9, the Individual Defendants had the power and ability to control the actions of Five9 and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

278.     WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief as follows:

a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b)   Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)   Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

279.     Lead Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

AMENDED CLASS ACTION COMPLAINT                                              CASE NO. 5:24-CV-08725-PCP

Dated: May 30, 2025

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

By: _____/s/ Joseph A. Fonti_____
Joseph A. Fonti (*pro hac vice*)
Benjamin F. Burry (*pro hac vice*)
George N. Bauer (*pro hac vice*)
Joseph W. Baier (*pro hac vice*)
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
bburry@bfalaw.com
gbauer@baflaw.com
jbaier@bfalaw.com

-and-

Lesley E. Weaver (Bar No. 191305)
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
lweaver@bfalaw.com

*Counsel for Lead Plaintiff*
*Lucid Alternative Fund, LP*

**THE LAW OFFICE OF JACOB SABO**
Jacob Sabo
22a Mazzeh Street
Tel-Aviv, Israel
Telephone (++972) 39070770

*Additional Counsel for Lead Plaintiff*
*Lucid Alternative Fund, LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 30, 2025.

                                                            */s/ Joseph A. Fonti*
                                                            Joseph A. Fonti

## CERTIFICATION

I, Shahar Cohen, on behalf of Lucid Alternative Fund, LP ("Lucid"), as Chief Executive Officer of Lucid, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Lucid.

2.      I have reviewed the Amended Complaint against Five9, Inc. ("Five9") and others alleging violations of the federal securities laws and have authorized its filing.

3.      Lucid did not purchase or sell securities of Five9 at the direction of counsel, or in order to participate in any private action under the federal securities laws.

4.      Lucid is willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.      Lucid's transactions in the Five9 securities that are the subject of the Amended Complaint during the class period specified therein of February 21, 2024 through August 8, 2024, inclusive, are reflected in Schedule A, attached hereto.

6.      For securities retained, Lucid owns and holds legal title to the securities that are the subject of this litigation.  For securities sold, Lucid owned and held legal title to the securities that are the subject of this litigation at all relevant times.

7.      Lucid has sought to serve as a representative party in a class action filed under the federal securities laws in the last three years in the following:

- *In re SolarEdge Technologies, Inc. Securities Litigation*, No. 1:23-cv-09748 (S.D.N.Y.)

- *Lucid Alternative Fund, LP v. Innoviz Technologies Ltd.*, No. 1:24-cv-01971 (S.D.N.Y.)

- *Lucid Alternative Fund, LP v. Aehr Test Systems, Inc.*, No. 3:24-cv-08683 (N.D. Cal.)

- *In re Elastic N.V. Securities Litigation*, No. 1:25-cv-00785 (E.D.N.Y.)

1

8.    Beyond its *pro rata* share of any recovery, Lucid will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: May 29th, 2025

_____

Shahar Cohen
Chief Executive Officer
Lucid Alternative Fund, LP

**SCHEDULE A**
TRANSACTIONS IN
FIVE9, INC.

COMMON STOCK

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/27/2024 | 2,000.00 | 41.83 | ($83,660.00) |
| Purchase | 07/02/2024 | 1,900.00 | 43.09 | ($81,871.00) |
| Purchase | 07/11/2024 | 1,500.00 | 41.40 | ($62,101.35) |
| Purchase | 07/16/2024 | 1,400.00 | 45.03 | ($63,046.06) |
| Purchase | 07/16/2024 | 100.00 | 44.97 | ($4,497.00) |
| Purchase | 07/16/2024 | 600.00 | 44.96 | ($26,976.00) |
| Purchase | 07/16/2024 | 2,301.00 | 44.95 | ($103,426.04) |
| Sale | 08/07/2024 | -1,300.00 | 41.80 | $54,340.00 |

FIVN 8/16/2024 $45.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 08/08/2024 | 50.00 | 2.15 | ($10,750.00) |
| Purchase | 08/08/2024 | 30.00 | 2.17 | ($6,512.10) |

FIVN 8/16/2024 $52.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 08/08/2024 | -100.00 | 0.54 | $5,400.00 |
| Sale | 08/08/2024 | -60.00 | 0.55 | $3,316.80 |

