**Pages 1 - 59**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

_____

Before The Honorable P. Casey Pitts, Judge

LUCID ALTERNATIVE FUND, LP,          )
Individually and on behalf of all )
others similarly situated,           )
                                     )
            Plaintiff,               )
                                     )
vs.                                  ) NO. 5:24-cv-08725-PCP
                                     )
FIVE9, INC., MICHAEL BURKLAND,       ) CLASS ACTION
and BARRY ZWARENSTEIN,               )
                                     )
            Defendants.              )
_____      )

                              San Jose, California
                              Thursday, December 18, 2025

**TRANSCRIPT OF MOTION TO DISMISS PROCEEDINGS**

**FOR THE PLAINTIFF:**

            MR. BENJAMIN F. BURRY, Attorney at Law
            MR. JOSEPH FONTI, Attorney at Law
            MR. DAVID LEOPARD, Attorney at Law
            BLEICHMAR FONTI & AULD LLP
            300 Park Avenue, Suite 1301
            New York, New York  10022

**FOR THE DEFENDANTS:**

            MR. MARK R.S. FOSTER, Attorney at Law
            MS. SUSAN L. SALTZSTEIN, Attorney at Law
            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
            525 University Avenue
            Palo Alto, California  94301

**Reported (REMOTELY) By:**  Lashawn Marshall, RPR, RMR
Official Court Reporter for the
Western District of Tennessee
167 North Main Street, Room 242
Memphis, Tennessee  38103

**Thursday - December 18, 2025**                    **2:01 p.m.**

# P R O C E E D I N G S

---o0o---

THE COURT DEPUTY:  Okay.  Calling Case Number 24-cv-8725, Lucid Alternative Fund versus Five9, Inc, et al. on today for the motion to dismiss.

Will the parties please approach the podiums, and state your appearances for the record, beginning with Plaintiff's counsel.

MR. BURRY:  Benjamin Burry of Bleichmar Fonti & Auld for the lead plaintiff.

THE COURT:  Good morning.  Afternoon.

MR. BURRY:  Good afternoon.

MR. FOSTER:  Good afternoon, Your Honor, Mark Foster from Skadden, Arps for the defendants.  With me is Susan Saltzstein.

THE COURT:  Good afternoon.

MR. FOSTER:  Good afternoon.

THE COURT:  Any other appearances for the plaintiffs today?

MR. BURRY:  Yes.  Joseph Fonti and David Leopard are my colleagues with me here today.

THE COURT:  Okay.  Good afternoon.

So we are here on the defendants' motion to dismiss the amended class action complaint, so I will hear from the defendants first, and then I'll give you an opportunity to respond.

**MR. FOSTER:**  Good afternoon, again, Your Honor.

This is a case involving barely missed annual revenue guidance.  In the midst, Five9 beat its guidance both quarters of the class period.  With that backdrop, I think that shows the challenges that Plaintiffs face here with their statements challenging the guidance and the company's prospects for the future.

The case is based on fraud by hindsight, and worse, it's based on fraud by ambiguous conclusory hyperbole, the very type that the Ninth Circuit and this court has rejected in complaints.  The type of hyperbole we're talking about is -- for some examples, Plaintiffs, in their position and opposition, talked about, quote, both negative impacts, 29 times, saying it was not possible for them to achieve their guidance 10 times, that the company was struggling 38 times.  They were underperforming 29 times.  And with these vague conclusory words, they paint a picture that cannot be reconciled with the results that we see here.

Your Honor, we've presented multiple independent grounds for dismissal for the 20 challenged statements;

for all statements, falsity; for all statements, stand a failure to plead scienter; for all 11 out of the 20 statements, they're protected by the Reform Act safe harbor.  And nine out of the 12 -- 20 statements we argue are inactionable corporate optimism.

Today, I would like to frame this argument in a way that's complementary to but not redundant of the arguments in our papers, which I think are fully briefed, just to provide the arguments in a perspective that's both chronological and in a way that goes to the heart of the case, which is their confidential witnesses.

Let me start with the framework because the bookings with the case matter.  This case started February 21, 2004 [sic], when Five9 announced its fiscal '23-year results, and they announced its guidance for fiscal year 2024.  In giving its guidance, the company said, quote, despite the ongoing macro headwinds, we are guiding to a better quarter over quarter of change.  We expect a very small sequential growth in the second quarter and larger increases in the second half of the year.

Keep in mind that this class period is all about the first half of the year.

They said that we have considerable backlog, and for that reason, that justified their guidance of giving

16 percent year-over-year revenue growth.  They reiterated that revenue growth in May.  And then the class period closes when the company announced its second quarter results.  And when it revised its fiscal year guidance, it beat its first quarter results.  It -- I mean, it beat its first quarter guidance.  And when it announced its second quarter guidance, it beat that, too.

Nevertheless, it lowered its going-forward-fiscal-year guidance, and they gave the reason.  They said, quote, in Q2, we had a challenging bookings quarter primarily due to customer budgets being more constrained and scrutinized.  They also said that our Q2 no -- Q2 new logo bookings came in softer than expected, especially in the last few weeks of June, which is when we typically close the majority of our deals, end quote.

And that's no different than most companies in the software world where sales reflect a hockey stick, where sales come up at the end of the quarter.

So that's the framework.  They beat their guidance, and then they ultimately, at the end of the story, beat their revised guidance and barely missed their original guidance at the end of the year.  They had predicted 1.055 billion in February, and at the end of the class -- at the end of the year, they were at 1.041.

They barely missed at the end of the year.

So what's in between?  What happened?  Well, Plaintiff's theory is predicated on nine confidential witnesses.  And I think it's worth going through them and showing why their allegations are both vague and not inconsistent with what was publicly reported.

I'll start with their lead confidential witness, Confidential Witness Number 1.  She left the company the day before the class period, so what she says that should not be given much credence with respect to whether the guidance would be met 11 months later.

**THE COURT:**  Well, I mean, it's actually incredibly dispositive as to what they -- depending on what it does or doesn't say, it's incredibly dispositive as to what was in the defendants' knowledge as of -- as of the date of the initial guidance, correct?

**MR. FOSTER:**  She would have information about what was happening at the company before February 21st that gave good guidance.

**THE COURT:**  The only day it wouldn't cover would be if -- something that was disclosed on February 21st itself, correct?

**MR. FOSTER:**  Well, her insights don't bear on what happened at the end of the story, which is what Plaintiffs don't reckon with, which is what happened --

**THE COURT:** Well -- but their -- I mean, their theory is about what was known on February 21st and whether that was false or misleading, right? I mean, that's the theory.

**MR. FOSTER:** That is the theory; though, their theory is actually intentioned with the truth that they allege came out on August 8th, which is that the new logo they can -- new logo bookings came in softer than expected in the last two weeks of June. So there's a disconnect right there with their theory. But --

**THE COURT:** Well, I mean, the theory, as I understand it, as to the revenue guidance, is that the -- you know, the statement was made on February 21st. I think that, you know, we started -- for the last seven out of nine years, we started with prudent revenue guidance of 16 percent year-over-year growth, and it was under -- you know, in all prior years, as I understand it, the company had substantially exceeded that 16 percent. Something like 28 percent instead.

