UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCID ALTERNATIVE FUND, LP,<br><br>Plaintiff,<br><br>v.<br><br>FIVE9, INC., et al.,<br><br>Defendants. | Case No.  24-cv-08725-PCP<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 42, 43, 46 |

Lead plaintiff Lucid Alternative Fund, LP brings this securities fraud class action lawsuit against defendants Five9, Inc., its CEO Michael Burkland, and its former CFO Barry Zwarenstein. Defendants move to dismiss plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court denies defendants' motion.

## BACKGROUND

Five9 sells subscription-based software that allows customers to run remote, cloud-based call centers.[1] Five9's software offerings include multiple AI products. Five9's business includes two streams: its net new sales and its existing customer base. Five9 does not bill customers or earn revenue for new sales until Five9's product is implemented and the customer's call center seats go live. Plaintiffs allege that, as a result, defendants have "a very clear picture" of future revenue months in advance.

On February 21, 2024, defendants issued Five9's revenue guidance for 2024. Defendants announced "prudent guidance" of 16% annual revenue growth, which reflected an anticipated

---

[1] The Court accepts the allegations in plaintiffs' amended complaint, Dkt. 36 (FAC), as true for the purposes of this Rule 12(b)(6) motion.

United States District Court
Northern District of California

acceleration in growth during the second half of 2024. On earnings calls and at conferences in early to mid-June 2024, defendants reaffirmed this guidance. On August 8, 2024, Five9 announced financial results for the second quarter of 2024 and reduced its annual revenue guidance from 16% to 12.2% without any anticipated acceleration in the second half of the year. On an earnings call that same day, defendants disclosed that Q2 was a challenging bookings quarter for Five9, that sales execution "wasn't up to snuff," and that customer budget constraints and macroeconomic factors contributed to slowed sales. Five9's stock price dropped after these announcements.

Plaintiffs allege that defendants made 20 false and misleading statements or material omissions about Five9's revenue guidance, AI products, sales practices, and sales trends prior to August 8, 2024. Specifically, plaintiffs allege that defendants knew that Five9 would not meet its revenue guidance before issuing and reaffirming the guidance, in part because of known macroeconomic headwinds impacting both the net new and existing businesses. To compensate for waning revenue, defendants allegedly implemented budget cuts and layoffs and adopted dishonest business practices including sneaking charges onto customer invoices, reinterpreting contracts to prevent customers from reducing call center seats, and promising new customers product capabilities that Five9 could not deliver. Plaintiffs allege that these sales practices backfired by leading to "de-bookings," or customers backing out of contracts or attempting to reduce their seats.

Plaintiffs bring claims on behalf of all persons who acquired Five9 securities between February 21, 2024, and August 8, 2024. Plaintiffs allege: (1) a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against Five9, Burkland, and Zwarenstein; and (2) a violation of Section 20(a) of the Act against Burkland and Zwarenstein. Defendants move to dismiss both claims under Rule 12(b)(6), arguing that plaintiffs have failed to plead falsity and scienter with particularity.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to state a claim, the defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6).

Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

A Section 10(b) violation requires "a material misrepresentation or omission of fact, scienter, a connection with the purchase or sale of a security, transaction and loss causation, and economic loss." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). "A securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA [Private Securities Litigation Reform Act]." *In re VeriFone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). And "[t]he PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).

For plaintiffs in private securities fraud class actions, the PSLRA creates "formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P.

*United States District Court*
*Northern District of California*

12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). A securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). To adequately plead scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 991.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), the Supreme Court held that a "strong inference" of scienter exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." In the Ninth Circuit, a court must conduct a dual inquiry in assessing whether this standard is met: "[F]irst, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). The strong inference standard applies only to the element of scienter, not to falsity. *Id.* ("Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a strong inference standard of plausibility.").

## ANALYSIS

### I.    Plaintiffs plead falsity and scienter with particularity.

#### A.    Falsity

To state a claim under Section 10(b), plaintiffs must plead the falsity of material statements or omissions. *Curry*, 875 F.3d at 1224. A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (cleaned up). The purportedly false or misleading statement must "directly contradict what the defendant knew at the time." *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 619

United States District Court
Northern District of California

(9th Cir. 2022). Even if a statement is not false, it may be misleading if it omits material information. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014). "Disclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) (cleaned up). "[E]ven general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

Whether a plaintiff alleges a false statement or an omission, they must allege materiality. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).[2]

The statements and omissions that plaintiffs allege were false or misleading fall into three categories:

### 1. Revenue Growth

#### a. February 2024

On a February 21, 2024, earnings call, Zwarenstein presented revenue guidance for fiscal

---

[2] The Court takes judicial notice of Exhibits 1–14 to plaintiffs' opposition to defendants' motion to dismiss and request for judicial notice. Dkt. 46. The exhibits include SEC filings, transcripts and recordings of earnings calls and conferences, a press release, and stock prices that are either incorporated by reference into the amended complaint or the proper subject of judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–1003 (9th Cir. 2018); Fed. R. Evid. 201. Defendants' request for judicial notice of Exhibits 3, 10, 11, and 13 to their motion are therefore denied as moot. Dkts. 42, 43; *see* Dkt. 52, at 2 ("Defendants would go so far as to accept Plaintiff's versions of these" transcripts). Defendants' request for judicial notice of Exhibits 1–2, 4–9, and 12 is granted for the same reasons. The Court takes judicial notice of the existence and content of the exhibits but not the truth of any facts therein. *See Khoja*, 899 F.3d at 999–1000, 1003.