FIVN 8/16/2024 $55.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 08/08/2024 | -50.00 | 0.30 | $1,500.00 |

FIVN 9/20/2024 $37.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/24/2024 | 40.00 | 6.36 | ($25,424.00) |
| Purchase | 07/16/2024 | 20.00 | 9.23 | ($18,453.00) |

FIVN 9/20/2024 $50.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 06/24/2024 | -40.00 | 1.46 | $5,824.00 |
| Sale | 07/16/2024 | -20.00 | 2.93 | $5,853.00 |

FIVN 10/18/2024 $42.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 07/10/2024 | 50.00 | 3.74 | ($18,715.00) |

FIVN 10/18/2024 $45.00 PUT

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 08/06/2024 | -20.00 | 7.90 | $15,800.00 |
| Sale | 08/06/2024 | -10.00 | 7.90 | $7,900.00 |

FIVN 10/18/2024 $47.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/24/2024 | 50.00 | 2.61 | ($13,050.00) |
| Purchase | 07/08/2024 | 50.00 | 2.79 | ($13,936.00) |

FIVN 10/18/2024 $50.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Buy | 06/24/2024 | 19.00 | 1.96 | ($3,726.09) |

FIVN 10/18/2024 $55.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 07/10/2024 | -50.00 | 0.84 | $4,215.00 |

FIVN 10/18/2024 $57.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 06/24/2024 | -50.00 | 0.76 | $3,800.00 |

FIVN 10/18/2024 $62.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 06/24/2024 | -19.00 | 0.51 | $971.09 |
| Sale | 07/08/2024 | -50.00 | 0.49 | $2,436.00 |

FIVN 11/15/2024 $42.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 07/19/2024 | 20.00 | 6.84 | ($13,680.00) |

FIVN 11/15/2024 $50.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 07/19/2024 | -20.00 | 3.79 | $7,580.00 |

FIVN 12/20/2024 $37.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 07/15/2024 | 58.00 | 11.37 | ($65,946.00) |

FIVN 12/20/2024 $42.50 PUT

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 08/06/2024 | -15.00 | 7.60 | $11,400.00 |

FIVN 12/20/2024 $55.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 07/15/2024 | -58.00 | 3.44 | $19,952.00 |

FIVN 1/17/2025 $37.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/28/2024 | 80.00 | 10.61 | ($84,900.80) |

FIVN 1/17/2025 $45.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/24/2024 | 70.00 | 5.00 | ($35,021.70) |

FIVN 1/17/2025 $60.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 06/24/2024 | -70.00 | 1.25 | $8,771.70 |
| Sale | 06/28/2024 | -80.00 | 2.01 | $16,100.80 |

FIVN 1/17/2025 $65.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/06/2024 | 70.00 | 5.77 | ($40,399.80) |

FIVN 1/17/2025 $85.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/06/2024 | -210.00 | 1.37 | $28,709.10 |

FIVN 12/19/2025 $35.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 06/24/2024 | 20.00 | 14.03 | ($28,060.00) |

FIVN 12/19/2025 $50.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 05/15/2024 | 6.00 | 16.04 | ($9,622.98) |

FIVN 12/19/2025 $57.50 PUT

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/17/2024 | -50.00 | 11.80 | $59,000.00 |
| Purchase | 06/24/2024 | 25.00 | 18.80 | ($47,000.00) |

FIVN 12/19/2025 $60.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 04/19/2024 | 11.00 | 15.09 | ($16,596.03) |

FIVN 12/19/2025 $67.50 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 06/24/2024 | -20.00 | 2.93 | $5,860.00 |

FIVN 12/19/2025 $80.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/15/2024 | -6.00 | 5.24 | $3,142.98 |

FIVN 12/19/2025 $85.00 CALL

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 04/19/2024 | -22.00 | 6.24 | $13,735.92 |

FIVN 1/16/2026 $55.00 PUT

| Transaction Type | Trade Date | Contracts | Price Per Contract | Cost/Proceeds |
|---|---|---|---|---|
| Sale | 05/06/2024 | -50.00 | 10.10 | $50,500.00 |