**MR. FOSTER:** Well, that's an average that -- that Plaintiffs compute, but it's listed in Paragraph 10 of the complaint in terms of what they gave and what they actually --

**THE COURT:** So, I mean, there was a representation that the 16 percent projected growth rate

made on February 21st was a prudent number, and, in fact, the company practice and the market understood that that generally was an incredibly conservative accounting by the company. And, you know, that reportedly what -- what FE-1 is saying or perhaps purporting to provide evidence of is that under the circumstances that were known to the defendants at the time, that that was -- that wasn't a prudent estimate. It was, in fact, quite the opposite. It was our -- you know, they said that it was already an estimate that was not achievable, right? And that's their theory, so what's -- why does that not hold up?

**MR. FOSTER:** If in crediting FE-1's allegations, consider her role. Paragraph 90 says her role was to oversee their installed base. And in paragraph -- Paragraphs 103 and 104, she says that customers did not have the money, and negative macro factors and budget constraints negatively affected those customers in the installed base.

Well, on February 21st, they said -- the company said: Despite the ongoing macro headwinds, we are guiding to a better quarter over quarter, and we expect very small sequential growth in the second quarter.

And they said that the macro headwinds were in the installed base. So what the company said matched FE-1's allegations. She said there are headwinds there.

They said there were headwinds there. That's not an inconsistency, to begin with.

THE COURT: Well -- so, I mean, she also says that these factors affected the new business as much as existing customers. And I guess your position just -- she's not able to testify to that because of her circumstance and her role?

MR. FOSTER: Two things: Yes to that, because her role was -- Paragraph 90 says she was involved in the installed base, existing customers. And, two, that's the only thing she says about the net new business, which is just a statement, a conclusory statement, that it just affected the net new as much. That's all she said in Paragraph 104.

THE COURT: Why would it be that -- you know, if there's a set of customers who -- I don't know. Why would it -- is it -- I know we're -- possibilities about the standard, but why would it be that there would be a differential impact of these sort of macroeconomic factors on new businesses as opposed to existing business? I mean, you could arguably and intuitively think it would work the other way, that existing customers at least are in the door, and if you can work with them, that -- trying to get new customers into your business who haven't previously had a relationship with

you would be more difficult in an era of belt-tightening.

**MR. FOSTER:**  Sure.  And the answer is in Paragraph 195 of the complaint.  The company gave the answer.  The CEO explained why, because the CEO acknowledged it's somewhat -- unusually impacts what's in the base, which is the installed base.  And they acknowledge that's sort of counterintuitive.

And he said, quote, the net new -- these are mission-critical systems.  There's no new vendors for the on-premise solutions, and people have to get moving, for example.

Just one of many.

If you want to do AI and automation, it's much, much easier to do it in the cloud than you can on premise.

And so that's how he explained "we're seeing good business irrespective of the macro" for the new -- net new.  And that's an explanation.

It's like it's a different type of transition that's going on.  The install -- the customers that were in their installed base weren't rushing to make a transition to the cloud in the same way that the net new customers were.  So that is the answer.  It seems counterintuitive at first blush, but that is how their business ran, and that's how they explained their

business to investors.

Other than that, FE -- FE-1's allegations are full of the same type of conclusory allegations about diminished revenue growth in the face of reported numbers that showed increases. The company beat, for the first quarter and the second quarter -- you can't really reconcile a vague conclusory allegation of diminished revenue growth and underperformance with the actual performance, which was exceeding the given expectations, particularly in the face of them saying Q1 -- Q1 we expect to be flat, which compared to prior years in Q1, they said they're usually down one or four percent, just -- that's the way their business works. They actually exceeded that. So underperformance at the time FE-1 was there really just doesn't match up with the reality of --

**THE COURT:** Well, I mean, again, the theory is that there was a deceleration of the growth rate, right? I mean, that has to be the theory here and that -- you know, the question of whether there was any false or misleading statement as to -- as to that issue. But the theory has to be not that it was a misrepresentation that there was no growth but that the representation that the market understood as to that growth was that it would not decelerate at the rate that it apparently did --

**MR. FOSTER:**  True.

**THE COURT:**  -- as reflected in the ultimate financial results and as the lowering of the projected revenue growth in August.

**MR. FOSTER:**  Well, as Your Honor pointed out, from the get-go, they pointed out that their rate of growth was decelerating because it was lower than in prior years.  So they weren't hiding the deceleration, and so then it's a question of --

**THE COURT:**  Well, no, it was the same, right?  I mean, the --

**MR. FOSTER:**  Well --

**THE COURT:**  -- initial -- the initial February 21, it was the same.  They were using the same prudent 16 percent that had been used in prior years.

**MR. FOSTER:**  I'm just saying the prior year, they predicted 15, and they got 17.  And this year, they went out and started the year saying "we think it's 16."  Ultimately, they got 14.6, right?  That's -- we're talking about a -- that's -- sorry.  Excuse me -- 14.4.  So a one point -- you know, a small difference, ultimately, when you're forecasting out one year.

And the basis of their forecast was, as they disclosed on February 21st, their backlog and their visibility into net new.  So there's no -- there are no

allegations that their backlog was not what it was, that their assumptions guiding based on that backlog -- they don't have any allegations that that backlog was not real in converting into revenue, and the actual results belie that idea.

And then with respect to net new, they're obviously looking at what they expect, and those are their best judgments as of February 21st of what they think they can do 11 months later based on, you know, how companies look at the future.

And, obviously, it's a matter of prediction and judgment. You look at what you've done in the past. You look at what you have in the pipeline, and you try to make your best judgment about what there is.

And, ultimately, FE-1 says it couldn't be done, and a couple of other CWs had that perspective. But those are ultimately just disagreements. You can look at data and say this is where we are, this is where I think we can be, and this is what we should do. It's not like it's -- you know, you have to predict what is going to happen with your customers, what they're going to do. It's not a science, but it is data driven, at the end of the day, and they made a judgment. And just because some confidential witnesses had a different opinion does not make it a lie that these defendants issued guidance that

they thought they could meet and almost met.

So I don't think FE-1 really provides any allegations that are actually inconsistent with that they disclosed about their installed base, which is where she had her base of knowledge. And, otherwise, her allegations are entirely conclusory.

So literally, FE-2, business manager, talked about sufficient -- sales were sufficiently slower, sales were down. But what does that mean? Those are pretty vacuous terms when you actually look at the results. Sales for what? When? Because she wanted Q2. They beat their expectations, so how are sales down?

Again, FE-2 also says that customers were reluctant to spend due to the macro, but the company acknowledged that macro force is in play. There's no disconnect there.

FE Number 3: FE-3 says the company was losing customers because of a deficient AI offering. Which customers? To what extent? Businesses gain and lose customers every day, so saying a company lost some customers doesn't really bear on the overall health of the company or the expectations they would have.

FE-3 said they lost hundreds of seats in Paragraph 126. Well, 120 seats -- I mean, they disclosed on February 21st that they have 350,000 seats. So in the

grand scheme of things, the allegation that they lost some seats is not surprising.  Businesses gain and lose.  But relative to the hole and their business, that does not show that the defendants lacked any reasonable basis for the guidance, let alone that they were trying to deceive investors by giving it.