year 2024, stating, "[F]or the last 7 out of 9 years, we've started with prudent revenue guidance of 16% year-over-year growth" and for "2024, we are doing the same by guiding to a growth of 16% year-over-year at the midpoint." Statement No. 1.[3] Zwarenstein added, "And it doesn't take a rocket scientist to figure out that there is an acceleration coming in the second half of the year that is embedded into our guidance." Statement No. 4. Zwarenstein and Burkland attributed their "confidence in the back half of the year" to a backlog of new logo and enterprise bookings in recent quarters, the revenue from which would count towards 2024. *See* Statement Nos. 2–3.[4]

Plaintiffs allege that the revenue guidance was false or misleading because defendants knew by February 2024 that Five9 would not achieve 16% annual growth or accelerated growth in the second half of the year. Plaintiffs' strongest allegations in support come from former employee FE-1, a senior vice president of customer success until February 20, 2024, who "oversaw existing customer accounts and was responsible for retaining customers and growing revenue within that base." FAC ¶ 90. FE-1 attended weekly E-Staff Meetings with Burkland and Zwarenstein that included presentations on Five9's sales data and revenue. FAC ¶¶ 96, 98–99. FE-1 alleges that, in the second half of 2023, Burkland and Zwarenstein "were concerned about the Company missing its revenue projections" and directed FE-1 and other executives to conduct separate weekly breakouts focused on ways to "immediately generate additional revenue" and to report back during the E-Staff Meetings. FAC ¶¶ 100–101. At the end of 2023 or in early 2024, Burkland and Zwarenstein told FE-1 to "'find' revenue equal to the millions in [revenue] shortfall 'because we told the Street we were going to make this much.'" FAC ¶ 104.

FE-1's allegations are insufficient to allege with particularity that defendants knew Five9 could not achieve its 2024 revenue guidance at the time the statements were made. In particular, FE-1's allegations do not establish that defendants were concerned with revenue shortfalls for *2024*, as opposed to for the then-ongoing 2023 fiscal year. FE-1 asserts, for example, that during the second half of 2023 defendants wanted to find immediate remedies to "achieve the revenue

---

[3] Statement numbers refer to appendix A of defendants' motion, Dkt. 42-1.

[4] Plaintiffs clarified at the motion hearing that they do not allege that defendants' February statements about the backlog were false.

United States District Court
Northern District of California

United States District Court
Northern District of California

guidance that the Company was reporting to investors." But in late 2023 and early 2024, when defendants allegedly expressed these concerns, Five9 had not yet issued revenue guidance for 2024. An intuitive reading of FE-1's allegations, then, suggests that defendants may have sought to prevent a revenue shortfall for 2023—a year in which Five9 ultimately beat its guidance by only 1%. *See* FAC ¶ 62. Plaintiffs argue that these allegations pertain to 2024 because the delay between sales bookings and revenue generation indicates that defendants were already focusing on the year ahead, as sales confirmed in 2023 would become revenue in 2024. While this may be true, Burkland and Zwarenstein's alleged directives to FE-1 and other executives to immediately find revenue because they "*told*" investors Five9 would make a certain amount suggests a concern about Five9's 2023 revenue guidance.

Other measures allegedly implemented by defendants in the second half of 2023 and early 2024 also fail to plead with particularity that the 2024 revenue guidance was false when issued. In addition to the weekly revenue breakouts among executives, FE-1 was allegedly directed in 2023 to "refuse customer requests to reduce the number of seats they bought below their original commitment" to "offset the Company's declining revenues." FAC ¶ 108. FE-6, a senior financial analyst until mid-February 2024, alleges that defendants directed his team in late 2023 to create a tight budget for 2024. FAC ¶ 157. In early 2024, Burkland then "ordered retroactive cuts" to further reduce the finalized 2024 budget, later implementing layoffs during the first quarter of 2024. FAC ¶ 158. In addition, January and February 2024 monthly reports that FE-6 prepared and sent to Zwarenstein "showed a year-over-year revenue stagnation below Company expectations." FAC ¶ 166. While these allegations may establish that defendants were concerned about budget and revenue in late 2023 and early 2024, they do not establish with particularity that the 2024 revenue guidance did not account for these measures.

Plaintiffs also argue that the 2024 revenue guidance was misleading because in each of the "7 out of 9 years" in which defendants had issued initial revenue guidance of 16% year-over-year growth, Five9 in fact achieved an average of 28% revenue growth. Plaintiffs contend that a reasonable investor would thus expect far more than 16% revenue growth based on defendants' statements that they were starting "with prudent guidance" and "doing the same" for the 2024.

Although compelling, plaintiffs' argument cannot stand without particularized facts as to why the guidance was misleading at the time it was made. For the same reasons discussed above, plaintiffs fail to plead with particularity that the guidance was misleading.[5]

Accordingly, plaintiffs do not allege with particularity that defendants' February 2024 statements about anticipated revenue growth were false or misleading. *See* Statements Nos. 1–4.