Similarly, FE-4 decides -- it is one of the only confidential witnesses who even purports to speak to the net new issue, said net new stalled in early 2024.  When?  What does it mean to stall?  Again, in light of the results, I don't think you can draw an inference that Defendants knew that their net new expectations were unachievable at that unspecified early point in time.

"Similarly exceptionally sluggish," what do these things mean?

"There were serious concerns."  Every business has serious concerns.  They look at underperformance, and they think about it.  You solve things, and that's why the Ninth Circuit in the *Ronconi* decision explains problems are the daily work of business people.  That doesn't make a lie out of statements.  Business people are charged with solving those problems.

If you're running a sales organization, your job is to find sales.  Go make it happen.  Call the customer.  Try harder.  That doesn't -- just because things are

underperforming at a given point in time does not mean that you're not going to achieve your results. You can't take a snapshot at the beginning of a quarter and say, well, that means things don't -- aren't going to work out at the end because the history of a company and the reality of software sales at every company is you get it at the end of the quarter. That's how business works. That's how it works here, and that's how they explained their business works here.

FE Number 6 talked about budget cuts, hiring freezes. What do those things have to do with revenue? Those are costs. Revenue is the money you bring in, not the money you spend. FE-6 doesn't say anything that bears on the issues in this case, other than FE-6 points out that they had a bookings file that was updated daily, which leads to the obvious inference: It's updated daily because things change daily. So if you take a snapshot at a given point in time, that doesn't mean that you don't have a reasonable basis for your guidance.

FE-7, like the others, says things were particularly slow. What does that mean? He said that 190 -- only a majority of the 198 sales leads of his led to sales. I don't know. Is that really so bad in the sales world? How do you know? There's no -- there are no facts or relevant sources of information to draw a

conclusion. If you've ever been in sales, it's cold calling and a lot of rejection. So a clear majority out of 198, is that so bad? And is it representative of anything? How so? Makes it so much different than the cases that Plaintiffs rely on like Fourscout, *Glazer versus Forescout*, where you have 20 corroborating witnesses who provide some level of detail about the impact on the whole company and the impact on guidance.

In that case, for instance, the plaintiffs alleged that there was a pressure campaign to make the salespeople say that their deals were committed when the customers hadn't committed them. And that was corroborated up and down the line by the confidential witnesses, and those confidential witnesses at least provided estimates of million-dollar deals, $80 million deals that slipped. And they were able to estimate that one in five of the deals companywide was impacted by this, and they brought in an expert to testify about the impact of the product.

That's not this case. We have a collection of vague conclusory allegations that just don't match up to anything, let alone show guidance wasn't reasonably given, much less that it was issued fraudulently.

Many of the allegations from FE-9 and FE-3, who spoke about the AI-product offering -- I mean, they say

that customers didn't like it.  It was failed.  It was poorly received.  Those are the very type of vague allegations that the Ninth Circuit rejected in *Vantive*, that Judge Breyer rejected in the Palo -- *Palo Alto Networks* case.  Those don't show falsity.  It shows some people didn't like the product, at best, but those don't bear on the company's performance.

There's always going to be people who complain about a product.  There's going to be some customers that like it, some that don't.  But Plaintiffs tried to artfully plead around these issues like the results -- no dispute that the company reported year-over-year increase in its sales for AI.  Just because they don't bring that to the Court's attention doesn't mean that the Court turns a blind eye to the reality of the results.

You take vague statements, attack those and say they're false, and then say, "I've got some other vague allegations from confidential witnesses," and you just juxtapose those, and that's their case.  But this is a company that gave repeated, verifiable, concrete numbers on both their guidance on their revenue, on their company retention.  Plaintiffs don't challenge that quantified, verifiable, concrete information that was out there.  Instead, they just attack vague statements with vague statements.  That's strategy.

Briefly on scienter, Your Honor?

**THE COURT:** Okay.  I mean, I -- yeah, you can offer a little bit.  I mean, it strikes -- it strikes me as the core issue on scienter is really the question of, you know, actual knowledge is sufficient for scienter, correct?

**MR. FOSTER:** Well, actual knowledge -- if you actually know that you're lying, absolutely.  That's what the --

**THE COURT:** So -- so, you know, the -- I'm not sure there's a -- that much daylight in the case, kind of, between a determination of falsity and a determination of scienter here.  So I'm not, you know, that -- I guess I'm not sure how -- you know, if, in fact, I were to conclude that they've adequately pleaded that these statements were false.  They've certainly provided a lot of allegations about why the individual defendants and the company would be aware of that falsity.

So I'm not sure this is the kind of -- I mean, you might be right that they're not actionable, but if they are actionable, is there really that much light between concluding that the statements are actual and concluding that there isn't an actual showing of scienter?

**MR. FOSTER:**  I think there's still daylight, and I direct the Court to the Ninth Circuit *Intuitive Surgical* decision.  That's a guidance case.  It's a guidance case where the court went through, and it analyzed falsity and analyzed whether the safe harbor applied and evaluated statements of corporate optimism.  And when it got to scienter, it still went through the analysis and looked at allegations of motive.  It -- even though the actual knowledge standard applied, it found that there was no motive.

Those issues still matter because just being simply aware of information -- even if you assume that Plaintiff's allegations are true, that they're particularized, and that they're contradictory, at most, those allegations show that there were different perspectives in the company.

And, yes, Defendants could have been actually aware, had actual knowledge that somebody doesn't think we're going to make it, and that data trending as of a certain point in time is on the line.  Right?  But that doesn't mean you don't believe it.

And as their own confidential witnesses allege, the CEO's theme song is "Don't stop believin'."  And that makes sense because leaders have to believe.  They have to inspire other people.  And if you have a reasonable

basis based on your track record, what you're hearing from people, and based on what you think is going to reasonably happen, then actual knowledge that there's some disagreement does not mean you're intending to deceive investors or you're consciously disregarding the truth.

THE COURT:  No.  I mean, I guess it would have to be -- it's not that there's disagreement or people have different views.  But if you had actual knowledge that -- that the growth -- that the company couldn't -- could not satisfy the 16 percent growth estimate that was going to be provided in that -- you know, we don't have to ask about your motive for saying that or anything like else like that, right?  That is --

MR. FOSTER:  You would --

THE COURT:  That's sufficient.  I mean, we don't --

MR. FOSTER:  And how do you show that they actually knew in February that they did not know that that was obtainable?  Because somebody says that the company was underperforming for the year in February?  I mean, early in the year.  Underperforming by how much?  Like, if you're off by a million dollars on a billion-dollar forecast, does that matter?  What does "significantly underperforming" mean, Your Honor?

**THE COURT:** I mean, again, we're getting -- or sort of right. We're also -- we're simultaneously talking about falsity at some level. And the question of scienter, I guess, is the point I'm getting to.

**MR. FOSTER:** Absolutely, and I think that's why it's important.

The analysis sometimes overlaps. No question. Falsify and scienter arise out of the same facts, but they're not the same inquiry, as Your Honor knows from the *Glazer* case. They're separate inquiries. And as *Intuitive Surgical* goes through, it still does the false and scienter analysis in light of the realities of what happens.

And so I think it's important to really think through: What did they actually know in February? That's contradictory. Why didn't they have a reasonable basis? No reasonable basis. Just because they had -- somebody reports, in an early meeting, saying there was underperformance; sales were sluggish? Give me numbers.