### b.    June 2024

### i.    Affirming Revenue Guidance

At a June 4, 2024, conference, Burkland and Zwarenstein were asked what underpinned their "confidence in getting to that 16% revenue growth for the year, given that, that requires an acceleration of growth in the back half of the year," and they reiterated their confidence in achieving the revenue guidance based on a "strong backlog of bookings" and growth on Five9's "net new logo win side." Statement No. 6; *see also* Statement No. 11 ("And that is what's in the backlog that we're so confident about our second half guide at this stage."). Zwarenstein affirmed that "we have a dollar-based retention rate that we expect to inflect upwards in the second half of the year." Statement No. 7; *see also* Statement No. 10 ("And when those tick up and you will see it, it will be both ratios from the revenue point of view …"). Plaintiffs allege that these statements affirming the 2024 revenue guidance were false or misleading because defendants knew that Five9 was not on track to meet its guidance and that revenue growth would not inflect in the second half of the year. Defendants respond that their statements about the revenue guidance were forward-looking statements protected by the PSLRA's safe harbor and that, in any event, their "confidence" in the guidance was inactionable puffery.

The PSLRA provides that a defendant "shall not be liable" for any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful

---

[5] Defendants argue that the revenue guidance could not have been false or misleading because Five9 generated record revenue during the class period. The argument is unavailing given that plaintiffs allege that Five9's guidance for the *rate* of revenue growth in 2024 was false or misleading, not that Five9's *gross* revenue growth fell short. *See Leventhal v. Chegg, Inc.*, 721 F. Supp. 3d 1003, 1014 (N.D. Cal. 2024); *In re Fastly, Inc. Sec. Litig.*, 801 F. Supp. 3d 880, 900 (N.D. Cal. 2025).

United States District Court
Northern District of California

cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)). "Guidance statements, like earnings projections, are forward-looking statements 'by definition.'" *In re Palo Alto Networks, Inc. Sec. Litig.*, No. 24-cv-01156-CRB, 2025 WL 1093247, at *8 (N.D. Cal. Apr. 11, 2025) (citing 15 U.S.C. § 78u–5(c)(1)(B)). A forward-looking guidance statement may nonetheless constitute a material misrepresentation or omission if "(1) the statement is not actually believed [by the speaker], (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (citation omitted); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (clarifying that the second basis applies only to an omission theory of liability and not a material misrepresentation theory).

Plaintiffs allege with particularity that Burkland and Zwarenstein were, by June 4, 2024, "aware of" but failed to disclose "facts tending seriously to undermine" the accuracy of the affirmed revenue guidance. *See Oracle*, 627 F.3d at 388. At a meeting attended by FE-2 in early April 2024, Burkland allegedly "admitted that there was a significant underperformance in Q1 *toward meeting the Company's projections*." FAC ¶ 116 (emphasis added). At another meeting attended by FE-5 in early May 2024, Burkland, when fielding questions about Five9's financial performance in Q1 2024, allegedly "admitted that Five9's business was struggling, and, in particular, that macroeconomic headwinds had negatively affected both new business and existing business sales." FAC ¶ 143. Even without quantifying this underperformance or Five9's "struggling" sales, the alleged admissions undercut defendants' full-throated recommitment to the revenue guidance for the second half of the year. These allegations plausibly and with particularity suggest that defendants told investors that Five9 remained on track to meet its revenue guidance

while already recognizing internally that Five9 was falling short of its projections.

Other allegations of tighten-the-belt measures directed by Burkland and Zwarenstein, company sales policies, and statements by other Five9 leaders collectively bolster the inference that Burkland and Zwarenstein knew that the revenue guidance was false or misleading when they reaffirmed it in June. FE-6 alleges that Zwarenstein and other "C-level executives" explained that the 2024 budget needed to "keep spending 'tight'" and that, after the budget was finalized, Burkland directed additional retroactive budget cuts in early January 2024. FAC ¶¶ 157–58. Five9 allegedly implemented a hiring freeze in late 2023 or early 2024, and Burkland or Zwarenstein had to approve any new hires for the sales team. FAC ¶ 159. Then, in January and February 2024, FE-6 allegedly sent Zwarenstein reports for each of the previous months that "showed a year-over-year revenue stagnation below Company expectations." FAC ¶ 166.

FE-4 alleges that during a May 2024 meeting, "at the end of month two of the second quarter," SVP of Sales and Business Operations Ari Klionsky reported that Five9 was "'only at 32 percent' of the revenue needed in Q2 to make the 2024 forecast." FAC ¶ 132. Klionsky "tracked all bookings and sales data" and "presented Five9 sales data" during the revenue portion of E-Staff Meetings with Burkland and Zwarenstein. FAC ¶¶ 97–98. Similarly, FE-6 alleges that during weekly meetings from March to May 2024, President Dan Burkland urged that "we need to anything we can" to "'pull' bookings from future quarters into the current quarters." Data presented by Klionsky during these meetings also allegedly showed that Five9's "customer retention, dollar-based retention rate, as well as sales to new customers were poor and *significantly underperforming the Company's forecasts*." FAC ¶ 141 (emphasis added). In addition, multiple FEs allege that leadership implemented new practices to drive revenue, including, in May 2024, adding "additional line fees to customer invoices" in violation of customer contracts and, in March 2024, directing sales personnel to say "yes" to any product requests from new customers, even if they might not be feasible. FAC ¶¶ 51, 57, 120, 176.