That's why the Ninth Circuit, in the logic, says you can't plead by hyperbole and learned adjectives. Facts, facts, facts. How much precision is necessary? That's always a question. And the reality is courts reckon with the level of detail needed in every case, but there is no detail here. That's the problem. There's

not detail to draw inferences about what they actually knew beyond conclusory allegations.

THE COURT: Okay. Thank you.

MR. FOSTER: Thank you, Your Honor.

THE COURT: Hear from Plaintiffs.

MR. BURRY: Good morning, again, Your Honor.

Defendants' motion should be denied for the reasons we set out in our opposition; however, I would like to respond to some of the points from the reply and some of what we just heard.

I'll start with this notion of record revenues. That's where Defendants started.

And so we're clear as to what they're saying, they're saying that on a dollar-figure level, each quarter had -- was higher than the preceding quarter. So there's -- I have three points on this and two factual and one on the law: First, they're referring to the wrong metric. The only metric at issue in this case is revenue growth for the year 2024. And as far as that metric, the company did not hit a record high. It hit a record low. We set this out in Paragraph 62 of our complaint. There's a chart.

I believe Mr. Foster misspoke earlier when he referred to the 2023 guidance because every year, the guidance was 16 percent or higher, and every year, the

company exceeded that, until 2024 when it, for the first time, sank below 16 percent revenue growth. So they're simply wrong on the facts. As far as the applicable metric, the company hit a record low.

Secondly, it's inappropriate to give Defendants credit for the revenue performance here where we have particular allegations that the class-period revenue was artificially inflated by virtue of their deceptive practices. FE-8 and FE-1 speak to that. The false line charges reneging on the customers' seat reductions.

And, thirdly, on the law, Mr. Foster doesn't cite any cases for the Court finding that record revenue immunizes securities fraud. But to be clear, nominally hitting a record for a metric that's not at issue does not immunize Defendants from liability from misrepresentations they make on other metrics as well as their underlying business.

While we're on the topic of revenue, I would like to highlight a key fact that undermines their falsity and scienter arguments, which Defendants do not address, and that is that there is a considerable lag between bookings and revenue. Defendants completely ignore this context, and they don't address the realities of the business, which is that when Five9 books a sale, it doesn't actually earn any revenue. That's because

following booking a sale, there's a lengthy implementation time where Five9 engineers get involve. They tailor the software to that particular client's needs. Only after the software is implemented and the seats have gone live or actually in use -- only then does Five9 actually earn any revenue.

We make this point on page --

**THE COURT:** So is that the backlog that's referred to in the February --

**MR. BURRY:** Exactly, Your Honor.

**THE COURT:** Okay.

**MR. BURRY:** Exactly.

**THE COURT:** And you're not alleging that the statement about the state of the backlog was false, correct?

**MR. BURRY:** No, not that February guidance. No. But it -- and, in fact, it provides the context for that revenue guidance that was relied upon by investors. They didn't just pick 16 percent out of a hat. They specifically couched it in terms of the bookings that the company had already secured.

So we point this out on Page 25 of our opposition. It comes from FE-5 at Paragraph 139; FE-1, Paragraph 106; FE-2, Paragraphs 120 through 122. And this gave Five9 a very clear picture of what their

revenue would be in advance.

As I mentioned, the -- in February 2024, when the class period began, that revenue was already baked in. It was simply a function of the 2023 bookings the company had already secured.

And it's not just the FEs who say this. It's Defendants themselves in the class-period statements. Statement 3, for example, Mike Burkland: Our confidence in the rest of the year -- i.e., in 2024 -- is really driven by what's in the backlog. We had a record Q4 -- he's referring to Q4 2023 -- bookings for enterprise, and we've had very good quarters from a booking standpoint the last several quarters -- i.e., Q2, Q3, Q4 2023 -- and it's that which gives us a lot of confidence in the back half of the year.

In other words, what he's saying is it's the last several quarters: Q2, Q3, Q4 2023. They're the basis for the company's revenue guidance for 2024, even as he specifically says the back half of 2024. So it's the bookings the prior year that make the 2024 revenue.

THE COURT: "Back half," is that a reference to Q3-Q4 of the fiscal, or is it a reference to the back half of the -- of the calendar year?

MR. BURRY: It is the calendar year. So when he says that's what gives us confidence in the back half of

the year, he's saying that's what gives us confidence the back half of 2024 because they're saying that these bookings will result in an acceleration of revenue coming in the back half of 2024.

And I would like to touch briefly --

**THE COURT:**  And just -- but I understand. You're not -- you're not saying that the representation as to that backlog was incorrect, correct?

**MR. BURRY:**  At that stage, no.  It's --

**THE COURT:**  Okay.

**MR. BURRY:**  It's the revenue guidance.  And the backlog is important because --

**THE COURT:**  But I guess you're -- so where is it that -- what did they know about that backlog or otherwise that was inconsistent with what they said in February or in May?

**MR. BURRY:**  Yeah.  So, you know, I -- let me go through that for a little bit.

Defendants Burkland and Zwarenstein, in 2023, recognized that there was a serious revenue shortfall, and for that reason, they convened a special revenue breakout session that occurred every Friday.  FE-1 attests to this.  FE-1 attended with all the senior revenue executives.  President Dan Burkland, SVP Ari Klionsky, EVP Lee attended these revenue breakout

sessions, and they reported back to Burkland and Zwarenstein the following Monday. The e-staff meetings occurred every Monday. And what they reported was it was -- we can't -- we can't fill that shortfall. We can't get there. FE-1 reported that.

And it's not as Defendant say a mere disagreement or a personal opinion. It's an informed opinion as a result of considered study about ways the company could fill this shortfall. And they concluded it wasn't possible, nor was it only FE-1 who said this. In Paragraph 104, which we referred to earlier, FE-1 recounts that President Dan Burkland, the CEO's brother, confirmed that meeting the revenue guidance was not possible. Senior Vice President Ari Klionsky confirmed meeting it wasn't possible. Doug Dopita, Nick Delis, all of them confirmed that meeting this revenue guidance was not possible.

**THE COURT:** Well -- so -- and this revenue guidance hadn't been made yet, right?

**MR. BURRY:** So it's the -- the company has had a perpetual 16 percent revenue growth as we spoke --

**THE COURT:** Right. But I guess it's -- are they talking -- in these meetings, are they talking about the mark -- the guidance they've already provided the market that's out there, or is there evidence that they're

talking about the guidance that they plan to make at some point in the future as to the -- as to that?  I mean, that's -- there's an ambiguity there.  It's one of the things they're pointing out, is that -- I mean, it could be that they were saying we can't meet the guidance and -- but actually, they put all these things in place at this time, and they -- they, at least -- I mean, is there an allegation they didn't make their guidance for fiscal year '23?

**MR. BURRY:**  No.  2023, they exceeded their guidance.

**THE COURT:**  Right.  And so how do we know that what -- that they're talking here about what they -- you know --

**MR. BURRY:**  Yeah, the --

**THE COURT:**  -- about what they're -- you know, if they're talking about we've -- I mean, it's even we told "The Street" we were going to make this much at the end of 2023, early 2024, I think is the allegation from Paragraph 104.  They haven't told "The Street" what they expect to make in Q -- in fiscal year '24 at that point, right?