These allegations plead particularized facts indicating the false and misleading nature of defendants' statements reaffirming the revenue guidance. Even though a company need not disclose all information in its possession or underpinning its opinions, plaintiffs allege with

10

United States District Court
Northern District of California

particularity that defendants knew, and failed to disclose, that Five9 was performing below its own projections and expectations in the first half of 2024. *See Oracle*, 627 F.3d at 391 ("Companies generate numerous estimates internally, and they may reveal the projection they think best while withholding others, as long as the projection revealed had a reasonable basis."). Revenue guidance effectively conveys a company's projections and expectations to investors. Defendants' statements therefore could have given "a reasonable investor the impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *See Berson*, 527 F.3d at 985.

For the same reasons, defendants' purported confidence in the revenue guidance was not mere corporate puffery. Generally, "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are held to be inactionable "puffing" because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). But plaintiffs "have plausibly alleged that the challenged statements 'contravened the unflattering facts in [defendants'] possession" and thus "went beyond mere optimism." *See Glazer*, 63 F.4th at 770; *Quality Sys.*, 865 F.3d at 1143. Moreover, because the statements "were made in response to specific questions asked by financial analysts" about the revenue guidance, they conveyed a "concrete" impression of the state of Five9's financial performance and are actionable. *See Glazer*, 63 F.4th at 770–71, 778–79 (explaining that phrases such as "'[w]e currently expect' might render the statements *opinions* rather than assertions of concrete fact, but it does not follow that the statements do not create an affirmative impression").

The same evidence discussed above is sufficient for plaintiffs to plead that certain of defendants' statements about the strength of Five9's sales, including that "the net new side of our business is very strong" and "we are seeing very strong bookings momentum on the net new side," were false or misleading. Statement Nos. 6, 10. But other portions of these statements constituted inactionable puffery. *See* Statement Nos. 6 (stating Five9 was "knocking down some of the largest enterprise deals" and "the market's coming to us"), 7 ("[W]e've been seeing strong business, major orders, really big ones that are sitting in our backlog."), 8 (stating "we keep making records" "quarter after quarter after quarter" on net new bookings), 10 ("Our logo retention has

11

been very strong."), and 11 (stating "[w]e're closing a lot more" opportunities "in the middle of that bell curve" and "we still do very well in SMB and commercial"). Statements characterizing sales and retention as "strong" are generally the kinds of "mildly optimistic, subjective assessment[s]" that courts tend to find inactionable. *Id.*; *see, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076–77 (N.D. Cal. 2001) ("[S]tatements which use[] the words 'healthy', 'strong', … 'robust', 'well-positioned', 'solid' and 'improved'… [are] vague and nonactionable."); *In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042 (N.D. Cal. 2025) (discussing caselaw that found statements about a "strong foundation" inactionable). And while Burkland's statement that "we keep making records" may, at first glance, appear verifiable, his preceding sentence was, "We haven't quantified them exactly." Statement No. 8. Although "general statements of optimism, when taken in context, may form a basis for a securities fraud claim," *Quality Sys.*, 865 F.3d at 1143—as they do for defendants' statements about the strength of Five9's net new growth—plaintiffs do not allege particularized facts showing that, companywide, Five9 had not secured large enterprise deals, was doing poorly among commercial customers, and was losing customers or experiencing de-bookings at a rate significant enough to result in negative growth (as opposed to a mere deceleration of upward growth). *See, e.g.*, FAC ¶¶ 106 ("Many customers de-booked the sale or reduced their seats."), 126 (describing one of FE-3's enterprise customers who switched to a competitor as "not an isolated incident").

In short, plaintiffs plead with particularity that defendants' June 2024 statements reaffirming the revenue guidance and two of their statements regarding the strength of Five9's sales were false or misleading. *See* Statement Nos. 6, 7, 10, and 11.

**ii.    Macro Factors**

At a conference on June 4, 2024, Zwarenstein stated that "macro" factors "really somewhat unusually just impact[] what's in the [existing customer] base" and not the net new business, "[s]o that part of the business is strong irrespective of the macro." Statement No. 5. Burkland echoed that "in spite of that macro, the net new side of our business is very strong." Statement No. 6.

Plaintiffs allege with particularity that these statements were false or misleading because defendants knew by June 2024 that macro factors impacted the net new side of Five9's business as

United States District Court
Northern District of California

well as the existing customer business. Most notably, FE-5 alleges that they attended Five9's quarterly town hall in early May 2024 where Burkland admitted "that macroeconomic headwinds had negatively affected both new business and existing business sales." FAC ¶ 143. Burkland allegedly explained that "potential Five9 new customers were hesitant to make large purchases because of the macro environment." FAC ¶ 143.

Other allegations support the inference that defendants' statements that macro factors did not impact the net new business were false or misleading when made. For example, FE-6 alleges that in late 2023, Zwarenstein explained to FE-6's team that "the reason for budget cuts was that macroeconomic headwinds were negatively impacting Five9's revenue and growth." FAC ¶ 157. FE-4, a director of solutions consulting until August 2024 who managed a team of sales personnel focused on net new and existing accounts, alleges that "front line salespeople in early 2024" explained that "weak net new business bookings" were caused by macroeconomic concerns. FAC ¶ 129. Similarly, FE-2, a business development manager until August 2024 who managed sales personnel tasked with sourcing net new business, alleges that new customers in 2024 told FE-2 and their team that macro factors made them reluctant to spend money on Five9's products. FAC ¶¶ 112, 118.