**MR. BURRY:**  Well, they -- it was understood that they were going to have to continue the 16 percent, and they understood that shareholders would react very

negatively, as they did when they downgraded that in August, the 26 percent stock drop.

THE COURT:  Where is that?  Where's the allegation as to that?  Is that particular -- there may have been an expectation, but, again, it's only actionable if there was an affirmative misrepresentation or omission or fraudulent omission here.  So where was -- or did they held the -- you know, at the time we're talking about here, where -- had they told the market, we, in all years -- or at least in the next year -- will make a 16 percent revenue projection?

MR. BURRY:  I think the e-staff allegations from FE-1 need to be considered in the context of the business that I mentioned.

2023 had already been baked in, and they were reaching this point at the tail end of 2023, where 2024 was getting baked in because, again, as Burkland says in Statement 3:  The 2024 revenue is just a function of those 2023 bookings that already happened.

And that's why Burkland and Zwarenstein are raising the alarm in '23, saying, look, the window's closing.  We're not going to get to 16 percent for 2024. What can we do?  Are there any other ideas that anyone has?  Let's have these special revenue breakout sessions.

And that's why, by the end of '23 and early '24,

FE-1, along with Dan Burkland, Ari Klionsky, Doug Dopita, and Nick Delis can all report that, look, we can't get there. It's just baked in.

Moving past the -- the e-staff meetings, there's also, at the same time, these monthly LTM reports. They're provided to Zwarenstein, and his Slack channel provided detailed information, the bookings file, which is used by Mike Burkland, Zwarenstein, Dan Burkland, tracking all the latest revenue booking from actual new customers as well as existing customers. These were further to the point that Defendants tracked these measures very, very closely, and they have great visibility into the company's bookings, which then translate to revenue.

Also, at the same time, in January, February 2024, Burkland and Zwarenstein were implementing these emergency retroactive budget cuts. The 2024 budget had already been decided, but they went back in, and Zwarenstein told FE-6 this was specifically because the company was having problems with revenue and growth that they were making these emergency changes.

Then on to April --

**THE COURT:** I mean, I'm still struggling a little bit with the fact that -- I mean, what -- that this specific allegation, as I understand it, is that

there was knowledge on February 21, 2024, that the company would be unable to make the 16 percent revenue.

**MR. BURRY:**  Uh-huh.

**THE COURT:**  I mean -- and, again, it seems like the -- like the strongest, most concrete and clear allegation you have regarding that is this statement that that there was a need to find revenue equal to the shortfall because we told "The Street" we were going to make this much.

**MR. BURRY:**  Right.

**THE COURT:**  And, again, that there's -- we don't have here, at least in that particular statement by FE-1, we -- it's we told "The Street."  It's not because we are going to tell Wall Street a few months from now that we will use the 16 percent projected growth rate, right?  I mean --

**MR. BURRY:**  Yeah.

**THE COURT:**  So there may have been an expectation, you know.  Obviously, this case seems to be about -- less about -- I mean, to some extent, about the financial performance of the company and some -- simple and expect -- and more about the fact that it -- that investors are investing on the basis of expected growth and accelerated growth, as opposed to, you know, deceleration and growth as the company grows, nonetheless

grows, I mean. So where is the specific evidence that they knew at that time that the 16 percent projection was false?

MR. BURRY: Yeah. Again, it's what FE-1 recounts from that history at the end of '23 leading up through the very date before issuing those guidance in the weekly e-staff meetings, combined --

THE COURT: I mean, we don't have -- FE-1 doesn't say, we ran -- you know, either at the end of '23 or in February '24, we -- we ran the numbers, and it generated a predicted revenue growth of 12 percent, for example, correct?

MR. BURRY: Yeah, we don't -- and, you know, at this stage of the proceedings, you know, quantification is not required. That's the kind of, you know, detail that would come in discovery, but I think FE-1 is --

THE COURT: No, but it would -- given the nature of the allegations of falsity that you're contending are at issue here, which is about the specific falsity of the revenue-prediction guidance that was given in two thousand -- in February, I think that might require -- it may not require -- entire specification. But if that -- if the theory is that that was false, you may need -- it would certainly be helpful and it may be necessary to have something stronger than "we're concerned about

making that" or at the very least someone saying very directly "we are going to tell the market that we will project 16 percent revenue growth, and we cannot make that, and -- and our efforts have failed."

**MR. BURRY:**  Yeah, I mean, that would be a smoking gun, Your Honor.  We would -- they would -- we don't have that.  At least with respect to the February statements, that's correct.  But I think from the context of the bookings being baked in advance in January and February 2024, I don't think it's a reasonable inference at this stage of the proceedings that they would be referring to the 2023 revenue that's already closed for the year.  I think it's fair to think that, in January and February of 2024, they're talking about 2024 revenue, especially, again, in the context of when Defendants speak to investors.  They say this 2024 revenue growth we're projecting is from the 2023 bookings.

**THE COURT:**  What -- to what extent does your claim here sort of depend upon their prior practices with respect to projecting revenue?  And, you know, if they had -- if their prior revenue projections had been more closely tied to the actual results of the company, would you still have the same theories here?

**MR. BURRY:**  I don't think it would -- it would change the case in that they knew they couldn't make

16 percent. But the fact that investors had understood conservatism baked in, I think that does add -- you know, the question with respect to falsity is what would a reasonable investor -- what would the investor's impression of the state of affairs be versus what was actually known inside the company?

And it's clear from analysts' opinions that they understood Defendants' comments to be prudent to have conservatism baked into the estimates. Multiple analysts say that and that they viewed the revelation in August of -- you know, Defendants' call it a minor reduction. It's a 25 percent reduction in revenue growth, going from 16 to 12.2. And, you know --

THE COURT: They ended up hitting at about 90 percent of their projection, right?

MR. BURRY: I think they ended up missing -- I think we might have the math in our -- in our complaint.

THE COURT: Or was it 14.4?

MR. BURRY: Yeah, that's about --

THE COURT: So that would be 90 percent of 16 percent.

MR. BURRY: Certainly above the materiality threshold.

THE COURT: Right. But I'm trying to -- and, again, I mean, I think it would be helpful for you to

respond in the other area that they have raised, which is what is the -- you know, given that we don't have a smoking gun, we don't have a report that -- if you looked at -- if you went to these particular sources and pulled them up at this point, they said 11 percent. They said 12.2 percent. They said 14 percent. We don't have that here.

We have, obviously, some stated concerns, and the meaning of those, you know, whether that -- they were reflecting what they intended to tell Wall Street in February or not. Let's assume that that was shown as well.

What is the evidence to conclude that there was knowledge of falsity as opposed to perhaps naive optimism on behalf of the individual defendants and anyone whose knowledge could be attributed to the company for purposes of scienter?

**MR. BURRY:** Yeah. So as far as scienter, I think we've at least shown actual access to data that contradicts the public statements -- that's the standard for *Quality Systems* -- or at least reckless disregard.

**THE COURT:** Right. But what is -- what did that data show? I don't think we have a specific allegation saying -- again, we don't have an allegation that if one pulled up the data -- and particularly, you know, that

anytime may be -- maybe late January '23 would be sufficient based on the time frame of when revenue was recognized.  But to say -- we don't have someone saying if one looked at that system at this time, it told them we're only going to make 12 percent increase in revenue, right?