FE-7, a director of enterprise sales until May 2024 who focused on new business, also alleges that in 2024, out of 200 leads "only two … ever resulted in any type of sale, with none of the sales closing prior to the end of Q2 2024." FAC ¶ 170. The "clear majority" of these failed leads cited macro reasons for declining the sales. FAC ¶ 171. FE-7 alleges that Five9 executives exerted "very strong pressure" on sales personnel to record all updates on sales leads and opportunities in Salesforce. FAC ¶¶ 171–72. FE-7 and their colleagues "diligently and immediately" did so, updating Salesforce with notes attributing failed new business leads in 2024 to macro factors. FAC ¶ 171. Multiple FEs further allege that Salesforce was Five9's "repository of sales data" and used to generate reports and metrics for executives. FAC ¶¶ 129, 144.

Defendants argue that these former employee allegations are vague and inadequate because plaintiffs do not provide any context to understand the prevalence of these customer anecdotes. The argument falls short. In *Leventhal v. Chegg*, this Court concluded that "detailed quantification

[wa]s unnecessary to demonstrate the existence of cheating on the platform at the pleadings stage." 721 F. Supp. 3d 1003, 1012 (N.D. Cal. 2024). Because the company there had said that cheating was minimal and "very isolated," plaintiffs only needed to "present compelling … evidence of substantial cheating during the class period." *Id.* at 1012–14. Here, defendants represented that macro factors had no impact on Five9's net new business. As in *Chegg*, then, plaintiffs only need to demonstrate with particularity that macro factors did in fact have an impact on net new business. They have done so.

Accordingly, plaintiffs allege with particularity that defendants' June 2024 statements about macro factors were false or misleading. *See* Statement Nos. 5–6.

### iii.    Omissions

Plaintiffs argue that defendants' failure to disclose Five9's "deceptive sales tactics" was materially misleading. Plaintiffs allege that the sales practices were intended to "artificially prop up" revenue and included: "(i) sneaking additional charges onto customer invoices, even though doing so was in violation of Five9's contracts with its customers; (ii) 're-interpreting' customer contracts to forbid them from taking usage reductions that had been promised to induce customers to sign up with Five9; and (iii) instructing salespeople to secure clients by promising capabilities that Five9 did not have." FAC ¶ 11; *see also* FAC ¶¶ 51, 57, 108, 120, 176, 193.

A plaintiff can plead a violation of Section 10(b) through a material omission of fact. *Curry*, 875 F.3d at 1224. But Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Siracusano*, 563 U.S. at 44–45.

Plaintiffs fail to plead with particularity that defendants had a duty to disclose the alleged sales practices to prevent investors from being misled. Although plaintiffs allege that Five9 implemented the sales practices in attempts to generate much-needed revenue, they do not allege that these practices were successful. *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, cited by plaintiffs, provides a useful counterpoint. 527 F. Supp. 3d 1151, 1181 (N.D. Cal. 2021). There, the court concluded that once the defendants "misleadingly attributed" a product's source

14

of growth, they had a duty to disclose that "allegedly coercive sales practices were '*a material driver*'" of sales. *Id.* (emphasis added). Here, plaintiffs do not allege that the sales practices constituted a material driver of revenue. Five9's Q2 revenue shortfall, in fact, suggests that they did not. Thus, plaintiffs do not plead with particularity that defendants had to disclose the sales practices to correct any investor misconceptions arising from other statements by defendants regarding the source of Five9's revenue.

### 2.      AI Products and Implementation

Plaintiffs also allege that certain statements by Burkland about Five9's AI products and implementation were false or misleading. *See* Statement Nos. 9, 12–14. Defendants argue, in part, that these statements were corporate puffery. The Court agrees as to portions of these statements. For example, Burkland said that Five9's "AI leadership is well known … Five9 is not just like a little bit ahead. We're viewed as well ahead." Statement No. 12. He characterized one of Five9's AI products as "leading" and identified Five9's "leadership in AI" as "a big differentiator." Statement Nos. 12–13. These "feel good monikers" and "mildly optimistic, subjective assessment[s]" are inactionable. *See Cutera*, 610 F.3d at 1111; *In re Pivotal Sec. Litig.*, No. 19-cv-03589-CRB, 2020 WL 4193384, at \*14 (N.D. Cal. July 21, 2020) ("Statements classifying Pivotal's products and business as 'uniquely position[ed],' 'strong across sectors,' 'best-in-class,' and 'industry-leading' are not actionable."); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016) (holding that a company's "boast[s]" that a its "metrics are superior" to its peers were puffery). Likewise, Burkland's statement that "we can go as fast as [customers] can go" to deploy and scale Five9's products for customers is the type of immaterial, boastful optimism that a reasonable investor would not rely on. Statement No. 9; *see Livid*, 416 F.3d at 946.

Other portions of these statements, however, are potentially actionable. In particular, Burkland repeatedly stated that Five9 was "winning these large enterprise deals" because of its AI products. Statement Nos. 12–14. Nonetheless, plaintiffs do not allege with particularity that these portions of Burkland's statements were false or misleading.