**MR. BURRY:**  Well -- so I think we do have it, and I also want to make sure Your Honor understands the difference between the falsity-scienter allegations for February versus the June statements, and I would like to get to the June statements as well.

But with respect to February, I think we do have that.  And it's -- I think it's Paragraph 95 through 104.  FE-1 recounts these e-staff presentations were very detailed.  Executive Vice President Lee presented a bookings spreadsheet that tracked very closely this data.  Ari Klionsky presented data from sales force.

And I think what FE-1 is saying, certainly at this stage of the proceedings, is if you look those up, it's clear that Five9 was not going to able to hit 16 percent.  And that was certainly FE-1's conclusion, Dan Burkland's conclusion, Ari Klionsky's conclusions, Doug Delis' -- I'm sorry -- Doug Dopita and Nick Delis' conclusion.

**THE COURT:**  And what did those specifically say?

**MR. BURRY:** Yeah. I -- at this time of the proceedings, I don't think, you know, that -- FE-1 isn't able to recall specific percentages or lines -- line items, you know, years after the fact. That should not be fatal to a complaint. FE-1 is clear that those presentations -- those detailed presentations from the company's sales --

**THE COURT:** It's not actually years after the fact, right, because we're -- well, maybe around a year after the fact. I mean, the --

**MR. BURRY:** Yeah, even --

**THE COURT:** The complaint was filed in '24, and we're talking about guidance offered in '24, correct?

**MR. BURRY:** Yes. I mean, this is a, you know, complaint that, obviously, we, you know, have to take seriously and submit with the Court. And for us to expect a witness to be able to rattle off percentages with confidence -- you know, here's how it was on this Monday; the following Monday, it was here -- I think that's too high of a burden for a plaintiff on a motion to dismiss.

I would like to get to the June allegations, which I think are slightly different.

When we get past February into April, we have the all-hands meeting that FE-2 attended. This is

Paragraph 115 and 116.  I think mostly on 116.

There, Mike Burkland admitted significant underperformance against the company's projections, and he heard his brother, Dan Burkland, at the same meeting express concern about the growing gap between the company's actual sales and revenue versus what expectations the company had created outside -- you know, outside the company for investors.

We also have the May all-hands meeting attended by both FE-4 and FE-5.  That's Paragraphs 132, 133 for FE-4; Paragraph 147 for FE-5.

In that May all-hands meeting, Senior Vice President Klionsky, who -- by the way, he's the same guy who presents sales force data at the e-staff meeting. Here, he's presenting sales force data at the all-hands meeting.  And what he says is:  We, quote, are not going to hit our number, end quote, for 2024 revenue.

I mean, that is a smoking gun, Your Honor.  And with respect to the May -- also the same month in May, the quarterly town hall, Mike Burkland again surfaces, and he's asked about the company's financial performance. He admits the company is struggling.  That's FE-5, Paragraph 143.

And, again, the context of this is Burkland and Zwarenstein repeatedly telling investors that they have

great visibility into the company's bookings. Zwarenstein says that in Statement 2 specifically: We've got good visibility.

And in May, they're even more explicit. We cover this in Paragraphs 66 and 222 of our complaint.

Zwarenstein, in May, is asked specifically by investors -- I'm sorry -- by analysts about the year-over-year revenue growth, and he responds that they have great visibility. Those are his words. That's a quote.

Burkland is even more specific. He, again, talks about the great visibility into backlog and bookings. And he says, quote: We tracked them very closely, end quote.

And then he says: We just presented them at our board meeting.

I mean, the context here couldn't be more clear, especially in light of what I explained at the outset, that the nature of Defendants' business gives them great visibility into the company's revenue because it's a function of the bookings that already happened. That's what -- that's what the FE say. That's what Defendants themselves admit.

And, certainly, with respect to the June statements, I think you have a whole different set of

allegations that are extremely -- you know, certainly meet the threshold plausibility particularity standard.

THE COURT:  What happened with respect to the stock price between June and August?

MR. BURRY:  You know, I don't -- I don't recall off the top of my head, Your Honor.  I know, in August, the share price immediately dropped 26 percent. Defendants don't even contest loss causation in this case.

THE COURT:  I guess I'm -- what I'm wondering about is if, you know -- is if the theory given -- you've said they have visibility.  They're saying this in May 2024.

If they had made -- would there be any difference in sort of -- other than shortening the class period, but in terms of class members, losses -- is there evidence there would be a difference in losses if they had made the August announcement in June as opposed to in August?

I mean, again, there's -- I understand that the loss -- Defendants did not actually raise a question of loss causation as to the June statements.  If the stock was sort of fluctuating up and down around the same price throughout that period, it may be the case that the June statements can't really be attributed to any increase,

whether they were false or not.

MR. BURRY:  Defendants don't challenge loss causation either from --

THE COURT:  I mean, I guess would you -- there would be loss causation to anyone who purchased between June and August.  But for any purchase between -- before then, they -- if they -- if they knew this in May and reported in May, then, presumably, they just would have suffered their loss in May rather than August.

MR. BURRY:  It's hard to -- you know, class certification's, obviously, a complicated process.  It's hard to preview.

But, certainly, I think if I understand your hypothetical correctly, certainly, there would still be the price inflation following the June statements reiterating --

THE COURT:  If there was.  I mean, that's why I was asking the question.

What degree of price inflation did you see after the June statements?

MR. BURRY:  I just don't have the figures right now, Your Honor.

THE COURT:  Okay.

MR. BURRY:  I would like to -- I guess while we're on the topic of revenue, Defendants spent some time

on these macro headwind statements.

Macro headwinds, along with the representations about the strength of the existing business -- the strength of the new business, the implementation times, we cover these on Pages 5 to 6 of our opposition.  These are independently actionable, apart from the revenue guidance, in that they're misrepresentations about the company's business.

As to the macro headwind statements specifically, that's Statements 5 and 7 by Burkland and Zwarenstein in June.

We have six FEs who speak to the falsity -- the knowing falsity of these statements.  There's -- FE-1, at the e-staff meetings, recounts that Burkland and Zwarenstein were told that the macro headwinds are affecting new business just as much as existing business.

There's FE-5 at the May town hall I mentioned earlier.  There, Burkland admitted that macro headwinds are affecting new business.  He says customer budgets are constrained.  We have a difficult time getting new customers.

We have FE-7, FE-4, and FE-2 who are all in the sales department at Five9.  They have different levels, different perspectives there.  But some personally went out and tried to sell to new customers.  Some managed

sales teams. And they all say that macro headwinds were affecting the company's efforts to get new business. In fact, FE-1 -- FE-7 recounts that of the 200 leads that FE-7 was sent to pursue, the number one factor for why they couldn't close those deals was macro headwinds. And this was all recorded contemporaneously in the company's sales force system, which is the single source of truth relied upon by executives. It's the basis for Ari Klionsky's presentations at the all-hands meeting, at the e-staff. It's the basis for the bookings file, the LTM reports that go directly to the individual defendants. It's all memorialized there.