Multiple FEs provide only conclusory allegations that "large enterprise customers that did business with Five9 did not even utilize Five9 AI capabilities"; that "sales were especially weak in

the enterprise segment" during Q1 of 2024; and that "enterprise customers were hardly using Five9's AI, if at all." FAC ¶¶ 110, 115, 155. Although FE-1 alleges that customers did not want one of Five9's AI products even when offered it for free, it is not clear whether enterprise customers, specifically, were offered the product or whether Five9's other AI products were more popular. FE-3, who "managed enterprise-level accounts," alleges only one example of an enterprise customer that terminated its business with Five9 because Five9's AI was deficient. FAC ¶¶ 124, 126. This single example does not speak to why enterprise customers chose Five9 in the first place. FE-9 similarly points to only one enterprise customer that elected to use a Five9 competitor's AI product. FAC ¶ 189. And FE-7, who was a director of enterprise sales, alleges only that sales were slow in 2024 because of macro factors, not because of problems with Five9's AI products. FAC ¶¶ 169–172. These conclusory allegations and limited examples are insufficient to plead with particularity that Five9, on a company-wide basis, was not winning enterprise deals at least in part due to its AI offerings. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (finding confidential witness allegations from certain teams at the defendant company were insufficient to allege "a significant impact" on revenue companywide); *Palo Alto*, 2025 WL 1093247, at *5–6 (finding conclusory assertions from confidential witnesses were insufficient to allege particularized facts on companywide demand trends).

Plaintiffs also argue that Burkland's statement that product deployments take time because of customers, not because of Five9's capabilities, was false or misleading because Five9's implementation delays led to customer "de-bookings." *See* Statement No. 9. But plaintiffs again fail to plead particularized facts showing that implementation delays were widespread enough that defendants were bound to "disclos[e] adverse information that cut[] against the positive information," *Schueneman*, 840 F.3d at 706, or to address an "aspect[] of [the] company's operation that the speaker [knew] to be performing poorly," *Quality Sys.*, 865 F.3d at 1143. For example, FE-1 alleges that by early 2024, E-Staff Meetings included discussions of customers backing out of sales "because Five9 engineers and implementation personnel were unable to timely and effectively deliver what Five9 sales personnel told customers Five9 would be able to

16

deliver." FAC ¶ 105. As a result of "significant delays in implementation," FE-1 alleges that "[m]any customers de-booked." FAC ¶ 106. FE-3 and FE-9 likewise allege implementation delays and de-bookings, but without any reference to the frequency or timing of these problems within the company. *See* FAC ¶¶ 134-36, 185. FE-2 alleges that "de-bookings were eventually so frequent that Five-9 developed a policy for how the de-bookings impacted sales commissions," but does not allege at what point this policy took effect. *See City of Sunrise*, 2019 WL 6877195, at *14 ("CW accounts must be 'contemporaneous' with the alleged misstatements."). The Court cannot conclude from these generalized allegations that implementation delays materially impacted Five9's business and needed to be disclosed to investors to "cut[] against" Burkland's corporate optimism that "we can go as fast as [customers] can go." *See Schueneman*, 840 F.3d at 706; Statement No. 9.

Plaintiffs therefore fail to allege with particularity that defendants' statements about Five9's product implementation and AI offerings were false or misleading. *See* Statement Nos. 9, 12–14.

### 3.    Risk Disclosures

Lastly, Plaintiffs allege that risk disclosures in SEC statements, on earnings calls, and at conferences were false or misleading because they warned of risks that had already materialized. *See* Statement Nos. 15–20.

"Risk disclosures that 'speak entirely of as-yet-unrealized risks and contingencies' and do not 'alert the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (cleaned up). Warning of "risks that 'could' or 'may' occur" can therefore be misleading if the company "knew that those risks had materialized." *Id.* at 704.

Three of the risk disclosure statements challenged by plaintiffs were made in filings and earnings calls on February 21, 2024, and May 2, 2024. *See* Statement Nos. 15–17. Of the allegations that the Court found sufficiently particularized to plead false and misleading statements above, however, many related to conduct and admissions from May 2024. Plaintiffs therefore do not adequately allege that the risks warned of had materialized by February 21, 2024, or May 2,

United States District Court
Northern District of California

2024. *Cf. Twitter*, 29 F.4th at 622 ("[T]emporal proximity alone does not satisfy the particularity requirements of Rule 9(b).").

The remaining risk disclosure statements made in early to mid-June 2024 do not actually warn of any risks. *See* Statement Nos. 18–20. For example, Zwarenstein's June 4, 2024, statement said, "[W]e will be making forward-looking statements during today's discussions, including regarding future events, turns, expectations, projections, beliefs that may affect the industry for our products or the Company's product development, AI information and potential growth drivers. These are predictions and should not be unduly relied upon." Statement No. 18. The statement does not actually identify any risks that could have already materialized. Accordingly, defendants were not compelled to disclose unnamed risks. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (explaining that the Act does not prohibit "statements that are incomplete" or compel the disclosure of all potentially adverse information in a company's possession); *Siracusano*, 563 U.S. at 44–45.

Plaintiffs therefore fail to plead with particularity that defendants' risk disclosure statements were false or misleading. *See* Statement Nos. 15–20.