And, finally, FE-6 also supports our challenge to these macro headwind statements in that, in implementing the emergency retroactive budget cuts, as Zwarenstein specifically mentioned, he was -- the reason was he was -- these macro headwinds were negatively affecting the business. So this just further shows Zwarenstein's awareness of the problem and his concern about it.

THE COURT: And what was the ultimate -- with respect to the ultimate results that were for the entire fiscal year, what -- is there evidence about the growth or lack thereof in new bookings versus with existing customers?

**MR. BURRY:** Defendants admitted in August that they had trouble closing new sales, and I think Defendants just spoke to that. Of course, it's not -- the inference -- the nonfraudulent inference, they suggest that they only realized this in June, I think, is -- they haven't demonstrated that as the compelling inference.

You know, keep in mind, Burkland, as late of June 12th, was reiterating his confidence in hitting that 16 percent, saying it's based on the backlog of bookings; we're already there.

It's not plausible to think, despite all these reports, despite all these meetings, despite contemporaneous access and his admitted visibility into bookings and the 2024 revenue is based on 2023 bookings -- it's not -- they haven't shown that the most plausible inference is that he -- there's a two-week period. Suddenly he just learned for the first time they weren't going to hit 16 percent.

Defendants make a few other arguments, which, I guess, they're not particularly emphasizing here, but --

**THE COURT:** I mean, I have read the briefs carefully, so I don't need everything to be --

**MR. BURRY:** Sure.

**THE COURT:** -- to addressed today. I mean, I

think I'm most interested of hearing from the parties on the issues we've been talking about, sort of the questions of scienter and falsity as to the revenue stream and other issues. I think the questions of, you know, the risk disclosures and the AI products have been adequate -- for the most part, adequately briefed. Obviously, if there's anything you'd like to add, you're free to do so.

MR. BURRY: Sure. I think I'd like to make two just final points on scienter, if I may.

You know, I think we've covered why we meet the standard from *Snap* and *Quality Systems* as far as actual access to contrary information or at least reckless disregarded information that was materially different than the impression given to investors.

But Defendants also focused on this motive part of scienter. Of course, motive is not required. That's blackletter law since *Tellabs* at least.

But as far as -- you know, to the extent the Court considers motive, I think we've alleged probably the two most powerful human motives there are, which is money and family.

As far as compensation, Defendants have a -- what courts have found to be a very uniquely lopsided compensation package where more than -- it exceeds the

90-to-10 ratio between stock versus base salary, that *Fibrogen* and *Rivian* found to be probative of scienter.

We've provided a demonstrative to the Court that I think, you know -- that spell -- provides these percentages specifically to bear that out.

And it's particularly probative where, here, as in *Fibergen*, Defendants also have compensation tied specifically to maintaining the fraud. And, here, namely, that is the millions of dollars in additional compensation that Burkland and Zwarenstein secured for themselves, if they were able to complete a sale of the company to an acquirer.

And with respect to the nepotism-family motive, Burkland was motivated to deny or conceal the revenue shortfall as well as the AI-product shortcomings because his brother, his son, his godson, his godson's brother -- you know, seemingly everyone related to this guy works for the sales organization and would suffer from the revelation of the truth, and that's exactly what happened.

Shortly after the market learned that the company had this revenue shortfall, Dan Burkland was out as president. He no longer is employed by the company.

And Defendants, you know, sort of reported confusion about this motion or argument that it

doesn't -- isn't supported.  I think the fact that there's really not cases on this is actually helpful or supportive of our argument here because other companies have -- especially large, publicly traded companies in this day and age have stringent antinepotism policies, and the reason they have those policies is because it's understood that business executives would not make -- their judgment will be influenced if their family were held in key positions at the company.

THE COURT:  Is there anything, other than the fact that these people were employed, that, in your view, supports concluding that -- inferring that the -- that, you know, material information was misrepresented or falsely represented for the sake of protecting their positions?

MR. BURRY:  Yeah.  I mean, we do -- different allegations about how the godson was kind of given a new role in sales and took an effort towards restructuring the sales department that sort of kind of botched things even worse.  So, yeah, I think, in that context, the -- this was Matt Tuckness who's identified in the complaint. He was brought in right at the turn of the year, and I think it's sensible that Mike Burkland didn't want to disclose immediately, you know, what -- this company isn't what you thought it was.  Our revenue is way down.

I think he wanted to see if these deceptive practices could bear fruit or at least cover it up for a while or if he could secure a lucrative acquisition.  I mean, you're talking about over a hundred-million-dollar payout if they could secure this acquisition that, as late as July, one of their major investors was publicly clamoring for.

So, yeah, I do think it does goes beyond --

**THE COURT:**  And what is the evidence that the guidance being 16 percent as opposed to 12.2 percent or 14.4, whatever they actually made it, was material in whether the company would be acquired?

**MR. BURRY:**  Yeah.  I think that that fundamentally altered analyst perspective of the business.  I mean, take a look at some of the analyst commentary we cite.  Seeking Alpha, for example -- I think it's Paragraph 81 -- says, you know, this has been a 20-plus -- high 20 percent growth company.  Now that it's below 15 percent, there's little reason to remain bullish.

Those are their words.

Yahoo Finance -- I mean, I guess --

**THE COURT:**  But that's the question of the market.  Now, the question of acquisition is different. I mean, it's interesting, arguably.  On the one -- you

know, there's -- obviously, the company that might acquire Five9 wants to feel like they're acquiring a valuable business and for whatever reason, but it's also potentially more feasible to do that if the stock price drops a little bit because --

**MR. BURRY:**  Right, but then the value is not there.  Maybe the --

**THE COURT:**  I mean, it's not -- it's a little -- how it fits into a theory of acquisition is not -- it's not as crystal clear or one to one as it might be in other circumstances, if, you know, their only allegation was they were cooking the revenue books in order to make it because they knew this company wanted them to report X percent revenue --

**MR. BURRY:**  I think --

**THE COURT:**  -- as a condition of whatever.

**MR. BURRY:**  The nature of investors' interest in Five9 was because they had been led to believe that this was an incredible growth company.  I mean, take a look at what Yahoo said, Paragraph 85, in assigning Five9 number one on its list of the 10 worst-performing growth stocks in 2024.  What they said is Five9 was expected to be an outperformer in this digital revolution, in the internet of things, and that just has not happened.

And so I think what prospective acquirers would

notice is that this company -- it has outdated technology. Its revenue growth is not there. You know, the previous interest -- and I think we note this in the complaint -- had been from large companies like Google or Oracle. Those companies want to buy a small company with promising technology, and that clearly was not the case.

This was now seen as a company that kind of missed the boat on AI. Their own internal sales guidelines admit Cresta and Level AI are competitors, and they have superior products. Don't even try to pitch AI to large enterprises because we're behind.

So, yeah, I think that fundamentally changes the nature of a potential acquirer's interest.

**THE COURT:** Okay. Great.

**MR. BURRY:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

I'll give you two minutes just to respond so -- been going a while.

**MR. FOSTER:** Thank you, Your Honor. With the two minutes that I have, I just wanted to point out -- to begin with, the deceptive practice allegation is pretty vague, and you have one CW FE who says that there were line charges added to unspecified customers with unspecified impact, and FE-1 is inconsistent with that at some level at least because she testified that -- she

speaks to the idea that they just reinterpreted their contract terms. I think there's -- sometimes when they are ambiguous, *Tellabs* says ambiguities count against Plaintiffs in this regard.