### B.    Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. "The PSLRA's 'strong inference' requirement has teeth. It is an 'exacting' pleading obligation that 'present[s] no small hurdle for the securities fraud plaintiff.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citations omitted). Thus, to establish a strong inference of deliberate recklessness, the plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991.

"Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants." *Apollo*, 774 F.3d at 607. In addition, "a complaint relying on statements from

United States District Court
Northern District of California

18

confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. … Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995.

To plead scienter here, plaintiffs must allege particularized facts establishing a strong inference that Burkland and Zwarenstein had the requisite mental states when they reaffirmed the revenue guidance and stated that Five9's sales were strong in June 2024 and when they stated that macro factors did not impact Five9's net new business.

### 1.    Actual Knowledge

The former employee allegations of direct admissions by Burkland are sufficient to plead that he had the requisite mental state when he made the false or misleading statements.

The allegations come from FE-2 and FE-5. FE-2 alleges that at a meeting in April 2024, Burkland admitted that Five9 had experienced significant underperformance in Q1 towards meeting its revenue projections. FAC ¶ 116. FE-5 alleges that at a meeting in May 2024, Burkland admitted that Five9's business was struggling and that macro factors negatively affected the net new business in addition to the existing customer base. FAC ¶ 143. Plaintiffs adequately plead a basis for the reliability and personal knowledge of these FEs by alleging the FE's job titles, responsibilities, chains of command, employment dates, and the bases for their contact with Burkland—in this case, attending weekly all hands meetings and quarterly town halls where Burkland spoke. *See Zucco*, 552 F.3d at 995; *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 882 (N.D. Cal. 2023) ("The FAC does this with respect to most of the confidential witnesses, describing their roles within DocuSign, how long they were employed there, the nature of their responsibilities, and, in some circumstances, their exact titles and who they reported to."); *see Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (finding CW allegations insufficient where none "had any direct (or indirect) contact" with individual defendants).

"The next question is whether the statements reported by the confidential witnesses are themselves indicative of scienter." *DocuSign*, 669 F. Supp. 3d at 883 (citing *Zucco*, 552 F.3d at

995). They are. The alleged admissions undermine, and sometimes directly contradict, Burkland's later statements to investors. They therefore establish a strong inference of deliberate recklessness or intent. *See Schueneman*, 840 F.3d at 705; *Glazer*, 63 F.4th at 766 (holding that "any one of the plaintiff's allegations" may be "sufficient to give rise to a strong inference of scienter").

### 2.    Access to Information

A "holistic" review of plaintiffs' remaining allegations, taken collectively, gives rise to a strong inference of scienter as to Zwarenstein. *See Glazer*, 63 F.4th at 766; *Tellabs*, 551 U.S. at 323. In particular, plaintiffs adequately plead that Zwarenstein had access to information on Five9's flagging revenue growth and the impact of macro factors on net new business based on allegations by FEs with sufficient personal knowledge. "[P]articularized allegations that defendants had 'actual access to the disputed information,' … raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145 (citation omitted).

As discussed above, plaintiffs allege that Five9's SVP of Sales and Business Operations Ari Klionsky "presented Five9 sales data" during the revenue portion of E-Staff Meetings with Burkland and Zwarenstein. FAC ¶¶ 97–98. Klionsky and the rest of the company used Salesforce to track sales data and generate reports and metrics. FAC ¶¶ 129, 144, 132, 165. Multiple FEs allege what this data showed during the class period. For example, FE-5 alleges that at weekly all hands meetings they attended, Klionsky presented data that "showed Five9's expected sales for the current period based on the extensive sales data" in Salesforce and "the latest projection of Five9 sales for the quarter." FAC ¶¶ 146–47. During April and May 2024, the data Klionsky presented showed that sales "were materially below where they were projected to be" for Five9's forecast. FAC ¶¶ 147–48. At a May 2024 meeting, two-thirds into Q2 and attended by FE-4, Klionsky allegedly reported that Five9 was "'only at 32% percent' of the revenue it needed in Q2 to make the 2024 forecast" and told President Dan Burkland that Five9 was not going to hit its 2024 projections. FAC ¶¶ 132–33. Another real-time report in Salesforce nicknamed "Dan's Dashboard" that was accessible to anyone in the sales organization also allegedly showed that Five9 was behind its sales forecast from March through May 2024. FAC ¶ 149.

FE-6 also personally prepared and sent a monthly report to Zwarenstein in January and

February 2024 "that tracked annual recurring revenue for the last twelve months for Five9 customers, the changes in customer business, and the reasons for the changes, and also broken down by customer segment. … If there was a customer loss or reduction in seats, the data were captured and tracked." FAC ¶ 164. FE-6 prepared this report by downloading data from Salesforce, "including the data entered by sales personnel specifically showing 'why is this customer down this amount.'" FAC ¶ 165. The reports for both months "showed a year-over-year revenue stagnation below Company expectations." FAC ¶ 166. Based on allegations by FE-7, the report also would have captured the sales teams' notes that macro factors were a common reason for failed new business leads.