We never said that the results immunize anything, but it does undercut the coherence of the theory ultimately when you are succeeding.

And what I wanted to highlight from the get-go, that I think Plaintiff's counsel underscored here, is the disconnect between their theory and the reality. Because when he read to you the statements about the assumptions, he left out the second premise. He said premise one for the guidance that was given on 16 percent was the backlog. Second premise was their visibility into net new, meaning their anticipated expectations for other sales that will come in. He left that out, and that's the disconnect I flagged from the beginning of the hearing because that's what they announced in August. It's like their expectations are net new at the end of June were different than expected.

At the end of the day, that's where the allegations come up short because they don't really show when and how the net new allegations -- net new business changed. They say that they don't need a smoking gun. True. But even their case is like Forescout. There were

numbers. There were percentages. There were at least reasonable estimates. There are none here. And cases like *Intuitive Surgical*, *J2 versus Espy*, *Vantive*, *Palo Alto Networks*, they all required some level of detail.

It's not enough to just have these conclusory adjectives. That's in the briefing, as Your Honor knows. And I think it was convinced by -- in its first ruling on the *Stitch Fix* case.

I think one thing -- we've heard about motive. I mean, the motive allegations are made up. The allegations about compensation, they're not in the complaint. The Court really shouldn't consider them. But beyond that, even if they added them on an amendment, they wouldn't show anything because the Ninth Circuit has held that compensation allegations alone are not sufficient.

What they point to are compensation awards that were made in December, after the class period. How did that incentivize fraudulent behavior before? It's not in the complaint. The Court shouldn't consider it, and it's incoherent, and it doesn't align with Ninth Circuit law in any event.

When you come to motive, it's completely undercut by the transparency here. They came out in the middle of the year, and they said we learned new

information in June, and we're telling it to you.  Okay?  We're lowering our guidance, and then they beat it.  They kept pushing, and they did it.  They didn't take advantage of this miss by selling stock.  They got no benefits from it whatsoever.

And their transparencies match by the -- what I started with at the end of the hearing, which is they disclosed macro headwinds throughout the class period.  Day one of the class period, they disclosed the macro headwinds.  When it comes to the net new, they didn't say that macro headwinds were not impacting net new at all.  They said that their confidence arose notwithstanding -- or the actual language was in spite of when the macro headwinds, meaning, yeah, there can be macro headwinds, but we're feeling pretty good because these customers still need our product, and they're doing it.

So what FE-1, FE-4, and FE-6 all say about macro headwinds matches the public disclosure where they're acknowledging the headwinds are affecting their business, but they're nevertheless confident.

Ultimately, things don't go quite as well.  But as Your Honor pointed out, 90 percent's in the A range, right?  This is guessing a year out from February.  Can we make it?  Do we have a reasonable basis?  Are there challenges along the way?  Do we get updates along the

way that may be -- may be negative?  Do we need to trend in the right direction?  What can we do to fix the problems.  That's *Ronconi*.

I think the Ninth Circuit law on this is very clear.  We -- Plaintiff's case just does not match up with the cases like *Quality Systems* that they cite where you had a director on their board of directors who said they were committing securities fraud and resigned.  They had officers do that.  They had an executive sell 80 percent of their stock.  This isn't *Quality Systems*.

So I've pointed out the distinctions in the case.  I think our briefing fully details the multiple independent reasons why I think there's an opportunity to dismiss.  And if you think they can do better, then give them a chance to do better, but I don't think this complaint cuts it.

Thank you, Your Honor.

**THE COURT:**  Thank you.

So is there something else you wanted to offer, or are you okay?

**MR. BURRY:**  I do want to make one point on this -- on the macro -- in response to the macro conditions.

We keep hearing this quantification sort of attack.  I want to point the Court to the Vazley

(phonetic) decision that was just decided in September by Judge Tigar. It's not in the briefing, but we came across it subsequently, and it involves remarkably similar facts where the CEO represented that his competitors were being affected by macro headwinds, but he was not, his company was not. And the Court heard a similar attack from Defendants citing the same *Ronconi* case saying that Plaintiff was required to show the impact on revenue.

The Court rightly held that *Ronconi* was abrogated by the Supreme Court, as noted in the *Glazer* case by the Ninth Circuit in 2023. And the Court said it is not appropriate to analyze the sufficiency of the pleadings under *Ronconi*. And the Court held, as the Court should hold here, that because the CEO made affirmative statements about macro headwinds not affecting the business and CWs and the sales organization show that wasn't true, it was actionable because it materially omitted facts that were contrary to the impression given to a reasonable investor.

And I -- and the -- so I can just read it into the record, Your Honor. The citation is 25 Westlaw 2721693, and that's September 24, 2025.

**THE COURT:** Okay.

**MR. BURRY:** Thank you, Your Honor.

THE COURT:  Thank you.

MR. FOSTER:  One sentence on that, if you may, Your Honor, just because I feel --

THE COURT:  I think -- let me say I understand that -- the degree of -- I mean, the degree of quantification generally depends upon the nature of the statement that was made and whether such quantification is necessary to render the statement false.  And, I mean, that was -- in some ways, both parties cited that to me, you know, and I also have, I think, three cases in the last week involving discussions of headwinds in the economic market.

I guess there were a lot of headwinds in 2023 and 2024 that people were spending a lot of time talking about and resulting in a lot of securities litigation.  So I've -- so I understand that.

I think I -- you know, it really comes down to what is the particular statement and that whether -- whether quantification is necessary to render that statement false or not.  You know, a statement we are not facing is that -- a statement "there is no cheating on our platform," which was in that case that I had.  Maybe different in terms of what is required to respond to it from other kinds of statements, as I understood it, so --

MR. FOSTER:  The only thing I was going to say

is that the Ninth Circuit is -- as recently as last year in the *Cloudera* case is still relying on *Ronconi*. It was only abrogated in terms of how it analyzed falsity and scienter together. It still --

THE COURT: Well, it's -- if it was suggesting that you needed -- you needed to satisfy the specificity standard as to scienter, but that's not right anymore, correct?

MR. FOSTER: To the extent courts apply the strong inference standard to be falsity, but the --

THE COURT: Okay.

MR. FOSTER: -- but the case is still good for all the propositions we cited.

Thank you, Your Honor.

THE COURT: Okay. Thank you. Have a good afternoon, and happy holidays.

(The proceedings concluded at 3:15 p.m. PST.)

# C E R T I F I C A T E

I, LASHAWN MARSHALL, RPR, RMR, do hereby certify that the foregoing 58 pages are consistent with 28 U.S.C. § 753(b), and to the best of my knowledge, skill and ability to discern testimony and comments via videoconference transmission, a true and accurate transcript from my stenotype notes of the MOTION TO DISMISS on the 18th day of December 2025, in the matter of:

LUCID ALTERNATIVE FUND, LP

vs.

FIVE9, INC., MICHAEL BURKLAND,
and BARRY ZWARENSTEIN,

Dated this 19th day of December 2025,

_S/Lashawn Marshall_
Lashawn Marshall, RPR, RMR
Official Court Reporter
United States District Court
Western District of Tennessee

UNITED STATES COURT REPORTERS