These allegations not only plead a particularized basis for the FEs' knowledge but also "link[] specific reports and their contents" to Zwarenstein. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); *see Veal*, 423 F. Supp. 3d at 814 (considering whether the complaint "identif[ied] any specific information that was either received or communicated by any Individual Defendant that would contradict any public statement at the time it was made"); *DocuSign*, 669 F. Supp. 3d at 884 ("Multiple confidential witnesses … spoke to executives' ability to access Salesforce, which contained customer data."). In *Quality Systems*, for example, the Ninth Circuit found that statements from confidential witnesses with personal knowledge of declining sales during the class period and executives' receipt and review of company sales reports, "[t]aken collectively," raised a strong inference that the individual defendants knew the contents of those reports showing the decline in sales. 865 F.3d at 1145. The same is true here; the FEs have pleaded specific facts about Five9's Salesforce data that reflected flagging revenue and the impact of macro factors on new business leads, as well as Zwarenstein's receipt of presentations and emailed reports reflecting this data.

Moreover, like in *Quality Systems*, defendants allegedly admitted "they had real-time access to, and knowledge of, sales information." *Id.* Plaintiffs allege that, during the class period, Burkland and Zwarenstein touted their "great visibility" into Five9's sales data and bookings and "track[ed] them very closely." FAC ¶ 222; *see* Statement No. 2 (touting "good visibility on the new logo side"). Burkland allegedly told investors that "we manage that backlog of product, seats,

21

subscriptions and other AI products […] like a pipeline. It's -- once we book that business, our PS team, our implementation team is very, very metrics-driven, and our turn-ups, we track them very closely. In fact, we just presented at our board meeting recently. So we're very -- it has -- we have great visibility on it." FAC ¶ 222. These "specific admissions by individual defendants regarding their involvement" with Five9's sales and revenue data bolster the inference that Zwarenstein and Burkland "knew of the[] circumstances" about which they later made allegedly false and misleading statements. *See Intuitive*, 759 F.3d at 1061–62; *DocuSign*, 669 F. Supp. 3d at 884.

### 3. Core Operations

The core operations theory also supports a strong inference of scienter. "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Intuitive*, 759 F.3d at 1062. "There are three circumstances under which core operations allegations can support a strong inference of scienter: (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 790 F. Supp. 3d 763, 779 (N.D. Cal. 2025) (citations omitted).

As discussed above, "plaintiffs' particularized allegations that defendants had actual access to material information about [Five9] that they failed to disclose is sufficient to support an inference of scienter" under the second prong of the core operations theory. *See id.* at 780. In addition, defendants concede that "Five9's cloud software constitutes core operations of the Company." Dkt. 42, at 25. Plaintiffs adequately allege that "it would be absurd" for Burkland and Zwarenstein as the CEO and CFO of Five9 not to know the revenue metrics and sales trends for cloud software under the third prong of the core operations theory. *See Blake v. Canoo Inc.*, --- F. Supp. 3d ---, No. 21-cv-2873 FMO (JPRX), 2025 WL 2992263, at *16 (C.D. Cal. Oct. 22, 2025).

### 4. Motive

Defendants argue that plaintiffs do not meet the high standard of pleading scienter in the

United States District Court
Northern District of California

absence of compelling and particularized allegations of motive.

"Generally, we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021). "Only where a complaint otherwise asserts compelling and particularized facts showing fraudulent intent or deliberate recklessness will we overlook the failure to allege a plausible motive." *Id.* at 1108.

Here, plaintiffs allege that defendants acted to protect Burkland's nepotistic hires, many of whom worked in the sales department, and to inflate the company's holdings for a potential acquisition. FAC ¶¶ 232–33. These allegations are speculative and not pleaded with particularity. For example, plaintiffs only allege that "it was reported" that Five9 was pursuing acquisitions during the class period. FAC ¶¶ 235–38; *see No. 84*, 320 F.3d at 944–45 (rejecting allegations that the defendant company had been contacted about possible mergers as "too generalized to establish scienter").

Nonetheless, even in the absence of particularized motive allegations, plaintiffs allege particularized facts sufficient to plead a strong inference of scienter as to Burkland and Zwarenstein that is at least as compelling as defendants' alternate explanation that Five9 "competed aggressively" in a field that is "subject to rapid and constant change." *See* Dkt. 42, at 20; *Tellabs*, 551 U.S. at 323. Plaintiffs' failure to plead motive with particularity is thus not a basis to conclude that their pleading of scienter is insufficient.

## II.    Plaintiffs state a claim under Section 20(a).

To state a claim under Section 20(a), a plaintiff must plead: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); 15 U.S.C. § 78t(a). "Control" is "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Whether a defendant is a controlling person "'is an intensely factual question,' involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and

the defendant's power to control" the primary violator. *Kaplan v. Rose*, 49 F.3d 1363 (9th Cir. 1994) (citation omitted), *overruled in part on other grounds by City of Dearborn,* 856 F.3d 605.

Defendants argue that plaintiffs' Section 20(a) claim fails because the Section 10(b) claim fails. But Plaintiffs plead a primary violation of Section 10(b) for the reasons stated above. Accordingly, plaintiffs adequately plead a claim against Burkland and Zwarenstein under Section 20(a).

### CONCLUSION

Defendants' motion to dismiss the amended complaint is denied. Defendants are ordered to file an answer to the amended complaint by March 16, 2026.

**IT IS SO ORDERED.**

Dated: February 23, 2026

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

24